UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
                    :

FAIVELEY TRANSPORT MALMO AB,

                    :     08-CV-03330 (JSR)

      v.

                    :

WABTEC CORPORATION.

                    :

------------------------------------- X


# FAIVELEY TRANSPORT MALMO AB'S POST-HEARING MEMORANDUM IN FURTHER SUPPORT OF ITS APPLICATION FOR A PRELIMINARY INJUNCTION


MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Faiveley Transport Malmo AB*

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ........................................................................................... 1

  I.     THE BFC TBU ........................................................................................... 1

  II.    FAIVELEY'S TRADE SECRETS IN THE BFC TBU ........................... 1

  III.   THE LICENSE AGREEMENT .............................................................. 2

  IV.   WABTEC'S MISAPPROPRIATION OF THE TRADE SECRETS ........... 4

        A.    Wabtec Did Not Return the Documents ................................. 4

        B.    Wabtec Continues to Manufacture the Licensed Products.................. 5

  V.    WABTEC'S REVERSE ENGINEERING PROGRAM ....................... 6

  VI.   FAIVELEY IS BEING HARMED BY WABTEC'S BEHAVIOR ................. 9

ARGUMENT ....................................................................................................... 10

  I.     THE SUBSTANTIVE LAW OF NEW YORK GOVERNS ........................... 10

  II.    FAIVELEY IS ENTITLED TO A PRELIMINARY INJUNCTION ........... 10

        A.    Irreparable Harm to Faiveley Is Presumed.......................................... 10

        B.    There is a Substantial Likelihood of Success on the Merits............... 11

        C.    Faiveley Has Demonstrated Sufficiently Serious Questions on
             the Merits and the Balance of Hardships Tips in Its Favor ............... 11

             1.    Harm to a Third Party Should Not Be Taken Into
                   Consideration in the Balance of Hardships Analysis.................. 11

  III.   WABTEC HAS MISAPPROPRIATED FAIVELEY'S TRADE
        SECRETS ............................................................................................. 12

        A.    Faiveley Has Protectable Trade Secrets ............................................. 12

             1.    Faiveley's Trade Secrets Are Not Known Outside the
                   Business .................................................................................... 13

             2.    Access to Manufacturing Drawings by Faiveley Employees
                   is Extremely Limited................................................................. 13

             3.    Faiveley Took Extraordinary Measures to Guard the
                   Secrecy of Its Trade Material..................................................... 14

             4.    Faiveley's Trade Secrets Are Extremely Valuable to
                   Competitors................................................................................ 14

             5.    Faiveley Expended Considerable Resources Developing Its
                   Trade Secrets.............................................................................. 15

# TABLE OF CONTENTS

(continued)

**Page**

6.     It Would Take Years for Wabtec to Develop the Trade Secrets on Its Own ........................................................ 15

B.     There Is Overwhelming Evidence of Wabtec's Misappropriation .......... 15

1.     Wabtec Has Put Forth No Evidence That Employees Involved In the Reverse Engineering Process Were Untainted By Faiveley Know-How ............................................ 16

2.     Even Before Wabtec Had Completed Any Reverse Engineering, Wabtec Copied Faiveley Drawings ........................ 18

3.     The Failure of Wabtec's First Reverse Engineering Effort Supports an Inference of Misappropriation .................................. 18

4.     Wabtec Involved Individuals with Knowledge of Faiveley's Trade Secrets in the Reverse Engineering Process ...................... 19

      a.     Faiveley's Lead Engineer Was Tainted with Faiveley Know-How ...................................................... 19

      b.     The Primary Drafter of the Reverse Engineering Drawings Was Tainted with Faiveley Know-How .......... 21

5.     Wabtec Retained Documents Containing Faiveley's Trade Secrets While Reverse Engineering Was Ongoing ...................... 21

6.     Drawings Received Through Wabtec's Purported Reverse Engineering Effort Were Useless ................................................ 22

7.     The Involvement of Rail Transit Consultants in the Reverse Engineering Process Further Supports an Inference of Misappropriation ........................................................................ 23

      a.     RTC Was Not Truly Independent of Wabtec ................. 23

      b.     RTC May Have Been Tainted with Faiveley Know-How ........................................................................ 23

8.     Drawings Received From Alkab Were Ignored in Many Cases and Crucial Dimensions and Tolerances Were Altered by Wabtec ...................................................................... 24

9.     Wabtec Retained Drawings Containing Faiveley's Trade Secrets Until Reverse Engineering Was Complete ...................... 25

CONCLUSION ................................................................................................ 25

ii

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Abdul Wali v. Coughlin,*
    754 F.2d 1015 (2d Cir.1985)............................................................... 11

*Alvenus Shipping Co. v. Delta Petroleum Ltd.,*
    876 F. Supp. 482 (S.D.N.Y. 1994) ............................................... 10

*B.U.S.A. Corp. v. Ecogloves, Inc.,*
    No. 05 Civ. 9988, 2006 WL 3302841 (S.D.N.Y. Jan 31, 2006).................... 13

*Brody v. Vill. of Port Chester,*
    261 F.3d 288 (2d Cir. 2001)............................................................. 12

*Brooktree Corp. v. Advanced Micro Devices, Inc.,*
    977 F.2d 1555 (Fed. Cir. 1992)............................................... 18, 19

*Celeritas Techs. Ltd. v. Rockwell Int'l Corp.,*
    150 F.3d 1354 (Fed. Cir. 1998).......................................................... 17

*Computer Assocs. Int'l, Inc.v. Quest Software, Inc.,*
    333 F. Supp. 2d 688 (N. D. Ill 2004) ............................................... 17

*Electro-Miniatures Corp v. Wendon Co., Inc.,*
    771 F.2d 23 (2d Cir. 1985)............................................... 13, 22, 25

*Fabkom v. R.W. Smith & Assocs., Inc.,*
    No. 95 Civ. 4552, 1996 WL 531873 (S.D.N.Y. Sept. 19, 1996).................... 16

*Flexible Techs., Inc. v. World Tubing Corp.,*
    910 F. Supp. 109 (E.D.N.Y. 1996) ............................................... 11

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
    730 F.2d 61 (2d Cir. 1984)............................................................. 13

*General Elec. Co. v. Sung,*
    843 F. Supp. 776 (D. Mass. 1994) ............................................... 20

*Integrated Cash Mgmt. Servs. v. Digital Transactions, Inc.,*
    732 F. Supp. 370 (S.D.N.Y. 1989) ...................................... 14, 15, 16, 17, 20

*Interstate Circuit v. United States,*
    306 U.S. 208 (1939)...................................................................... 17

*LinkCo, Inc. v. Fujitsu Ltd.,*
    230 F. Supp. 2d 492 (S.D.N.Y 2002).................................................. 12

## TABLE OF AUTHORITIES

### (Continued)

**Cases**                                                               **Page**

*MetLife Inc. v. Metro. Nat. Bank,*
  388 F. Supp. 2d 233 (S.D.N.Y. 2005)............................................................... 11

*Monovis, Inc. v. Aquino,*
  905 F. Supp. 1205 (W.D.N.Y. 1994) ...................................................... 19, 20, 21, 24

*North Atl. Instruments, Inc. v. Haber,*
  188 F.3d 38 (2d Cir. 1999)................................................................. 11, 14

*Norbrook Labs.* v. *G. C. Hanford Mfg. Co.*
  297 F. Supp. 2d 463 (N.D.N.Y. 2003) ............................................................ 16

*Novomoskovsk Joint Stock Co. "Azot" v. Revson,*
  No. 95 Civ. 5399 (JSR), 1998 WL 651076 (S.D.N.Y. Sept. 23, 1998)............................ 17

*Park West Radiology v. Carecore Nat'l LLC,*
  240  F.R.D. 109 (S.D.N.Y. 2007) .................................................................. 12

*Payment Alliance Int'l, Inc. v. Ferreira,*
  530 F. Supp. 2d 477 (S.D.N.Y. 2007)............................................................ 10

*Shamrock Techs.. Inc. v. Med. Sterilization, Inc.,*
  808 F. Supp. 932 (E.D.N.Y. 1992) .............................................................. 14

*Telerate Sys., Inc. v. Caro,*
  689 F. Supp. 221 (S.D.N.Y. 1998) .............................................................. 14

*Valjean Mfg. Inc. v. Michael Werdiger, Inc.,*
  No. 03 Civ. 6185, 2004 WL 1948752 (S.D.N.Y. Sept. 2, 2004)................................... 10

*White Plains Coat & Apron Co. v. Cintas Corp.,*
  460 F.3d 281, 284 (2d Cir. 2006)................................................................. 10

Petitioner Faiveley Transport Malmo AB ("Faiveley") hereby submits this post-hearing memorandum in further support of its application for a preliminary injunction.

## STATEMENT OF FACTS

### I.    THE BFC TBU

A TBU (tread brake unit) is a type of brake part that uses air pressure to transfer force via a brake shoe to the tread of the wheel. 139:24-140:11.[1] A BFC actuator is a mechanical device that uses air pressure to transmit force to a wedge-shaped piston head. 140:13-21. The BFC and its use as a BFC TBU was invented by an engineer at SAB Wabco in the 1970s. 145:6-11. The BFC TBU employs novel technology, including the "wedge" principle, which involves transferring air pressure into a vertical and then a horizontal force, to push the brake shoe onto the wheel tread. 139:23-140:21; 140:23-141:5; Pet'r Ex. 8, at p. 8. The BFC TBU is superior to earlier technology because it was compact, cost-effective, had an integrated slack adjuster, and performed reliably. 146:5-12. In addition to the untold number of individual components sold, more than 135,000 complete units have been sold around the world since the 1970s. 54:1-3; 146:13-16.

In November 2004, Faiveley Transport acquired SAB Wabco, which allowed Faiveley to enter the railcar brake business. 52:10-11; 53:16-21. Since the acquisition, Faiveley has continued to manufacture BFC products. 54:4-6.

### II.    FAIVELEY'S TRADE SECRETS IN THE BFC TBU

Faiveley's trade secrets in the BFC TBU include dimensions and tolerances, surface finishes, material selection and treatments, lubrication specifications and special instructions for

---

[1] Unless otherwise specified, all citations refer to the Hearing Transcript from July 28, July 29, July 31 and August 1, 2008.

manufacturing, testing and assembly. 232:13-19. These trade secrets are disclosed in Faiveley's manufacturing drawings (Pet'r Ex. 14; 147:11-21; 234:25-235:2; 256:11-22).[2]

Faiveley takes significant measures to protect the secrecy of its manufacturing drawings of the BFC TBU. The physical drawings are kept in locked cabinets in a facility in Landskrona, Sweden, and only certain authorized employees are allowed access. 150:5-10. The electronic versions of the manufacturing drawings require a password to access, and only the user accounts of certain employees allow access to these electronic drawings. 149:19-23. Non-Faiveley employees cannot access the manufacturing drawings through lawful means. 150:11-15.

Faiveley's employees are obligated to protect the confidentiality of the manufacturing drawings. Faiveley's employment contracts have confidentiality provisions. 117:13-118:3. Moreover, it is generally understood that maintaining the secrecy of the manufacturing drawings is a Faiveley policy. 118:10-13. In addition, Faiveley employees belong to a union that has a confidentiality agreement with employers, including Faiveley. 203:1-4.

Faiveley does not share manufacturing drawings with customers. 118:24-119:2. The text on the face of the manufacturing drawings states that they are to be kept confidential. 257:24-258:4; Pet'r Ex. 12.

## III.    THE LICENSE AGREEMENT

In 1993, SAB Wabco and Wabco (Wabtec's predecessor) entered into an agreement (the "License Agreement") pursuant to which Wabco was licensed certain products, including the BFC actuator and the BFC TBU family. Pet'r Ex. 1. This included a license to use SAB Wabco's proprietary intellectual property, specifically SAB Wabco's "Know-How, Patents, Patent Applications and New Technology" for the "manufacture, assembly, installation,

---

[2] Faiveley's other drawings, such as its assembly drawings, do not contain these trade secrets. 288:2-289:1. Accordingly, assembly drawings lack the information necessary to manufacture BFC TBU components. 151: 17-24.

application, use, sale and/or maintenance" of the Licensed Products, including the BFC TBU. Pet'r Ex. 1, Article 2.1.[3]

The License Agreement required that Wabtec "take all appropriate steps" to maintain the confidentiality of this information and documentation. Pet'r Ex. 1, Article 20.1. The License Agreement also required Wabtec to inform Faiveley prior to making any modifications to the licensed technology. Pet'r Ex. 1, Article 13.1. At the end of the license period, Wabtec was required to return all documents to Faiveley. Pet'r Ex. 1, Article 22.1.2. Wabtec was not permitted to enter into any new contracts to manufacture the Licensed Products following the end of the license period. Pet'r Ex. 1, Article 22.1.1.

With the acquisition in 2004, SAB Wabco's rights and duties under the License Agreement were transferred to Faiveley Transport Malmo AB. The question of whether Faiveley Transport Malmo AB is the proper party to seek redress under the License Agreement has been adjudicated by the ICC, which issued an order stating that Faiveley Transport Malmo AB is SAB Wabco's successor under the License Agreement. Pet'r Ex. 6, ¶126 and p. 26.

Pursuant to the License Agreement, SAB Wabco furnished information to Wabtec that enabled Wabtec to manufacture BFC TBU units; this information included the twelve manufacturing drawings being considered in this case. 110:14-111:15; 152:3-6. After the acquisition of SAB Wabco, Faiveley continued to furnish Wabtec with updated information on the BFC TBUs. 113:1-4.

---

[3] Prior to entering into the License Agreement, Wabtec was unable to satisfy a certain segment of the railcar industry because it had not developed a BFC TBU. 601:25-602:4; 602:24-603:3. One of Wabtec's purposes in entering into the License Agreement was to enable it to manufacture the BFC TBU. 601:15-17.

During the term of the License Agreement, Wabtec made several minor changes to the drawings. Pet'r Ex. 7. Wabtec did not inform Faiveley prior to making these changes, as it was required to do under the License. 113:9-114:6.

The License term extended until December 31, 2003, with the possibility of annual renewals. Pet'r Ex. 1, Art. 21.2. Faiveley sent Wabtec notice in December 2004 that the License Agreement would be not be renewed again and thus would terminate effective December 31, 2005. Pet'r Ex. 2.[4]

## IV.    WABTEC'S MISAPPROPRIATION OF THE TRADE SECRETS

### A.    Wabtec Did Not Return the Documents

Wabtec did not return Faiveley's documents in a timely fashion after the termination of the License Agreement. 299:17-19. Wabtec had not undertaken a search for documents to be returned to Faiveley prior to March 2007, despite being notified in December 2004 of its obligation to return such documents. 624:23-625:6; Pet'r Ex. 2. During the March 2007 search, Wabtec did not search the electronic files of individuals in the engineering department for Faiveley manufacturing drawings, nor did Wabtec search the email files of those individuals. 630:11-18. Faiveley again requested that its documents be returned, in letters from counsel dated April 12, 2007 and May 29, 2007. Pet'r Ex. 24.

Wabtec finally undertook another search for Faiveley documents in September 2007. 631:21-632:20. As a result of this additional search, Faiveley manufacturing drawings were located in Wabtec's files that had not previously been located, including manufacturing drawings found on the computer of Roland Moore, the lead engineer in charge of the Licensed Products. 632:21-633:4; 634:24-635:8. Certain Faiveley documents were not returned until October 10,

---

[4] Although Wabtec and Faiveley discussed the possibility of extending the term of the License, no agreement was ever reached. 69:14-17; 69:16-19; 94:25-95:1. Accordingly, the License Agreement expired at the end of 2005.

2007. Pet'r Exs. 24 and 102. Wabtec still has not confirmed that they have returned all Faiveley documents. Pet'r Ex. 24.

Wabtec's document retention policies establish that it still has Faiveley drawings: Faiveley-based drawings are only "obsoleted" once Wabtec has received the reverse engineered drawing. 563:17-24; 620:19-621:3. Wabtec retains both hard copies and electronic copies of so-called "obsoleted" drawings. 487:6-9; 620:4-11.

### B.    Wabtec Continues to Manufacture the Licensed Products

Although the License Agreement terminated on December 31, 2005, Wabtec witness James Hoffner testified that throughout 2006 Wabtec continued to use Faiveley drawings to supply customers with products. 677:4-8.

Customers such as NYCT were informed of the termination of the License Agreement and that Wabtec therefore was no longer authorized to provide the Licensed Products. 303:21-304:6. NYCT had not even been aware during the term of the License Agreement that Wabtec was supplying the documents as a licensee of Faiveley. 816:2-5. Following the termination, Wabtec continued to misrepresent to NYCT that it still had the right to supply the Licensed Products. Pet'r Ex. 24. In a May 29, 2007 letter, Faiveley reminded Wabtec that continued provision of the Licensed Products to NYCT would violate the License Agreement. Pet'r Ex. 25. On June 5, 2007, Wabtec responded that it would not cease supplying NYCT because it had "identified alternatives to the Licensed Technology and/or the Faiveley Products." Pet'r Ex. 25.

During a spring 2007 meeting with NYCT, Faiveley learned that a contract for the overhaul and upgrade of its R142A cars ("Contract 06L9582"), which were already equipped with Faiveley BFC TBUs, would likely be granted as a sole-source procurement to Wabtec. 304:9-304:21. On June 21, 2007, Faiveley sent an e-mail to NYCT requesting that NYCT send to Faiveley, *inter alia*, the rebuild specifications, scope of work, quantities and delivery schedule

and any other documentation required for Faiveley to submit a bid for Contract 06L9582. Pet'r Ex. 25. On July 20, 2007, NYCT informed Faiveley that NYCT could not provide Faiveley with the requested information, as Wabtec claimed these materials were proprietary. Pet'r Ex. 25. On July 3, 2007, Faiveley filed a request pursuant to the Freedom of Information Law ("FOIL") asking that NYCT provide Faiveley with the relevant documentation. Pet'r Ex. 25. Faiveley never received any documents in response to its FOIL request. 306:5-7. On July 13, 2007, Faiveley submitted its own bid for Contract 06L9582. Pet'r Ex. 25.

In a letter dated July 20, 2007, NYCT informed Faiveley that Wabtec would be awarded Contract 06L9582 on a sole-source procurement basis. Pet'r Ex. 25. On July 27, 2007, Faiveley filed a protest against NYCT's award of Contract 06L9582 to Wabtec on several grounds, including that the award of such contract to Wabtec violated Faiveley's intellectual property rights. Pet'r Ex. 25. In its September 5, 2007 response, NYCT reaffirmed its award of Contract 06L9582 to Wabtec, adding that it was not in a position to determine the ownership of the intellectual property rights at issue. Pet'r Ex. 25.

## V.    WABTEC'S REVERSE ENGINEERING PROGRAM

Six of the twelve BFC TBU parts that were singled out for the purposes of the hearing are currently being provided by Wabtec to NYCT pursuant to Contract 06L9582. 565:15-22. Wabtec asserts that the parts being supplied to NYCT were developed by means of independent reverse engineering. The task of reverse engineering the 84 parts that comprise a BFC TBU is extremely difficult. 327:2-7. It is highly improbable that Wabtec could have developed all of the information necessary to manufacture a BFC TBU on its own. 328:16-23. The product has never been copied exactly; despite piracy attempts, no company has been able to meet the quality and performance of the original part. 55:2-9. No company has ever reverse engineered all of the parts necessary to make a BFC TBU. 281:13-15.

6

Wabtec's first attempt at reverse engineering the BFC TBU was with a Chinese company called Hongdu and spanned from 2005 to 2007. 567:21-568:11; 604:19-22. Hongdu was unable to reverse engineer the product and did not produce a single usable drawing. 671:14-24.

Wabtec's second effort to reverse engineer the BFC TBU began in June/July 2007 and involved Alkab and KTM Solutions. 663:11-15. Every component of the BFC TBU was or is being reverse engineered in this effort. 604:23-607:7.

Roland Moore, the Lead Engineer for the Foundation Brake Group, received Faiveley manufacturing drawings during the License period and was one of two Wabtec employees who became most familiar with those drawings. 732:24-733:20. Moore helped identify available components to be sent for reverse engineering because of his special expertise in the components of the Licensed Products. 617:2-10.

During Wabtec's first attempt to reverse engineer the BFC TBU, Moore conducted a site visit to Hongdu to explain how the unit functioned and answer questions. 619:4-10. Moore also received and commented on reverse engineering drawings sent from Hongdu. 619:11-13.

During Wabtec's second reverse engineering attempt, Wabtec reviewed and made alterations to the drawings it received from Alkab. 672:11-15. Roland Moore was involved in this review. *See, e.g.*, Pet'r Exs. 83 and 92. He altered the geometric dimensions and tolerances from Alkab drawings based on information not taken into account at the reverse engineering stage. 459:21-460:2; 462:1-3. He also made substantive comments on KTM drawings. Pet'r Ex. 37. Moore also added surface finishes and made other material revisions to at least six to eight of these allegedly completed reverse engineering drawings. 464:19-21; 742:22-744:4.

The chief draftsman for the reverse engineering drawings completed in 2008 was Dart Collins. 452:13-17. Like Roland Moore, Dart Collins had been exposed to Wabtec versions of the Faiveley drawings. Pet'r Ex. 93.

A number of revisions that Wabtec made to the drawings it received from Alkab are inexplicable unless Wabtec used Faiveley's proprietary information. For example, Wabtec ignored the material specification for the guide sleeve that Alkab has supplied, and instead used the same one that appeared on the original Faiveley drawing. 336:6-15; *see also* Pet'r Exs. 27-32b. Furthermore, Wabtec's supposedly reverse engineered drawing of a guide sleeve includes a gap on the cylinder, a feature present on the original Faiveley drawings but missing on the Alkab drawing. 336:19-337:1; *see also* Pet'r Exs. 27-32b. Wabtec's supposedly reverse engineered drawing of a push sleeve included a special instruction for rust protection, which is also present on the original Faiveley drawings, but missing from the Alkab drawing. 350:16-23; *see also* Pet'r Exs. 77-83b. Wabtec's supposedly reverse engineered drawing of a push sleeve included a material treatment requirement, which is once again present on the original Faiveley drawings, but missing from the Alkab drawing. 350:25-351:5; *see also* Pet'r Exs. 77-83b.

Ten of Wabtec's supposedly reverse engineering drawings include specific manufacturing information, which also appears on the original Faiveley drawings, but is missing from the Alkab drawings. Pet'r Ex. 87. A number of ECRNs call for changes to measurements and tolerances on the drawings; however, the calculations for those changes are not supported by the accompanying data sheets. Pet'r Ex. 87.

Wabtec attempted to use a firm called RTC as a go-between to distance itself from the reverse engineering firms Alkab and KTM. However, Dallas Spadaro, the RTC liaison between Wabtec and the aforementioned reverse engineering firms had extensive connections to Wabtec.

He worked for Wabtec between 1980 and 1986, where he developed close relationships with Wabtec employees working on the current reverse engineering process, including Al Kreger. Spadaro Dep. 58:21-59:22.[5]  Spadaro had also performed work for Wabtec in the past that directly related to the BFC TBU, including authoring a 221-page document guaranteeing the safety of the BFC TBU to New York City. *See* Spadaro Ex. 5.

In July 2007, Wabtec enacted a freeze on the sale of all parts derived from Faiveley know-how, meaning that they were not sold because they were Faiveley parts that had not yet been reverse engineered.  675:5-676:24; Pet'r Ex. 103.  Despite this freeze, James Hoffner decided to ship some parts even though they had not yet been reverse engineered because the customer was "in trouble." 677:14-678:10.

## VI.    <u>FAIVELEY IS BEING HARMED BY WABTEC'S BEHAVIOR</u>

Faiveley is being harmed by Wabtec's misappropriation, in part because it is losing out on the business from the overhaul of NYCT's R142A cars, and in part because its trade secrets are being used without its consent and disclosed to unauthorized third parties.  Faiveley is capable of performing this overhaul, either from its facilities in Europe or from its new facility in Exton, Pennsylvania. 308:21-309:13; 309:14-21; 310:5-11.

NYCT has no objection to using Faiveley as a substitute supplier for Contract 06L9582. 813:6-814:13.  NYCT's representative stated that the required testing and evaluation would take no longer than three to four months. 814:14-815:23.

---

[5] All deposition testimony cited herein has been designated by Faiveley and submitted to the Court.  Similarly, all deposition exhibits cited herein were relevant to the deposition testimony designated by Faiveley, and accordingly were provided to the Court.

## ARGUMENT

### I.    THE SUBSTANTIVE LAW OF NEW YORK GOVERNS.

"New York courts have adopted a flexible choice of law approach and 'seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.'" *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006) (citation omitted). Here, New York has the most significant interest because this action concerns the ability of Wabtec to supply parts to the New York City subway system. Accordingly, the Court should apply the substantive law of New York.

### II.    FAIVELEY IS ENTITLED TO A PRELIMINARY INJUNCTION.

To prevail on a motion for a preliminary injunction in aid of foreign arbitration, the party requesting relief must show (1) irreparable harm and (2) <u>either</u> (a) a likelihood of success on the merits <u>or</u> (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994) (granting preliminary injunction in aid of foreign arbitration).[6]    As demonstrated below, Faiveley has met this burden.

#### A.    Irreparable Harm to Faiveley Is Presumed

It is well established that irreparable harm is presumed where a trade secret has been misappropriated. *See Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 480 (S.D.N.Y. 2007). Indeed, it is clear that the loss of trade secrets is not measurable in money

---

[6] The same two-factor test is applied to determine a request for affirmative injunctive relief. *Valjean Mfg. Inc. v. Michael Werdiger, Inc.*, No. 03 Civ. 6185 (HB), 2004 WL 1948752, at *3 (S.D.N.Y. Sept. 2, 2004) (granting affirmative injunctive relief).

damages. *See N. Atl. Instruments, Inc. v. Harber*, 188 F.3d 38, 49 (2d Cir. 1999). Because Wabtec has misappropriated Faiveley's trade secrets, harm to Faiveley is presumed.[7]

**B.    There is a Substantial Likelihood of Success on the Merits**

The moving party "need not show that success is an absolute certainty" to meet the "likelihood of success" standard.    It need only be shown that the probability of the movant "prevailing is better than fifty percent." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). As set forth in Section III.B, Faiveley is substantially likely to succeed on the merits.

**C.    Faiveley Has Demonstrated Sufficiently Serious Questions on the Merits and the Balance of Hardships Tips in Its Favor.**

Even assuming *arguendo* Faiveley was unable to demonstrate a likelihood of success on the merits, an injunction should still issue because Faiveley has easily established "a sufficiently serious question going to the merits and a balance of hardship tipping decidedly in [its] favor." *Flexible Techs., Inc. v. World Tubing Corp.*, 910 F. Supp. 109, 113 (E.D.N.Y. 1996). Here, the balance of hardships favors Faiveley because "[a] trade secret once lost is, of course lost forever." *Id*. at 115.

**1.    Harm to a Third Party Should Not Be Taken Into Consideration in the Balance of Hardships Analysis.**

Harm to third parties, including the public in general, plays a limited role in a balance of hardships analysis.    The public interest may be considered only when injunctive relief is sought with respect to the exercise of governmental regulatory or statutory authority or if injunctive

---

[7] NYCT denied Faiveley's protest to NYCT's award of the 06L9582 Contract to Wabtec on September 5, 2007.    A mere six weeks later, on October 18, 2007, Faiveley filed the present application for preliminary injunctive relief.    In any event, even by Defendant's recitation of the facts, Faiveley has not unreasonably delayed.    Courts do not impose rigid deadlines by which a request for preliminary injunctive relief must be made and may excuse delay if the plaintiff can provide a credible explanation for its inactivity. *See MetLife Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 233, 237 (S.D.N.Y. 2005) (granting preliminary injunctive relief where delay was due to an effort to investigate facts relevant to the motion).    Here, Faiveley sought to avoid litigation with Wabtec and endeavored to reach a resolution with NYCT. *See* Pet'r Exs. 24 and 25.

relief directly affects a governmental authority. *See, e.g., Brody v. Vill. of Port Chester*, 261 F.3d 288, 290 (2d Cir. 2001) (considering public interest when reviewing grant of preliminary injunction of eminent domain proceedings). Indeed, the public interest is generally not considered in disputes between two private parties. *See Park West Radiology v. Carecore Nat'l LLC*, 240 F.R.D. 109, 114 (S.D.N.Y. 2007). Here, because an injunction would not significantly affect a governmental authority, the public interest should not be given significant weight. Importantly, Falk did not indicate that an injunction would threaten the operation of the New York City subway. *See generally* 806:3-829:12.[8] Instead, Falk testified that an injunction prohibiting Wabtec from selling BFC TBU components to NYCT would result in—at most—a three to four month delay while Faiveley qualifies to supply the city with those components. 813:24-8:15-23. Further, as Wabtec acknowledged, there is no safety issue. 822:21-823:2.

### III.    WABTEC HAS MISAPPROPRIATED FAIVELEY'S TRADE SECRETS.

To state a claim for misappropriation of a trade secret under New York law, a plaintiff must establish (1) that it possessed a trade secret, and (2) that the defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 497-98 (S.D.N.Y. 2002).[9]

#### A.    Faiveley Has Protectable Trade Secrets.

To determine whether information constitutes a trade secret, New York courts consider: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business

---

[8] Tellingly, New York City Transit did not voluntarily intervene in this matter, but rather appeared to testify only at the behest of the Court. Hr'g Tr. 428:6-13.

[9] The same actions described below also constitute breaches of the License Agreement for which injunctive relief is warranted.

and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* at 498. The information detailed on the manufacturing drawings constitutes "paradigmatic" trade secrets under New York law. *See, e.g., Electro-Miniatures Corp. v. Wendon Co.*, 771 F.2d 23 (2d Cir. 1985) (affirming finding that drawings of slip ring assemblies constituted a trade secret); *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (manufacturer's process, consisting of formulae for compounds, processes of manufacturing, methods of treating material and equipment specifications was "paradigmatic trade secret" under New York law).

### 1.    Faiveley's Trade Secrets Are Not Known Outside the Business.

The information found on manufacturing drawings is confidential and cannot be found in the public domain. 147:9-21. Indeed, no company in the world has successfully duplicated the entirety of the BFC unit. 54:25-55:5. By its own admission, Wabtec was unfamiliar with the BFC TBU technology prior to receiving Faiveley's trade secrets via the 1993 License Agreement. *See* Pet'r Ex. 7; 603:21-605:4.

### 2.    Access to Manufacturing Drawings by Faiveley Employees is Extremely Limited.

Faiveley implemented a series of measures to limit its employees' access to the manufacturing drawings. Passwords to access copies of the drawings were only given out to a select number of employees who needed them to perform their daily functions. 160:11-16; 161:9-14; 149:19-23. Such password protection is further evidence of the drawings' trade secret status. *See B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 Civ. 9988 (SCR), 2006 WL 3302841, at *3 (S.D.N.Y. Jan. 31, 2006) (finding that information was a trade secret, *inter alia*, because a password was required for access). Moreover, few employees are allowed to electronically view

the drawings, and fewer still are allowed to modify them. 149:24-150:4; 154:9-12. Only certain employees can remotely access the drawings, and none are allowed to take hard copies of the drawings home with them. 201:13-24. Hard copies of the drawings are kept under lock and key, and only a small number of employees are allowed to view them. 150:8-15.

### 3. Faiveley Took Extraordinary Measures to Guard the Secrecy of Its Trade Material.

Absent a license agreement, Faiveley never gives manufacturing drawings to customers. 285:17-19. Further, it was Faiveley's company policy to keep all manufacturing drawings confidential, and employees who had access to the drawings were obligated to treat them as confidential. 117:12-118:7; 203:1-5. In addition, confidentiality notices were placed on all manufacturing drawings. 149:12-18. Such measures by Faiveley satisfy the requirements for trade secret status under New York law. *See Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 808 F. Supp. 932, 937 (E.D.N.Y. 1992) (holding that the owner of a trade secret is simply required to take "reasonable precautions to guard the secret" and noting that "[n]ot every disclosure extinguishes the right to a trade secret"); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 732 F. Supp. 370, 376 (S.D.N.Y. 1989) (holding that owner took reasonable precautions to protect secrecy where software source code was kept under lock and key and programmers were required to sign confidentiality agreements).

### 4. Faiveley's Trade Secrets Are Extremely Valuable to Competitors.

The more valuable information is to an entity, the more likely it is to be a protectable trade secret. *North Atl. Instruments*, 188 F.3d at 44. To establish that the information is valuable, all that need be shown is that it affords the business "a slight competitive edge." *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 232 (S.D.N.Y. 1988).

The BFC TBU technology afforded Faiveley a distinct competitive advantage.  The BFC TBU family of products have enjoyed tremendous commercial success and, as even Wabtec has acknowledged, an excellent technical reputation.  146:14-15; Pet'r Ex. 7.  Faiveley has sold more than 135,000 BFC actuators throughout the world.  54:1; 146:15-16.  The value of the BFC TBU technology was, in fact, the very reason Wabtec entered into the 1993 License Agreement.  601:15-17.  Wabtec witnesses testified that the BFC TBU gave them access to customer contracts previously unavailable to it.  601:15-17.

5.    **Faiveley Expended Considerable Resources Developing Its Trade Secrets.**

Faiveley's quest to develop the BFC TBU design began over 30 years ago.  146:22-147:2.  Faiveley invested innumerable hours drafting and testing designs before developing the BFC TBU as it now exists.  146:17-19; 147:3-8.  Such an investment in the development of trade secrets deserves protection under the law.  *See, e.g., Integrated Cash Mgmt.*, 732 F. Supp. at 376.

6.    **It Would Take Years for Wabtec to Develop the Trade Secrets on Its Own.**

Development of BFC TBU technology by Wabtec would require the expenditure of significant time and resources.  No company has yet been able to successfully develop all components of a BFC TBU.  54:25-55:5; 218:13-15.  Wabtec's failed reverse engineering effort with Hongdu (*see infra* Section III.B.4) further highlights the difficulty associated with such a task.

B.    <u>**There Is Overwhelming Evidence of Wabtec's Misappropriation.**</u>

Trade secret misappropriation is generally proven by circumstantial evidence:

> Misappropriation and misuse can rarely be proven by convincing and direct evidence.  In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more

probable than not that what the plaintiffs allege happened did in
fact take place.

*Fabkom v. R.W. Smith & Assocs., Inc.*, No. 95 Civ. 4552, 1996 WL 531873, at *9 (S.D.N.Y.

Sept. 19, 1996) (citation and internal quotation marks omitted).

To establish misappropriation, it is not necessary for Faiveley to prove that any particular

piece of information, such as a dimension, tolerance or material specification, was directly

copied from a Faiveley drawing into a Wabtec drawing.  Rather, all Faiveley need establish is

that prior knowledge of Faiveley drawings "benefitted" Wabtec in its efforts to develop a

competing product.  *Integrated Cash Mgmt.*, 732 F. Supp. at 377 (although "no direct copying

occurred," injunction was issued because defendant's employees with prior exposure to

plaintiff's trade secrets "benefitted" from that prior exposure); *see also Norbrook Labs. v. G.C.*

*Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 478 (N.D.N.Y. 2003) (although no direct copying

occurred, misappropriation found because access to trade secret "saved [defendant] from having

to conduct its own trial and error work").

As set forth below, this case features "smoking gun" evidence that certain dimensions

and tolerances were in fact directly copied from Faiveley drawings into Wabtec drawings.  In

addition, there is an overwhelming amount of circumstantial evidence that suggests not only

outright copying, but also that Wabtec improperly "benefitted" from its knowledge of Faiveley's

drawings in ways that run equally afoul of trade secret law.

### 1.   Wabtec Has Put Forth No Evidence That Employees Involved In the Reverse Engineering Process Were Untainted By Faiveley Know-How.

Perhaps most startlingly, Wabtec has failed to put forth a single witness with firsthand

knowledge as to the procedure *actually* followed to reverse engineer the BFC TBU components.

Wabtec's only attempt to establish such evidence was the testimony of Paul Jamieson—an

individual who could merely discuss what he instructed others to do, but lacked knowledge of what actually occurred. As the Court stated during the hearing:

> [I]f it is defendant's contention that there were one or two in-house folks who came into the act after Alkab and *mirabile dictu* came up with all the right additional information, even though they were completely shielded from what Faiveley had provided, then, then [sic] their failure, if it is their failure, [D]efendant's failure to call someone who allegedly did that work, such as Mr. Kreger, could very, very likely give rise to an adverse inference favorable to petitioner.

362:5-13. Al Kreger and Jerry Stepp were the two Wabtec employees responsible for the initial review of the reverse engineering drawings (742:6-11), but were not produced at trial. This warrants an adverse inference against Wabtec. *See Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939) ("production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse"); *Novomoskovsk Joint Stock Co. "Azot" v. Revson*, No. 95 Civ. 5399 (JSR), 1998 WL 651076, at *6 (S.D.N.Y. Sept. 23, 1998).

But even if an adverse inference is not granted, Wabtec's failure to produce Kreger and Stepp means that Wabtec has failed to meet its burden of establishing independent development. "It is a well-recognized principle that, where a defendant in a trade secret case claims independent development, the burden shifts to the defendant to show that this was in fact the case." *Integrated Cash Mgmt.*, 732 F. Supp. at 377-78.

Moreover, the involvement of individuals tainted with Faiveley know-how in the reverse engineering process, namely Moore and Collins, conclusively supports an inference against independent development. *See, e.g., Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1357 (Fed. Cir. 1998) (defendant "did not independently develop its own de-emphasis technology, but instead assigned the same engineers who had learned of [plaintiff's] technology"); *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 701 (N.D. Ill.

2004) ("clean room" approach to isolating a development team "is a valuable exercise only if procedures are followed to make certain that no improper material passes through the walls").[10]

### 2.    Even Before Wabtec Had Completed Any Reverse Engineering, Wabtec Copied Faiveley Drawings.

Moore testified that in March 2007, Wabtec "obsoleted" a Faiveley drawing for a component of the BFC TBU and replaced it with a "Wabtec drawing." 703:14-704:1; Pet'r Ex. 97. Moore testified that this "Wabtec drawing" could have been created in one of two ways: it could have been based on a reverse engineering drawing or it could have been based on an original Faiveley drawing supplied during the License Agreement. 716:5-717:4. Because, however, no reverse engineering drawings were available in March 2007 (Alkab was not retained until August 2007 (Kabazie Ex. 4; Kabazie Dep. 71:18-72:2), and did not send drawings to Wabtec until December 2007 (Kabazie Ex. 14)), it follows that the "Wabtec drawing" could only have been based on a Faiveley drawing. Accordingly, Petitioner's Ex. 97 constitutes "smoking gun" evidence of copying of Faiveley drawings. Indeed, Moore testified that Wabtec versions of Faiveley drawings are "in most respects" copies of the original Faiveley drawings. 774:4-17.

### 3.    The Failure of Wabtec's First Reverse Engineering Effort Supports an Inference of Misappropriation.

From 2005 to 2007, Wabtec retained Hongdu to reverse engineer the BFC TBU. 567:23-568:11. Hongdu was unable to produce even a single usable reverse engineering drawing. *Id.* The difficulty Wabtec encountered in its first attempt to reverse engineer the BFC TBU with

---

[10] Further, the testimony of Alkab, the primary firm retained by Wabtec to reverse engineer the BFC TBU, demonstrates that Alkab was never instructed to maintain records of the purportedly "clean" reverse engineering process. Kabazie Dep. 15:6-12. Wabtec's failure to produce any such documentation further supports an inference that Wabtec's reverse engineering process was not clean. *See Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1566 (Fed. Cir. 1992) ("'[W]hether there has been a true reverse engineering job or just a job of copying can be shown by looking at the defendant's records. The paper trail . . . tells a discerning observer whether the [product] is a copy or embodies the effort of reverse engineering.'").

Hongdu over two years sharply contrasts with its second attempt at reverse engineering with Alkab in only four months. 722:12-14; 619:14-17; 568:2-11; Kabazie Exs. 4, 14; Kabazie Dep. 71:18-72:2. The speed with which Wabtec claims to have reverse engineered the BFC TBU further supports an inference of misappropriation. *See Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1231 (W.D.N.Y. 1994) (finding that the "circumstances of [defendant's] speedy coming of age in the . . . marketplace weigh decidedly in favor of the inference [of misappropriation]"); *Brooktree Corp.*, 977 F.2d at 1567-68 (failed attempt at reverse engineering followed by immediate results in second attempt supports inference of misappropriation).

### 4. Wabtec Involved Individuals with Knowledge of Faiveley's Trade Secrets in the Reverse Engineering Process.

#### a. Faiveley's Lead Engineer Was Tainted with Faiveley Know-How

Moore received Faiveley manufacturing drawings during the License Agreement and was one of two Wabtec employees who became most familiar with those drawings. 732:24-733:20. Indeed, the evidence conclusively demonstrates that Moore communicated with Faiveley regarding Faiveley's manufacturing drawings in 2002 (Ragnarsson Dep. Ex. 5), may have viewed Faiveley manufacturing drawings as recently as 2007 (708:2-5), and certainly viewed Wabtec versions of Faiveley drawings in 2007 (705:7-10). Despite Moore's prior exposure to Faiveley's trade secrets, Wabtec chose to intimately involve Moore in its supposedly "independent" reverse engineering efforts. For example, (i) Moore was selected to identify components to be sent to outside reverse engineering firms because he was particularly knowledgeable about those parts (617:2-10); (ii) after the drawings came back from outside reverse engineering firms, Moore reviewed them for content and created Wabtec versions of those drawings (749:12-750:12; *see also* Pet'r Exs. 37, 80, 89); (iii) even after the reverse engineering process was supposedly complete, Moore made substantive revisions to six to eight

reverse engineering drawings (743:6-744:4); and (iv) Moore established the in-house "testing criteria" used to evaluate and modify the work product of the supposedly "independent" third party reverse-engineering firms (737:24-738:9).

Such involvement by Moore in the reverse engineering process gives rise to a compelling inference of misappropriation. *See General Elec. Co. v. Sung*, 843 F. Supp. 776, 779 (D. Mass. 1994) (where person "intimately familiar" with trade secret is involved in development of competing product, a "compelling inference" of misappropriation arises). Indeed, this inference persists even if Moore sincerely attempted to avoid using his knowledge of the Faiveley drawings. *See Integrated Cash Mgmt.*, 732 F. Supp. at 378 (even assuming "good intentions," defendant's prior exposure to trade secrets would have made it "impossible" to develop a competing process without misappropriation); *Monovis*, 905 F. Supp. at 1234 ("even assuming the best of good faith, it is doubtful whether [defendant] could completely divorce his knowledge of the trade secrets").

The inference that Moore used his knowledge of the Faiveley drawings is particularly compelling because in several cases Moore made revisions to drawings that had originally been submitted by Alkab, and then had been converted into Wabtec drawings by other Wabtec employees, namely Al Kreger and Jerry Stepp. *See, e.g.*, Pet'r Exs. 80, 89. Yet, in these instances, neither Alkab nor Kreger nor Stepp were able to get the dimensions and tolerances exactly right. It was only Moore—the one person with extensive prior exposure to the Faiveley drawings—who was able to do this. If determining the proper dimensions and tolerances were simply a matter of general engineering knowledge, there would be no reason to suspect that only Moore would be capable of performing the task. Accordingly, a compelling inference arises that Moore relied upon his knowledge of the Faiveley manufacturing drawings in these instances.

*See Monovis*, 905 F. Supp. at 1215 (rejecting argument that engineers with no prior experience with technology could have determined tolerances by using "common sense engineering," and finding it more likely that individual with prior exposure to plaintiff's manufacturing drawings used plaintiff's trade secrets when determining tolerances).

> **b.    The Primary Drafter of the Reverse Engineering Drawings Was Tainted with Faiveley Know-How.**

The evidence also establishes that Collins was the draftsperson who created all of the so-called Wabtec reverse engineering drawings. Collins Dep. 56:2-7. But like Moore, Collins also was tainted by his prior exposure to Faiveley drawings. In particular, the evidence shows that Collins: (i) had seen Faiveley drawings during the term of the License Agreement (Collins Dep. 76:12-14); (ii) had been involved in creating Wabtec versions of Faiveley drawings (Collins Dep. 51:15-18; Pet'r Ex. 93); (iii) had extensive prior experience creating Wabtec drawings for the R142A contract (Collins Dep. 85:21-86:5); (iv) was never asked to delete Faiveley material in his possession (Collins Dep. 167:11-168:2); and (v) in at least one instance, still had access to a Wabtec version of a Faiveley drawing when creating the reverse engineering drawing (Collins Dep. 193:13-16). Under these circumstances, for the same reasons set forth above, a compelling inference arises that Collins used his prior knowledge of the Faiveley drawings while creating the so-called Wabtec reverse engineering drawings.

> **5.    Wabtec Retained Documents Containing Faiveley's Trade Secrets While Reverse Engineering Was Ongoing.**

The evidence shows that Wabtec did not even begin to search for Faiveley manufacturing drawings until March 2007. 624:23-625:6. The evidence further establishes that the March 2007 search was inadequate and that an additional search was required in September 2007. 631:21-632:20. Significantly, Roland Moore's electronic files were not searched until September 2007. 631:21-632:3. Accordingly, it follows that Wabtec retained access to Faiveley drawings until at

21

least September 2007, thus giving rise to an inference of misappropriation. *Electro-Miniatures Corp.*, 771 F.2d at 26 (proof of defendant's access to drawings supports an inference of misappropriation).

### 6.    Drawings Received Through Wabtec's Purported Reverse Engineering Effort Were Useless.

The key third-party reverse engineering firm relied upon by Wabtec to supply the manufacturing drawings for the BFC TBU was Alkab.   In deposition testimony, however, William Kabazie, the president of Alkab, stated that:

> (i)    undertaking this project was a "dice roll" for Alkab because a reverse engineering project of this magnitude was not Alkab's "core competency" (Kabazie Dep. 132:17-133:3);
>
> (ii)    twenty percent of the drawings provided by Alkab included no specific tolerances whatsoever (Kabazie Dep. 116:4-14);
>
> (iii)    even with respect to the 80 percent of drawings that had some tolerances included, only 10-20 percent of the specific tolerances were supplied (Kabazie Dep. 117:5-11); and
>
> (iv)    ten to fifteen percent of those tolerances that were supplied by Alkab were likely incorrect (Kabazie Dep. 89:12-20).

Because of these issues, Kabazie stated that Wabtec would be a "fool" if it relied on the Alkab drawings to manufacture the products.   Kabazie Dep. 90:24-91:9.   Such testimony regarding the inadequacy of Alkab drawings was confirmed by Richard Sullivan, Faiveley's summary witness, who concluded that the Alkab drawings were either missing key manufacturing information such as material requirements and specifications, and special instructions, *see* Pet'r Ex. 87; *see also* 336:6-15; 336:19-337:1; 350:16-23; 350:25-351:5, or contained tolerances and dimensions that were ignored by Wabtec. *See* Pet'r Ex. 87.

### 7.    The Involvement of Rail Transit Consultants in the Reverse Engineering Process Further Supports an Inference of Misappropriation

#### a.    RTC Was Not Truly Independent of Wabtec.

Spadaro testified that he, as well as the president of RTC and several other RTC employees, all previously worked at Wabtec. Spadaro Dep. 28:15-19; Spadaro Dep. 81:4-13. During his tenure at Wabtec, Spadaro developed close relationships with several current Wabtec employees, including Kreger, one of the Wabtec individuals most intimately involved in the current reverse engineering project. Spadaro Dep. 58:21-59:22. Spadaro further testified that he did not actually "approve" any of the reverse engineering drawings that he was provided. Spadaro Dep. 240:3-241:5. Rather, he said he was merely an "extra set of eyes" for Wabtec (Spadaro Dep. 53:2-10), and that, in any case, Wabtec—and not he—was the final arbiter of whether to accept a given reverse engineering drawing (Spadaro Dep. 240:3-241:5). Spadaro also noted that, besides the reverse engineering project, he also was working on several additional projects for Wabtec at the time of his deposition. Spadaro Dep. 33:15-24. Considered collectively, the foregoing evidence calls into serious question whether RTC's work on the reverse engineering project can be considered truly independent.

#### b.    RTC May Have Been Tainted with Faiveley Know-How.

Spadaro testified that in 1996 or 1997 he was hired by Wabtec to perform a reliability, maintenance, and safety analysis of the BFC TBUs being provided to New York City (Spadaro Dep. 68:15-22), and that his work on that project continued until 2002 or 2003. Spadaro Dep. 83:7-16. As part of this project, Spadaro authored a 221-page document guaranteeing the safety of the BFC TBU to NYCT. Spadaro Ex. 5.

### 8. Drawings Received From Alkab Were Ignored in Many Cases and Crucial Dimensions and Tolerances Were Altered by Wabtec.

Wabtec's final reverse engineering drawings in many cases contain the exact same dimensions and tolerances as the original Faiveley drawings. *See* Pet'r Ex. 87. The examples selected by Sullivan demonstrate that Wabtec must have copied from Faiveley's original drawings because the duplication of such precise measurements on such a consistent basis is statistically impossible. The inference of copying is particularly compelling because, in each instance identified by Sullivan, the dimensions and tolerances were different than, or altogether missing from, the Alkab drawings. *See Monovis*, 905 F. Supp. at 1214 (inference of misappropriation warranted where drawings relied upon by defendant to establish independent development "lack critical information such as tolerances and clearances which are supplied later in detailed design drawings"). For example, the Faiveley and original Wabtec drawings of the push sleeve have a control diameter for the small end of 2.756 inches, while the corresponding dimension on the Alkab drawing is 2.636 inches. *See* Pet'r Exs. 77-80. As indicated by the accompanying ECRN, Roland Moore changed this dimension back to 2.756 inches on Wabtec's final supposedly reverse engineered drawing. *See* Pet'r Exs. 83 and 87; 760:3-763:17. Similarly, the length of the large end on the Faiveley and Wabtec drawings is 4.29 inches, while the corresponding length on the Alkab drawing is 4.19 inches. *See* Pet'r Exs. 77-80. Again, the accompanying ECRN indicates that Roland Moore changed this dimension back to the one specified on the Faiveley drawing. *See* Pet'r Exs. 87 and 83, 751:11-760:2, 765:13-766:24. Roland Moore acknowledged that no calculations, field experience or testing was ever performed for this product, and that his knowledge of these dimensions was based at least in part on his exposure to the BFC TBU during the license period. 767:1-20.

24

9.     **Wabtec Retained Drawings Containing Faiveley's Trade Secrets Until Reverse Engineering Was Complete.**

The evidence demonstrates that Wabtec did not "obsolete" Faiveley drawings until reverse engineering drawings became available. 620:19-621:3. The evidence further shows that such reverse engineering drawings were not delivered to Wabtec until late December 2007. Accordingly, the fact that Wabtec retained access to Faiveley drawings until late December 2007 gives rise to an inference of misappropriation. *See Electro-Miniatures Corp.*, 771 F.2d at 26.

## CONCLUSION

For the reasons set forth above, the Court should enter an order enjoining Wabtec, pending a final determination in the pending ICC arbitration, from either manufacturing, marketing, selling, or offering for sale any BFC TBU products, parts, or kits, including any such items manufactured, machined, assembled, or derived from the current or prior reverse engineering efforts.

Date:    August 6, 2008

By: _____
A. John P. Mancini
Gregory A. Frantz
Vanessa M. Biondo
Christine M. Hernandez

MAYER BROWN LLP
1675 Broadway
New York, NY  10019
(212) 506-2295
(fax) (212) 849-5895

*Attorneys for Petitioner Faiveley Transport Malmo AB*

25