UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

FAIVELEY TRANSPORT MALMÖ AB,          :
                                       :
            Plaintiff                  :
                                       :
v.                                     :          08 CIV 3330 (JSR)
                                       :
WABTEC CORPORATION,                    :          Hon. Jed S. Rakoff
                                       :
            Defendant.                 :
-------------------------------------------------------------x

**DEFENDANT WABTEC CORPORATION'S
POST-HEARING MEMORANDUM**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

DISCUSSION ...................................................................................................................2

I.    Faiveley Failed To Establish Any Likelihood Of Success On The Merits..........................2

    A.    Faiveley Failed to Establish that It Possesses Any Alleged Trade Secrets..............2

        1.    Competitors Manufacture and Sell BFC Parts On the Open Market...........3

        2.    Faiveley Did Not Establish That It Has Taken Sufficient
Precautionary Measures to Protect Its Manufacturing Information.............4

    B.    Wabtec Did Not Use Faiveley's Alleged Trade Secrets.........................................6

        1.    Wabtec Conducted A Bona Fide Reverse Engineering Process.................6

        2.    Mr. Moore's Limited Involvement Did Not Compromise The
Reverse Engineering Process......................................................................10

        3.    Mr. Sullivan's Summary Chart Does Not Evidence Wabtec's Use
of Any Alleged Faiveley Trade Secrets.......................................................12

II.   Faiveley Has Not Established Irreparable Harm .............................................................13

    A.    Irreparable Harm Should Not Be Presumed in This Matter ...................................14

        1.    Any Presumption Of Irreparable Harm Has Been Conclusively
Rebutted........................................................................................................14

        2.    The Presumption Of Irreparable Harm Is Rebutted By Faiveley's
Delay In Seeking Injunctive Relief.............................................................17

III.  This Court Should Consider the Public Interest and Deny the Injunction.........................18

IV.   Faiveley Lacks Article III Standing to Seek Relief in this Court ......................................19

CONCLUSION...................................................................................................................21

RESPONSE TO R. SULLIVAN SUMMARY CHART (EXHIBIT A).........................................22

## TABLE OF AUTHORITIES

**Page**

### CASES

Airlines Reporting Corp. v. S and N Travel, Inc.,
58 F.3d 857 (2d. Cir. 1995) ................................................................................................20

Allen v. Wright,
468 U.S. 737 (1984).................................................................................................19, 20

Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.,
436 F.3d 82 (2d Cir. 2006) ...........................................................................................20

Am Medica Communs. Group v. Kilgallen,
261 F. Supp. 2d 258 (S.D.N.Y. 2003) .............................................................................13

Brody v. Village of Port Chester,
261 F.3d 288 (2d. Cir. 2001) ...................................................................................18, 20

Bross Utilities Service Corp. v. Aboubshait,
618 F. Supp. 1442 (S.D.N.Y. 1985) ...............................................................................21

Building Industry Fund v. Local Union, No. 3
992 F. Supp. 162 (E.D.N.Y. 1996) .................................................................................20

DB Riley, Inc. v. AB Engineering Corp.,
977 F. Supp. 84 (D. Mass. 1997)......................................................................................5

Delta Filter Corp. v. Morin,
108 A.D.2d 991 (N.Y. App. Div. 1985) ............................................................................3

FMC Corp. v. Taiwan Tainan Giant Indust. Co., Ltd.,
730 F.2d 61 (2d Cir. 1984) ...........................................................................................17

Fitzgerald v. Berman,
No. 1:02-cv-926,  2003 U.S. Dist. LEXIS 27156 (N.D.N.Y. Sept. 30, 2003) .......................20

Frink America, Inc v. Champion Road Machinery Ltd.,
48 F. Supp. 2d 198 (N.D.N.Y. 1999)............................................................................3, 4

Geritrex Corp. v. Dermarite Indus., LLC,
910 F. Supp. 955 (S.D.N.Y. 1996) ...........................................................................14, 16

Gidatex, S.R.L. v. Campaniello Imports, LTD,
13 F. Supp. 2d 417 (S.D.N.Y. 1998) ...............................................................................17

Ivy Mar. Co. v. C.R. Seasons, Ltd.,
907 F. Supp. 547 (E.D.N.Y. 1995) .................................................................................15

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,
596 F.2d 70 (2d. Cir. 1979) ..........................................................................................13

Jayaraj v. Scappini,
    66 F.3d 36 (2d. Cir. 1995) ...........................................................................13

Joneil Fifth Ave, Ltd. v. Ebeling & Reuss Co.,
    458 F. Supp. 1197 (S.D.N.Y. 1978) ...........................................................19

Kewanee Oil Co. v. Bicron Corp.,
    416 U.S. 470 (1974)................................................................................6, 10

Loveridge v. Pendleton Woolen Mills, Inc.,
    788 F.2d 914 (2d Cir. 1986) .......................................................................13

New York Spool Corp. v. Indus. Paper Tube, Inc.,
    160 A.D.2d 194 (N.Y. App. Div. 1990) .......................................................4

Rodriguez v. DeBuono,
    175 F.3d 227 (2d Cir. 1999) .......................................................................13

Sit-up Ltd. v. IAC/Interactive Corp.,
    2008 WL 463884 (S.D.N.Y. Feb. 20, 2008).............................................2, 4

Speedry Chem. Inc. v. Carter's Ink Co.,
    306 F.2d 328 (2d Cir. 1962) .........................................................................3

Thomas & Betts Corp. v. Richards Mfg. Co.,
    2007 WL 1237852 (D.N.J. Apr. 26, 2007)..............................................4, 5, 6

Time Warner Cable v. Bloomberg, L.P.,
    118 F.3d 917 (2d Cir. 1997) .......................................................................18

Worldwide Sport Nutritional Supplements Inc. v. Five Star Brands, LLC,
    80 F. Supp. 2d 25 (N.D.N.Y. 1999)......................................................14, 17

**MISCELLANEOUS**

Restatement of Torts § 757 cmt. b ...............................................................................3

4B N.Y. Prac., Com. Litig. in New York State Courts § 81:6 (2d ed.) ...........................................2

## TABLE OF CITED EXHIBITS

**Plaintiff's Exhibit ("P.Ex.__") ............................................................................ Page**

1 (License Agreement)...........................................................................1, 16, 20

11 (Faiveley Drawing of Packing Cup) ...............................................................21

13 (Faiveley Drawing of Leader Nut).................................................................21

14 (SAB Wabco Drawing of Control Socket) ......................................................21

15 (SAB Wabco Drawing of Ratchet Pin) ...........................................................21

16 (Faiveley Drawing of Spring Sleeve) .............................................................21

17 (Faiveley Drawing of BFC Bush) ..................................................................21

18 (Faiveley Drawing of Adjuster Nut) ..............................................................21

19 (Faiveley Drawing of Yoke) .........................................................................21

20 (Faiveley Drawing of Regulator Bush) ..........................................................21

21 (Faiveley Drawing of Locking Ring) .............................................................21

22 (Faiveley Drawing of Adjuster Spindle).........................................................21

23 (Faiveley Drawing of Push Sleeve) ...............................................................21

24 (May 29, 2007 Letter, M. Schuck to D. Seitz)................................................18

25 (July 20, 2007 Letter, NYCT to Faiveley Transport USA) .........................15

27                    ................................................................Exhibit A

28                    ................................................................Exhibit A

30            ................................................................................Exhibit A

31B           ................................................................................Exhibit A

32            ................................................................................Exhibit A

33            ................................................................................Exhibit A

34            ................................................................................Exhibit A

35            ................................................................................Exhibit A

37 (Oct. 5, 2007 Email, R. Moore to A. Kreger et al) ........................................10

38B ..............................................................................Exhibit A

39 ..............................................................................Exhibit A

40 ..............................................................................Exhibit A

41 ..............................................................................Exhibit A

42 ..............................................................................Exhibit A

44 ..............................................................................Exhibit A

44B ..............................................................................Exhibit A

45 ..............................................................................Exhibit A

46 ..............................................................................Exhibit A

47 ..............................................................................Exhibit A

48 ..............................................................................Exhibit A

49B ..............................................................................Exhibit A

50 ..............................................................................Exhibit A

51 ..............................................................................Exhibit A

53 ..............................................................................Exhibit A

54B ..............................................................................Exhibit A

59 ..............................................................................Exhibit A

59B ..............................................................................Exhibit A

60 ..............................................................................Exhibit A

62 ..............................................................................Exhibit A

63B ..............................................................................Exhibit A

64 ..............................................................................Exhibit A

65 ..............................................................................Exhibit A

67 ..............................................................................Exhibit A

68B ...............................................................................................Exhibit A

77 .................................................................................................Exhibit A

78 .................................................................................................Exhibit A

79 .................................................................................................Exhibit A

80 .................................................................................................Exhibit A

83 (ECRN: Sleeve-Push) ................................................................10, 11

83B ..............................................................................................Exhibit A

87 (Sullivan Chart) ....................................................................1, 12, 14

92 (ECRN: BFC Tread Brake Components) ...........................................12


**Defendant's Exhibit ("D.Ex.__") ....................................................... Page**

47 (Nov. 15, 2006 Letter, J. Quigley to A. Neupaver) ........................................18

68 (June 18, 2007 Email, J. Quigley to multiple parties) ...........................15, 18

97 (Jan. 2, 2008 Email, W. Slater to J. Haithcock et al) ...............................15

102 (Mar. 26, 2008 Email, C. Akins to S. Plochochi et al) .............................15

103 (Apr. 25, 2008 Letter, C. Akins to S. Plochochi)........................................15

255 ..............................................................................................Exhibit A

295 (Dimension Inspection Report)..............................................9, Exhibit A

296 (Dimension Inspection Report)...........................................................9

297 (Dimension Inspection Report)..............................................9, Exhibit A

298 (Dimension Inspection Report)..............................................9, Exhibit A

303 (Dimension Inspection Report)..............................................9, Exhibit A

304 (Dimension Inspection Report ..............................................9, Exhibit A

546 (Exh. F to Expert Witness Report of D. Horsley)........................................3

567 (Faiveley Corporate Structure Chart)..................................................21

## INTRODUCTION

Wabtec Corporation ("Wabtec") secured an overhaul contract from the New York City Transit Authority ("NYCT") to replace wearable parts in the tread brake unit of the R-142A subway cars' braking systems. (Hearing Transcript ("Tr.") at 807:18-20 and 810:2-23) Faiveley Transport Malmö AB ("Faiveley") alleges that Wabtec is unable to perform this contract without breaching a license agreement and misappropriating trade secrets. Faiveley seeks preliminary injunctive relief precluding Wabtec from selling any parts, including parts Wabtec purchased on the open market from third-party manufacturers. (Tr. at 5:14-17).

Faiveley's breach of contract claim can be disposed of peremptorily, as Faiveley failed to present any evidence of a breach. Section 22.3 of the License Agreement specifically permitted Wabtec to manufacture and sell competing products both during and after the license term. (*See* P.Ex. 1).

Faiveley's trade secret misappropriation claim falls just as quickly. Wabtec is not selling a complete tread brake unit to the NYCT for the R-142A overhaul contract.[1] (Tr. at 565:15-20). It is selling specific wearable component parts. (Tr. at 565:15-20 and 810:11-23). Faiveley claimed that Wabtec misappropriated trade secrets contained on twelve manufacturing drawings for component parts of the tread brake unit: the packing cup, push sleeve, leader nut, spring sleeve, guide sleeve (bush), guide sleeve (regulator bush), ratchet pin, adjuster nut, control socket, locking ring, spindle and yoke. (*See* P.Ex. 87). Six of the drawings – for the control socket, locking ring, spindle, adjuster nut, push sleeve and yoke – are for items that are not part of the R-142A overhaul. (Tr. at 565:15-23). With regard to the six drawings for R-142A components, Faiveley failed to establish: (1) that those drawings contain trade secrets unknown

---

[1]  Sections 22.1.1 and 22.2 of the License Agreement require Wabtec to continue to carry out contracts of sale of products entered into prior to termination and pay Faiveley royalties on same. (P.Ex. 1) Wabtec entered into the R-160 contract before December 31, 2005, the date upon which Faiveley claims the license agreement terminated. (Tr. at 566:12-567:2, 593:1-16). Faiveley has not disputed that such "grandfathered" contracts are not relevant to this proceeding. (Tr. at 660:8-18).

to others in the market; and (2) that Wabtec made use of the alleged trade secrets in its reverse engineering process.

Faiveley's claim further fails because there is no evidence of irreparable harm. The value of the R-142A contract can be readily converted to monetary damages, and Faiveley's failure to compete on the R-142A bid was entirely due to Faiveley's year-long delay in initiating the NYCT's qualification process. (Layman Tr.[2] at 116:12-17, 60:7-61:17).

Finally, Faiveley's claim fails because it has failed to prove that it has standing under Article III of the United States Constitution to pursue the claims asserted.

## DISCUSSION

### I.  FAIVELEY FAILED TO ESTABLISH ANY LIKELIHOOD OF SUCCESS ON THE MERITS.

"For a party to succeed on a claim for the misappropriation of trade secrets under New York law, it must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." Sit-up Ltd. v. IAC/InterActive Corp., No. 05-CIV-9292, 2008 WL 463884 at *8 (S.D.N.Y. Feb. 20, 2008) (internal quotations omitted). Faiveley has not satisfied either of these burdens.

#### A.  Faiveley Failed To Establish That It Possesses Any Alleged Trade Secrets.

Faiveley has failed to meet its threshold burden of proving that it possesses a protectable trade secret on at least three bases. First, "the Second Circuit has established that matters of general knowledge in an industry are by definition not trade secrets."[3] Sit-up Ltd., 2008 WL

---

2    Deposition transcripts submitted to the Court will be referenced by the last name of the deponent; e.g., "Layman Tr." for the deposition transcript of Andrew Layman.

3    Under New York law, secrecy is "the defining element" of a trade secret claim, and is routinely identified as an "essential prerequisite" and the "most important" consideration in trade secrets litigation. See 4B N.Y.Prac., Com. Litig. in New York State Courts § 81:6 (2d ed.) (citing cases).

463884, at *12 n.10, *citing* Speedry Chem. Products Inc. v. Carter's Ink Co., 306 F.2d 328, 331

(2d Cir. 1962). Second, Faiveley did not prove that its manufacturing information affords it "an

advantage over competitors who do not know or use it." Restatement of Torts § 757 cmt. b[4];

*see, e.g.*, Delta Filter Corp. v. Morin, 108 A.D.2d 991, 993 (N.Y. App. Div. 1985) (no

protectable trade secret where "it was dubious as to the degree to which Delta's method of

pleating the filter gave it any significant competitive advantage"). Third, Faiveley failed to

prove that it has taken sufficient precautionary measures to preserve the secrecy of its

manufacturing information. *See* Frink America, Inc v. Champion Road Machinery Ltd., 48 F.

Supp. 2d 198, 206 (N.D.N.Y. 1999).

### 1.    Competitors Manufacture And Sell BFC Parts On The Open Market.

As to Faiveley's failure of proof on the first two bases, it is undisputed that at least four

third parties make or sell BFC component parts in direct competition with Faiveley on the open

market:  Sabre Rail in the United Kingdom, Yujin in South Korea, Durox in the United States,

and Flourishing in Taiwan.  (Tr. at 554:12-25, 555:15-556:2, 556:22-557:19, 848:8-849:2; D.Ex.

546; Tr. at 852:23-853:4; 854:10-855:2).  It is also undisputed that Wabtec purchased from

Flourishing over 500 BFC pistons which have been successfully used in the overhaul of the

BFCs pursuant to the NYCT R-142A overhaul contract.  (Tr. at 558:7-559:22).  Faiveley

employee, Otmar Berghaus testified that for at least 5 years a Korean manufacturer has been

selling BFC-style parts.  (Tr. at 120:17-122:10).  This evidence shows that the information

contained on Faiveley's manufacturing drawings is (1) generally known in the industry or (2) not

necessary to manufacture BFC parts – or both.  If the former, the information is not secret.  If the

latter, the information affords Faiveley no competitive advantage.

If the third parties are using the information contained on Faiveley's manufacturing

drawings to make BFC parts, then that information is generally known in the industry, and so by

---

4    New York generally looks to section 757 of the first Restatement of Torts for its definition of
a trade secret. *See* Frink America, Inc., 48 F. Supp. 2d at 206.

definition is not a trade secret. *See, e.g.*, Sit-up Ltd., 2008 WL 463884, at *12 n.10. Where a product had been or could be copied by competitors, "the information contained in plaintiff's engineering and production drawings, and jigs and fixtures involve public matters and, therefore, do not constitute a protectible trade secret . . . ." Frink America, Inc., 48 F. Supp. 2d at 207.[5]

On the other hand, if the third parties were able to reverse engineer and then manufacture BFC parts without the use of Faiveley's manufacturing information, that information affords no competitive advantage to Faiveley. On this point, Faiveley employee Bjoern Neller testified that at least one Faiveley competitor (Yujin) has reverse engineered BFC parts and is manufacturing them without the use of Faiveley manufacturing information. (Tr. at 445:24-446:3).

Faiveley's failure to establish that its manufacturing information (1) is not generally known in the industry and (2) affords it a competitive advantage, is fatal to its claim of misappropriation. *See, e.g.*, Thomas & Betts Corp. v. Richards Mfg. Co., 2007 WL 1237852, at *17 (D.N.J. Apr. 26, 2007).

### 2. Faiveley Did Not Establish That It Has Taken Sufficient Precautionary Measures to Protect Its Manufacturing Information.

To establish secrecy, Faiveley must also prove that it had in place sufficient measures to preserve the secrecy of its manufacturing information. Faiveley did not offer sufficient evidence to establish this element of its claim. *See, e.g.*, Frink America, Inc., 48 F. Supp. 2d at 207-08 ("plaintiff also failed to safeguard its process and equipment from public disclosure by taking rudimentary precautions to prevent its employees or competitors from acquiring familiarity with the production designs").

Faiveley's witnesses acknowledged that Faiveley has regularly provided manufacturing drawings to its suppliers, but admitted they do not know if those suppliers are bound by written

---

5    *See also* New York Spool Corp. v. Indus. Paper Tube, Inc., 160 A.D.2d 194, 195 (N.Y. App. Div. 1990) ("manufacturing process was in actual use by others in this industry and similar industries, and was therefore not a trade secret").

confidentiality agreements.[6]  (Tr. at 167:23-168:4, 176:2-4, 194:6-8, 195:11-14, 435:15-20, 436:17-20, 439:7-9; Ragnarsson Tr. at 60:16-61:3, 61:8-14).  Instead, Faiveley relied on a general "understanding" or "expectation" of confidentiality.  (Tr. at 435:15-17, 436:6-16, 437:5-21)  As the Court stated, however, Faiveley's general understanding is not in accord with the law.[7]  (Tr. at 435:1-10).  *See also* DB Riley, Inc. v. AB Engineering Corp., 977 F. Supp. 84, 91 (D. Mass. 1997) ("the relatively weak proprietary statement on the Riley drawings does not preserve the trade secrecy of the information in the drawings" where drawings were distributed to suppliers without formal confidentiality agreements).

    Faiveley's witnesses also admitted they do not know if Faiveley employees with access to the manufacturing drawings are bound by written confidentiality agreements.  (Tr. at 159:9-160:4, 164:4-15).  Faiveley's corporate designee regarding the BFC TBUs, Anders Ragnarsson, testified that all of the employees at Faiveley's Landskrona facility could view and print the manufacturing drawings without any restriction as to department or job description.  (Ragnarsson. Tr. at 64:7-66:14, 67:10-18, 138:18-139:6).  Such failure to protect its alleged trade secrets is also proof that Faiveley does not possess protectable trade secrets in its manufacturing information.  *See* Thomas & Betts , 2007 WL 1237852, at *14 (that alleged trade secret design was known by sixty manufacturing workers without proof that they were bound by confidentiality agreement "weighs against a finding that this is protectable information.").

---

6    Mr. Neller also testified that he does not know how many suppliers have received manufacturing drawings. (Tr. at 435:18-20). Mr. Neller admitted he does not know whether manufacturing drawings are also provided to customers. (Tr. at 285:13-19).

7    Mr. Neller testified that Faiveley provided manufacturing drawings to suppliers relying solely upon (1) the same general understanding of confidentiality it accords to maintenance manuals and assembly drawings, and (2) the "copyright protection" notice or "protection disclaimer," affixed to such drawings. (Tr. at 435:15-17, 436:6-16, 437:5-21).

**B.**    **Wabtec Did Not Use Faiveley's Alleged Trade Secrets.**

Regardless whether Faiveley has proven that it possesses any trade secrets with respect to the twelve BFC parts it identified at the hearing, Faiveley has failed to demonstrate that Wabtec is using those purported trade secrets.[8]

Four of the parts are not being sold by Wabtec other than in the "grandfathered" R-160 contract. (Tr. at 565:24 -567:2). There can be no reasonable contention that Wabtec is misusing Faiveley's purported trade secrets for parts not being sold. *See* Kewanee v. Bicron Corp., 416 U.S. 470, 475 (1974) ("The protection accorded . . . is against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided . . . ."). Moreover, Faiveley cannot credibly argue that Wabtec may not re-sell parts Wabtec purchased from third-parties on the open market.

Of the remaining eight parts, only six are being sold to NYCT as part of the R-142A overhaul contract. (Tr. at 565: 15-23). Those six parts have been reverse engineered by Wabtec through independent third-parties and there is no credible evidence that Faiveley's purported trade secrets have been used in that process. Id. Trade secret misappropriation does not exist if the alleged trade secrets have not been used or disclosed. *See* Kewanee, 416 U.S. at 475.

**1.**    **Wabtec Conducted A Bona Fide Reverse Engineering Process.**

Although Wabtec's reverse engineering effort began in 2005, that attempt was never completed and Wabtec has not used the work product of that effort.[9] (Tr. at 635:19-22, 567:12-568:11, 639:22-24). In mid-2007, Paul Jamieson, the chief engineer for Wabtec's passenger transit division, initiated the current reverse engineering process. (Tr. at 641: 22-24, 528: 9-11).

---

[8]    If, however, the Court finds that Faiveley has failed to prove it possesses a protectable trade secret, the issue of reverse engineering is moot. *See* Thomas & Betts Corp., 2007 WL 1237852, at *33.

[9]    The work was performed by a firm in China named "Hongdu." Wabtec was not satisfied with the quality of Hongdu's work so Wabtec elected to terminate its relationship with Hongdu. (Tr. at 671:14-24, 567:12-568:8).

Mr. Jamieson established the reverse engineering process and personally selected the firms and individuals involved, all of whom acted at his direction.[10]  (Tr. at 562:12-15).

The reverse engineering process undertaken by Wabtec for BFC parts involved the engagement of third-party engineering firms to independently reverse engineer BFC parts.  The principal reverse engineering firm was Alkab Contract Manufacturing, Inc. ("Alkab").  (Tr. at 560:8-18).  Alkab's William Kabazie unequivocally testified that Alkab did not have any prior knowledge of BFCs and that Wabtec did not provide any manufacturing drawings to Alkab. (Kabazie Tr. at 36:21-37:5, 47:6-12, 109:25-112:1).[11]

Another significant participant in the reverse engineering of the BFC parts was Rail Transit Consultants ("RTC"), which did an independent review of the adequacy of the preliminary Alkab drawings for manufacturing purposes.  (Tr. at 578:9-19).  Dallas Spadaro, the engineer at RTC who worked on the reverse engineering project, is a mechanical engineer.  He worked in Wabtec's foundation brake group prior to 1986, but left Wabtec more than five years prior to the 1993 License Agreement.  He unequivocally testified that Wabtec did not provide any manufacturing drawings to him or RTC.  (Spadaro Tr. at 110:23-111:1, 111:12-16).

In order to assure that the drawings generated by third-parties Alkab and RTC would be useable today in Wabtec's manufacturing facility, Mr. Jamieson selected Wabtec engineers who worked outside the foundation brake group to review the reverse engineered drawings.  (Tr. at 609:8-610:1).  The persons Mr. Jamieson selected included Al Kreger and Jerry Stepp.

---

10  Mr. Jamieson has no meaningful knowledge of the Faiveley manufacturing drawings.  (Tr. at 531:13 - 533:23).

11  KTM Solutions was another engineering firm that provided reverse engineering services in connection with the BFC but to a much lesser extent than Alkab.  Spring Masters provided reverse engineering services for BFC specialty springs.  (Tr. at 560:8-18, 577:5-15).  The evidence is that original Wabtec, SAB and Faiveley drawings, or any tolerances or dimensions from those drawings, were not given to any third-parties like Alkab and KTM. (Tr. at 790:23-791:16).

Mr. Kreger is a retired Wabtec engineer who worked in Wabtec's electronics, pneumatics, and compressor engineering groups. He never worked in the foundation brake group. (Tr. at 569:7-23). Mr. Stepp is an engineer in Wabtec's coupler group and he too has never worked in Wabtec's foundation brake group. (Tr. at 580:3-18). Accordingly, neither of them previously worked with the BFC. (Tr. at 580:13-18).

Mr. Jamieson also selected Wabtec's Dartlan Collins to perform certain tasks as part of the reverse engineering project. (Collins Tr. at 55:8-10; Tr. at 582:15-583:8). Mr. Collins is a "draftsman" who simply prepared the final reverse engineering drawing based on information provided to him. (Collins Tr. at 110:11-111:11; Tr. at 673:20-25). He is not an engineer, and did not exercise any engineering judgment in the reverse engineering process. (Collins Tr. at 22:21-23, 72:13-73:19). Although Mr. Collins had previously provided drafting services in connection with BFCs, he testified unequivocally that he could not and did not recall any details on any such drawings, that he did not access any drawings of Faiveley parts in connection with his reverse engineering work, and that he is not even familiar with how a BFC operates. (Collins Tr. at 7:9-11, 52:10-53:18, 57:12-59:3, 134:4-7, 193:4-194:10).

The Wabtec quality assurance department, which was asked by Mr. Jamieson to measure parts provided to it, performed that simple task and would have no way to tie the parts to a SAB/Faiveley drawing or a Wabtec drawing of a Faiveley part. (Tr. at 561:15-22).

Mr. Jamieson instructed the Wabtec personnel working on the project that they were not to access any "Faiveley drawings." (Tr. at 563:13-16). The specific reverse engineering process established by Mr. Jamieson was:

- Mr. Kreger was instructed to review a bill of material for the BFC TBU and determine which parts were catalog items, meaning that such parts are standard ["off-the-shelf"] commercially available items that can be purchased in the open market through catalogs from multiple vendors. (Tr. at 560:19-561:2, 568:12-569:6, 575:7-14). Ultimately, these commercially available parts were purchased from third-party vendors. (Tr. at 576:4-17).

- For non-catalog parts, assemblies and/or component parts were sent to third-party engineering firms, such as Alkab, for reverse engineering. (Tr. at 576:18-577:25).

- Alkab's drawings were sent to RTC for a manufacturability review and comments. (Tr. at 578:6-19, 579:21-580:2; see, e.g., D.Exs. 401, 405, 409).

-8-

- RTC's comments were reviewed by Mr. Stepp. (Tr. at 580:3-12). He identified certain dimensions on parts for which he wanted measurements. (Tr. at 582:15-583:1).

- Wabtec's quality assurance department obtained ten samples of the part, measured the noted dimensions, produced a report and provided that report to Mr. Stepp. Mr. Stepp used this information to assist him in determining the final dimensions and tolerances to be used on the reverse engineering drawings. (Tr. at 582:15-583:1). *See also* D.Exs. 295, 296 297, 298, 303, 304, 305, 306 (Dimensional Inspection Reports).

- The reverse engineering drawings containing Mr. Stepp's information were sent to Mr. Kreger and Mr. Collins. Mr. Collins drafted the formal drawing as pescribed in the information provided to him by Mr. Stepp. Mr. Kreger prepared paperwork and issued the engineering change and release notice (ECRN) in accord with Wabtec's normal practices. (Collins Tr. at 108:9-14, 110:16-111:11, 113:14-114:14; Tr. at 582:15-583:25).

- Once the ECRN had been issued and the reverse engineered drawing "released" (entered) into Wabtec's viewing system, the reverse engineering process was complete. The final version of the reverse engineered drawings was usually called "Revision A." (Collins Tr. at 108:9-18; Tr. at 789:14-790:10).

- Upon being entered into Wabtec's viewing system, the reverse engineered drawing replaced the previously existing manufacturing drawing of that BFC part. At that point, the previously existing drawing was made "obsolete", *i.e.*, it became unavailable on the viewing system. (Collins Tr. at 152:11-16; Tr. at 789:14-790:16). Thereafter, it could be accessed only with the permission of Mr. Jamieson. (Tr. at 563:17-564:6). This would include the existing Wabtec manufacturing drawings for the same part currently being made for the grandfathered NYCT R-160 contract. (Tr. at 593:1-11).

- Mr. Jamieson testified that he has not given permission for any such "obsolete" drawings to be accessed. (Tr. at 563:17-564:6).

Based on the reverse engineered manufacturing drawing, Wabtec would either manufacture the part or procure it from a vendor, just like any other part in Wabtec's system. Those parts, once received, would undergo a "first article inspection." (Tr. at 584:16-585:7). The first article inspection encompassed extensive analysis by Wabtec's quality assurance department to determine whether the part conformed to the drawing and could be shipped, or whether there was a variation in the part requiring instruction to the vendor to manufacture the part correctly, or assistance from engineering group responsible for those parts. (Tr. at 585:8-586:4).

All of the reverse engineered parts were 100% production tested in units for the grandfathered NYCT R-160 contract, as well as in the units currently being overhauled pursuant

to the NYCT R-142A overhaul contract. (Tr. at 593:23-594:15). Mr. Jamieson testified that he is unaware of any quality issues being detected as a result of the testing performed. (Id.).

The above process is bona fide reverse engineering. It most certainly is not a "sham." It has resulted in independently developed BFC parts, parts developed without the use of any purported Faiveley trade secrets. Thus, Faiveley's trade secrets are not being used by Wabtec and therefore cannot be the basis of a misappropriation claim. *See* Kewanee, 416 U.S. at 475 ("[T]rade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture").

### 2.   Mr. Moore's Limited Involvement Did Not Compromise The Reverse Engineering Process.

At the hearing, Faiveley attacked Wabtec's reverse engineering process by insinuating that Mr. Moore assisted in the process, or intervened after it was completed, using Faiveley's alleged trade secrets. (*See, e.g.*, P.Exs. 37, 83) The evidence demonstrates, however, that Mr. Moore did not impart any alleged Faiveley trade secret information at any stage of the reverse engineering process or after it had been completed.

For example, Faiveley offered Plaintiff's Exhibit 37 as purported evidence that Mr. Moore was providing Faiveley trade secret information to KTM. However, Mr. Moore was vetting KTM's capabilities for reverse engineering by reviewing KTM's first set of drawings and pointing out that certain information was missing from the reverse engineered drawing. (Tr. at 746:23-25, 795:23-796:7). In doing so, he provided no alleged Faiveley trade secret information to KTM. (Tr. at 611:5-612:16, 740:5-7; 745:4-8, 795:23-796:24, 797:5-21). Mr. Moore testified that while drawings from some of the reverse engineering firms were received through him, other than reviewing the first set of KTM drawings and the later-discarded Hongdu drawings, he did not review any drawings provided to Wabtec by the reverse engineering firms. (Tr. at 744:10-745:3). Mr. Moore also testified that he was not involved in making the Wabtec

drawings from the reverse engineered drawing received from the engineering firms. (Tr. at 742: 22-25). Mr. Moore further testified that he never gave any original drawings, or any tolerances or dimensions from those drawings, to any of the Wabtec personnel or independent third parties involved in the reverse engineering process. (Tr. at 790:23-791:16).

Faiveley also attempted to demonstrate that Mr. Moore made use of Faiveley trade secrets after the reverse engineering process was completed. As Mr. Moore testified, once the final reverse engineered drawing was completed, typically in Revision A of the drawing, it was released to the Wabtec viewing system so that manufacturing and outside vendors could use it. (Tr. at 789:18-790:2). Mr. Moore could then also see the drawing. (Tr. 790:8-10). However, the original Wabtec version of the Faiveley drawing had already been taken off the system. (Tr. at 790:3-7). Thus, when Mr. Moore was able to see the final reverse engineered drawing of a part, he was unable to look at either the original Wabtec or Faiveley drawings for that part. (Tr. at 790:11-16).

Faiveley nonetheless contends that Mr. Moore used Faiveley trade secrets in making changes to the drawings after the completion of the reverse engineering process, such as with the changes to the push sleeve set forth in the ECRN in Plaintiff's Exhibit 83. However, Mr. Moore testified that he did not look at any original Wabtec or Faiveley drawings for the push sleeve when he made the changes. (Tr. at 790:17-22). Mr. Moore's changes to the dimensions on the push sleeve drawing were requested by manufacturing or were based on the function of the part, something that any engineer would learn by working with the parts over many years without *any* knowledge of Faiveley's alleged trade secrets. (Tr. at 757:16-759:24). Moreover, the change of the length of the larger diameter cylinder for the push sleeve from 4.19 to 4.29 inches could be derived from the dimensions set forth on the face of the Alkab drawing, Plaintiff's Exhibit 79. (Tr. at 791:17-793:18).

Likewise, Mr. Moore testified that the 2.756 control dimension on the push sleeve was not taken from the Faiveley drawing, but was determined by viewing mating parts and the dimensions on the Alkab drawing, Plaintiff's Exhibit 79. (Tr. at 763:22-765:10; 793:23-795:12).

Mr. Moore further testified that the change to this control diameter did not change the actual 2.636 dimension of the diameter of the smaller push sleeve cylinder established in the Alkab drawing. (Tr. at 793:23-794:22). Beyond that, Mr. Moore, who looks at 25-50 drawings per week, testified that he could not remember any specific dimensions or tolerances. (Tr. at 787:21-788:6). There is no evidence or testimony that Mr. Moore used or even needed the original Wabtec or Faiveley drawings or dimensions to change the dimensions for the reverse engineered push sleeve.[12]

### 3. Mr. Sullivan's Summary Chart Does Not Evidence Wabtec's Use of Any Alleged Faiveley Trade Secrets.

Faiveley attempted to demonstrate through a chart (P.Ex. 87) prepared by its summary witness, Mr. Sullivan, that Wabtec used Faiveley's alleged trade secrets to change the reverse engineered drawings.[13] As the first of the two examples from this chart showcased by Faiveley at the hearing, Mr. Sullivan asserted that the presence of a gap in Wabtec's final reverse engineered drawing for the guide sleeve 53508, when no such gap existed in the Alkab reverse engineered drawing for this part, allegedly establishes that Wabtec used Faiveley trade secret information. (Tr. at 336:16-338:18). Yet, Mr. Sullivan conceded that the gap is visible if you look at the part (Tr. at 363:7-365:2), and Mr. Neller testified that the gap is obvious to anyone looking at the part *and that such a gap is not a trade secret of Faiveley*. (Tr. at 444:10-16).

---

12 Faiveley also cross-examined Mr. Moore with respect to changes (*see, e.g.,* P.Ex. 92) to the jointing ring, which was not one of the 12 parts put in issue by Faiveley. Mr. Moore likewise testified that he did not look at any, and indeed could not look at any, original Wabtec or Faiveley drawings for the jointing ring and did not remember the dimensions on those drawings, but instead, looked at the actual parts to do the changes. (Tr. at 785:17-787:2, 787:17-20, 784:9-785:16).

13 Mr. Sullivan was not a fact witness with personal knowledge, and the Court held that he was not qualified as an expert witness under rule 702 as he had no relevant expertise. (Tr. 345:6-13, Tr. 361:2-15). He was allowed to testify as a "summary witness" to describe a chart he prepared that compared manufacturing drawings. (Id.) Wabtec objected to the introduction of the chart as it was not referenced in Mr. Sullivan's expert reports and, despite having been prepared by Mr. Sullivan two weeks prior to the hearing, was not turned over to Wabtec until Mr. Sullivan took the witness stand. (Tr. 357:19-358:19).

The other evidence purportedly summarized by Mr. Sullivan's chart for the guide sleeve 53508, as well as the summaries regarding the other seven reverse engineered parts, is equally flawed. Quite simply, it fails to prove *any* instance of Wabtec's use of alleged Faiveley trade secret information to change the reverse engineered drawings. This is demonstrated in detail on Exhibit A hereto (Wabtec's Chart in Response to Plaintiff's Exhibit 87). Rather, the evidence shows that the changes made to the drawings were based on (1) information proprietary to Wabtec or known to Wabtec prior to the License Agreement (*e.g.*, the use of Delrin 500 for the guide sleeve), (2) general engineering know-how (*e.g.*, the instruction on the guide sleeve drawing to "remove mold flash"), and/or (3) information readily ascertainable from the product itself (*e.g.*, the gap in the guide sleeve). (Tr. at 537:11-538:18, 544:12-20, 545:19-546:4, 444:10-16). As Exhibit A demonstrates, there are vastly more differences between Wabtec's reverse engineered drawings and Faiveley's drawings than the few similarities that Mr. Sullivan and Faiveley seized upon. Those differences, as evidenced by a review of the drawings themselves, prove that Wabtec was not changing Alkab or KTM drawings to make them conform to Faiveley drawings.

## II.    FAIVELEY HAS NOT ESTABLISHED IRREPARABLE HARM.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." AM Medica Communs. Group v. Kilgallen, 261 F. Supp. 2d 258, 261 (S.D.N.Y. 2003) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)). Because irreparable harm is defined as an "injury for which a monetary award cannot be adequate compensation," Jayaraj v. Scappini, 66 F.3d 36, 39 (2d. Cir. 1995) (quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d. Cir. 1979)), it is well established that "where money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene where there is an adequate remedy at law." Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d 914, 918 (2d Cir. 1986).

**A.     Irreparable Harm Should Not Be Presumed in This Matter.**

For purposes of preliminary injunctive relief, there is a "*rebuttable* presumption of irreparable harm which attaches to trade secret misappropriation." Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC, 80 F. Supp. 2d 25, 30 (N.D.N.Y. 1999) (emphasis added). The Court thus is not precluded from finding that there is no risk of irreparable harm, even if the claim involves misappropriation of trade secrets. *See, e.g.*, Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955, 966 (S.D.N.Y. 1996) (the presumption, standing alone, is insufficient to justify a finding of irreparable harm where the evidence demonstrates that plaintiff's purported harm "should be fully compensable by money damages . . ..").

**1.     Any Presumption Of Irreparable Harm Has Been Conclusively Rebutted**

Relying heavily upon the presumption of irreparable harm , Faiveley introduced scant evidence at trial relating to its alleged injury. Such evidence, even when generously described, consisted of no more than (1) the assertion that Wabtec was awarded the NYCT R-142A Overhaul Contract – and Faiveley was not – by claiming that the BFC-type TBU was Wabtec's product (Tr. at 305:1-18, 391:3-19 (Neller))[14]; and (2) the allegation that Wabtec used Faiveley's alleged trade secrets in its effort to reverse engineer BFC-type TBU component parts sold to NYCT. (*See* P.Ex. 87).[15]

---

[14] John Quinn, Faiveley's corporate designee regarding Faiveley's marketing and sales efforts, testified that the only alleged continuing injury resulting from Wabtec's conduct was the loss of the NYCT contract. (Quinn Tr. at 59:23-60:3, 61:10-18). Joseph Quigley, the Managing Director of Faiveley Transport USA until October 31, 2007, testified similarly. (Quigley Tr. at 183:17-25).

[15] Although Mr. Hoffner testified regarding one or two post-termination occasions where non-reverse engineered products were sold for non-grandfathered contracts (Tr. at 677:9-13, 678:522, 679:11-18), these were isolated incidents and there is no evidence either that such sales are continuing or that Faiveley suffered irreparable harm as a result of those sales. Moreover, Faiveley cannot be found to complain about post-termination sales by Wabtec when at least until October 2007, Faiveley Transport USA was continuing to supply Wabtec with spare parts for Wabtec to provide – *i.e.*, resell – to customers. (Quigley Tr. at 149:10-17).

As to NYCT's decision not to award the overhaul contract to Faiveley, the sole evidence introduced by Faiveley in support of its claim was Mr. Neller's testimony that Faiveley was not awarded the overhaul contract because Wabtec asserted that it was the designer of the BFC TBU. (Tr. at 305:1-18, 391:3-19). The overwhelming evidence belies this claim. Both NYCT's response to Faiveley Transport USA's "Commercial Offer" and NYCT's response to Faiveley Transport USA's protest of the sole source award to Wabtec make clear that NYCT would not even consider awarding the overhaul contract to Faiveley because Faiveley had not undertaken the process to qualify as a supplier of its parts to NYCT. (P.Ex. 25 at 2-3; P.Ex. 25 at 2-9). The designated testimony of NYCT's Andrew Layman further supports that this was NYCT's basis for not considering Faiveley for the contract. (Layman Tr. at 60:21-61:17). Even Mr. Neller conceded that it was NYCT's position that Faiveley wasn't eligible to be awarded the overhaul contract because it had not qualified itself as a supplier to NYCT. (Tr. at 391:20-392:5). Moreover, as Faiveley has failed to proceed with any alacrity to qualify as a provider to NYCT, Faiveley can blame only itself for any "continuing" harm associated with its failure to obtain the overhaul contract because it remains unqualified to supply the relevant parts to NYCT.[16] In sum, there can be no irreparable harm where Faiveley's alleged injury is premised on the loss of a contract for which Faiveley is not even qualified to compete.

Even were the Court to find that Wabtec is using Faiveley's alleged trade secrets to produce parts used to satisfy the NYCT overhaul contract – which, as set forth above, Wabtec is not – the evidence would still not support application of any presumption of irreparable harm.[17]

---

16  For more than a year, the NYCT has actively encouraged Faiveley to undertake the necessary qualification procedures, yet Faiveley has failed to seriously attempt to qualify. (Layman Tr. at 116:12-117:3; D.Exs. 68, 97, 102, 103; P.Ex. 25). Moreover, as admitted by Mr. Neller, Faiveley remains unqualified to perform any part of the R-142A contract. (Tr. at 418:9-15; *see also* Layman Tr. at 100:24-101:2; Tr. at 811:5-8 (K. Falk) (Wabtec is the only qualified supplier)).

17  It is axiomatic that Faiveley's failure to establish that the information at issue constitutes a trade secret would, in and of itself, be fatal to Faiveley's ability to establish irreparable harm as a result of alleged misappropriation. *See, e.g.*, Ivy Mar. Co. v. C.R. Seasons, Ltd., 907 F. Supp. 547, 567 (E.D.N.Y. 1995).

In the first instance, the record is devoid of any evidence that Wabtec improperly disseminated Faiveley's alleged trade secrets – the manufacturing drawings – to a third party, and Faiveley did not contend that any such dissemination took place.  Moreover, because of the relationship between the parties under the License Agreement, there is no question that Wabtec obtained the subject information lawfully.  (*See* P.Ex. 1 at §§ 2.1, 5; Tr. at 111:10-15, 113:1-4 (Berghaus)).  Because Wabtec continues to perform under the R-160 contract with NYCT – entered into prior to termination of the License Agreement – there is further no question that Wabtec has the right to possess the subject information (P.Ex. 1 at § 22.1.1; Tr. at 566:7-567:2 (Jamieson)).  Finally, in light of the R-160 contract, there is no question that Wabtec has the right to use the subject information to manufacture and sell pursuant to that contract the parts reflected in the drawings introduced by Faiveley at trial (P.Ex. 1 at § 22.1.1; Tr. at 566:7-567:2 (Jamieson)).  Thus, the issue presented is limited to one of scope:  Did Wabtec use the subject information beyond the scope allowed under the License Agreement post termination.

Under such circumstances, even if Faiveley were to establish misappropriation in the context of the parts manufactured and sold to NYCT for the overhaul contract, the only injury which the evidence could support is in the form of the unjust enrichment of Wabtec by use of Faiveley's alleged trade secrets.  Such injury could be remedied through monetary damages in the form of Wabtec's disgorgement of any profits resulting from such sales.[18]  Faiveley can assert no further injury because, as described above, Wabtec obtained, possesses and continues to use the alleged trade secrets lawfully under the terms of the License Agreement because of the continuation of the R-160 contract.  (*See* P.Ex. 1 at § 22.1.1).

---

[18]  *See* Geritrex Corp., 910 F. Supp. at 966 (where plaintiff did not contend that there was any danger of defendant disseminating its alleged trade secrets, but argued instead that defendant would suffer loss of sales from a competing product, the court held that there was no irreparable harm, and that such loss "should be ascertainable by comparing the customer lists and sales information of the two companies and should be fully compensable by money damages unless defendants are judgment-proof.").

Accordingly, any assertion of irreparable harm has been conclusively rebutted pursuant to the evidence introduced at trial.[19]

### 2. The Presumption Of Irreparable Harm Is Rebutted By Faiveley's Delay In Seeking Injunctive Relief.

The presumption of irreparable harm is further rebutted by Faiveley's delay in seeking injunctive relief.  It is well established that delay alone will rebut the presumption of irreparable harm for trade secret claims.  *See, e.g.,* Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC, 80 F. Supp. 2d 25, 27-28 (N.D.N.Y. 1999).  Further, a defendant need not prove prejudice before an injunction may be denied on the basis of inexcusable delay.  *See* Gidatex, S.r.L. v. Campaniello Imports, LTD, 13 F. Supp. 2d 417, 419 n.1 (S.D.N.Y. 1998).

In determining whether Faiveley delayed in seeking injunctive relief, it is not necessary to establish when Faiveley had conclusive evidence of Wabtec's alleged wrongful conduct.  Rather, it is sufficient that Faiveley failed to take action after it became sufficiently "suspicious" that Wabtec had misappropriated Faiveley's alleged trade secrets or breached the License Agreement.  *See* Worldwide Sport Nutritional Supplements, Inc., 80 F. Supp. 2d at 34-35 (finding no irreparable harm based because plaintiff had become "very suspicious" that defendant was using its trade secrets to manufacture a competing product at least seven months before seeking injunctive relief).

Here, the evidence establishes that Faiveley unjustifiably delayed no less than five months before seeking a preliminary injunction.  In his November 15, 2006 termination letter,

---

[19] For these same reasons, the presumption of irreparable harm is inapplicable.  The stated rationale for the presumption of irreparable harm for trade secret misappropriation in the Second Circuit is that a "trade secret once lost is, of course, lost forever."  FMC Corp. v. Taiwan Tainan Giant Indust. Co., Ltd., 730 F.2d 61, 63 (2d Cir. 1984).  Whereas there is no evidence that Wabtec has breached any confidentiality obligation to Faiveley, and it is beyond dispute that Wabtec obtained, possesses and continues to use the alleged trade secrets pursuant to and consistent with the terms of the License Agreement (due to the continued performance under the R-160 contract), there is simply no evidence to support any claim that Wabtec has or will disseminate Faiveley's purported trade secrets or that the alleged secrets will be "lost forever" absent an injunction.  The basis for a presumption of irreparable harm is therefore absent.

Mr. Quigley directed Wabtec to "cease immediately [its] marketing, distribution and selling" of the licensed products. (D.Ex. 47).[20] Mr. Quigley testified that by the end of the first quarter of 2007, he was aware that Wabtec was using Faiveley's designs to manufacture licensed products. (Quigley Tr. at 228:11-229:23). Further, Mr. Neller testified that Faiveley was aware that Wabtec would be awarded the sole source procurement in the Spring of 2007 and admitted that Faiveley was investigating Wabtec's use of Faiveley know-how after the termination of the License Agreement by April, 2007. (Tr. at p. 304:9-21, 380:17-25, 381:20-25). Shortly thereafter, in a May 29, 2007 letter to Wabtec's counsel, Faiveley's attorney, Ms. Shuck, asserted that Wabtec had breached the License Agreement. (P.Ex. 24 at 5). Finally, by the time Mr. Neller and Mr. Quigley met with NYCT on June 18, 2007 – still four (4) months prior to the commencement of this action – Faiveley felt that it had sufficient knowledge of an alleged breach by Wabtec, that it told NYCT that Wabtec had violated the agreement. (*See* D.Ex. 68). Nonetheless, Faiveley unjustifiably chose to delay until October, 18 2007 to file this preliminary injunction lawsuit.

## III. THIS COURT SHOULD CONSIDER THE PUBLIC INTEREST AND DENY THE INJUNCTION.

The Second Circuit has held that "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." Brody v. Village of Port Chester, 261 F.3d 288, 290 (2d. Cir. 2001) (quoting Time Warner Cable v. Bloomberg, L.P., 118 F.3d 917, 929 (2d Cir. 1997)).

Keith Falk, Director of Car Systems Engineering for New York City Transit, testified that the consequences of an interruption in the supply of tread brake units would be as follows:

---

20  As articulated in Wabtec's Preliminary Statement, Wabtec maintains its assertion that this letter terminated the License Agreement as of December 31, 2006. (*See also* Quigley Tr. at 108:17-109:7).

> The 142 Bombardier cars, there is about a thousand cars involved, their tread brakes are being overhauled as part of our SMS or scheduled maintenance system program.
>
> Once, obviously, if we don't have parts for that, that program would have to be halted. The SMS on the R-142A involves the upgraded components and we have just started the SMS program on the R-142 cars. … Basically now is when we've determined that the six-year point is when the components have reached the end of that life and that's why we are overhauling them at this time. …
>
> If we are cut off from that supply, it could severely implicate our ability to continue trains in service.

(Tr. at 810:7-811:4).  As Mr. Falk confirmed, Wabtec is the only supplier who has qualified with NYCT to supply the necessary parts.  (Id. at 811:5-8).

Granting the injunctive relief requested by Faiveley would "severely implicate" NYCT's ability to continue trains in service, for a period of time that could range from a year to sixteen months.  (Tr. at 814:14-19).  Even on an expedited qualification schedule, NYCT believed that it would take at least three to four months to complete the testing and evaluation on Faiveley's tread brake unit, and an additional several months to test the durability of Faiveley's components.  (Tr. at 815:20-816:1).  The lengthy service interruptions that NYCT would experience in the event of an injunction would have a severe negative impact on the interests of NYCT[21] and New York residents who rely upon public transportation.  (See also Layman Tr. at 105:9-106:5).

## IV.    FAIVELEY LACKS ARTICLE III STANDING TO SEEK RELIEF IN THIS COURT.

Article III standing is a threshold burden a plaintiff must satisfy to proceed with an action.  See Allen v. Wright, 468 U.S. 737, 750-751 (1984)[22].  Standing cannot be presumed or

---

21  Beyond the public interest, the detrimental impact of the requested injunction on a third party – the NYCT – is also properly considered by this Court.  See Joneil Fifth Ave, Ltd. v. Ebeling & Reuss Co., 458 F. Supp. 1197 (S.D.N.Y. 1978).

22  Wabtec has also raised this issue in the underlying foreign arbitration.  There, the Arbitration Tribunal as an initial matter placed the burden of proof on Wabtec to disprove Faiveley

Continued on following page

granted gratuitously, and a district court must resolve material factual disputes and affirmatively establish constitutional jurisdiction prior to deciding a case on the merits. *See* <u>Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co.</u>, 436 F.3d 82, 85 (2d Cir. 2006); *see* <u>Airlines Reporting Corp. v. S and N Travel, Inc.</u>, 58 F.3d 857, 862 n.4 (2d. Cir. 1995). If Faiveley cannot establish standing, the Court has no jurisdiction to address the merits of Faiveley's motion for a preliminary injunction, and this action must be dismissed. *See, e.g.*, <u>Brody v. Village of Port Chester</u>, 261 F.3d 288 (2d Cir. 2001); <u>Fitzgerald v. Berman</u>, No. 1:02-cv-926, 2003 U.S. Dist. LEXIS 27156, at \*19 (N.D.N.Y. Sept. 30, 2003); <u>Building Industry Fund v. Local Union No. 3</u>, 992 F. Supp. 162, 171 (E.D.N.Y. 1996).

The parties to the License Agreement were SAB WABCO Holdings, B.V. ("SAB WABCO") and Wabtec. (P.Ex. 1). Faiveley Malmo offered no proof that it, rather than any one of the other forty entities in the "Faiveley Transport Group", succeeded to SAB WABCO's contract rights. (See D. Ex. 567; Tr. at 73:7-22). Marc Chocat, the architect of the SAB WABCO acquisition, testified that he was unable to place SAB WABCO on the Faiveley Transport organization chart, as the SAB WABCO entities had been split up into various different companies to spread the debt load. (Tr. at 73:4-22).

Although the Court suggested that any lack of standing may be addressed through a change in the caption, such a change is not possible given that the preliminary injunction is sought by means of a miscellaneous motion in aid of a foreign arbitration, where the Claimant is Faiveley Malmo. Prior to allowing Faiveley Malmo to proceed on its contract claim, the Court must therefore satisfy itself that Faiveley Malmo is the correct Faiveley entity, as Malmo cannot enforce a contract where the contract rights are held by a subsidiary or a sister affiliate. *See*

---

Continued from previous page

Malmo's standing claim, found that Wabtec had not met the initial burden, and reserved a final decision on standing for the hearing on the merits. Leaving aside the substantial question as to whether Swedish law would allow standing to be presumed, it is beyond dispute that in order to take advantage of the U.S. federal courts, the burden lies on Faiveley Malmo to establish its entitlement to relief. <u>Allen v. Wright</u>, 468 U.S. 737, 750-751 (1984).

Bross Utilities Service Corp. v. Aboubshait, 618 F. Supp. 1442, 1445 (S.D.N.Y. 1985) (dismissing claims by parent to enforce agreement where rights belonged to a subsidiary).

Similarly, there is no document or testimony proving that Faiveley Malmo possesses rights to the alleged trade secrets at issue and can therefore assert a misappropriation claim. The legends on the manufacturing drawings at issue bear the name of Malmo's subsidiary, Faiveley Transport Nordic, or simply bear the name "Faiveley Transport". (*See* D.Ex. 567; P.Exs. 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23). Faiveley Transport Holding GmbH's Service Business Development manager for bogie brakes and couplers testified that the engineering, design and manufacturing for the BFC tread brake units is the responsibility of Faiveley Transport Nordic AB, not the Claimant. (Tr. at 222:5-9, 371:19-25, 372:1-3).

Lack of jurisdiction therefore provides an independent basis for dismissal.

## CONCLUSION

For all the foregoing reasons, Wabtec Corporation respectfully requests that this Court deny Faiveley Transport Malmö A.B.'s motion for a preliminary injunction.

Date: August 6, 2008

Respectfully submitted,

Lawrence E. Flatley
Courtney C.T. Horrigan
Brian T. Himmel
Maria N. Bernier
Barry J. Coyne
Daniel K. Winters

REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219
412-288-4058
Fax: 412-288-3063

599 Lexington Avenue
New York, New York 10022
(212) 521-5400

*Attorneys for Defendant Wabtec Corporation*

-21-

EXHIBIT A: Wabtec's Chart in Response to Plaintiff's Exhibit 87
(Also responsive to the individual summary chart for each part, namely P.Ex. 31b, 38b, 44b, 49b, 54b, 63b, 68b, 83b)

| Faiveley's Part Number (Summary Chart) | Reverse Engineered Wabtec Drawing (Response to Sullivan Summary Charts) |
|---|---|
| 1. Guide Sleeve 53508 (response to P.Ex. 31b) | 1. The "gap" is plainly visible upon observing the part. (Tr. at 363:7-365:2). Mr. Neller testified the gap is not a trade secret (Tr. at 444). <br> 2. Mr. Jamieson testified that Delrin 550CL is a standard bearing material that Wabtec has used for many products, including products other than BFCs (Tr. at 537-38). <br> 3. Mr. Jamieson testified that the special instructions notes are standard Wabtec instructions for molded parts (Tr. at 546-48). Other than Delrin 550CL, instructions on the reverse engineered drawing are not found on the Faiveley (P.Ex. 27) or original Wabtec (P.Ex. 28) drawings. <br> 4. Data sheets supporting measurement of 10 production parts are in evidence as D.Ex. 297. <br> 5. There is no allegation that the dimensions and tolerances are the same for the reverse engineered drawing as compared to the original Wabtec (P.Ex. 28) and original Faiveley drawings (P.Ex. 27). Mr. Jamieson testified that every dimension and tolerance on the reverse engineered drawing (P.Ex. 30) is different from those on the original Wabtec drawing (P.Ex. 28). <br> 6. Wabtec added a side view and dimensions to the reverse engineered drawing (P.Ex. 30) not included on the Faiveley drawing (P.Ex. 27). The reverse engineered drawing (P.Ex. 30) has a standard Wabtec surface finish of 250 micro-inches which is different from the 25 micrometer or 1000 micro-inch surface finish specified by Faiveley (P.Ex. 27). |
| 2. Packing Cup (response to P.Ex. 38b) | 1. The special instruction requiring the marking of the manufacturer's name on the part is standard industry practice as evidenced by notes on the KTM drawing (P.Ex. 34) stating that the part is to be marked in accord with MIL-STD-130 (a military standard also used by civilian manufacturers) which includes marking the identification of the manufacturer. <br> 2. There is no allegation that the dimensions and tolerances are the same for the reverse engineered drawing as compared to the original Wabtec (P.Ex. 33) and original Faiveley drawings (P.Ex. 32). Faiveley admits that five dimensions varied by an average of 0.014" when comparing the reverse engineering drawing (P.Ex. 35) to the Faiveley drawing (P.Ex. 32). Many of the dimensions on the reverse engineered drawing do not appear on the Faiveley drawing. <br> 3. Data sheets supporting measurement of 10 production parts are in evidence as D.Ex. 303. <br> 4. The Wabtec material specification (M-23018 and M-01008-22) for the reverse engineered drawing differs from Faiveley material specification (A-628740). <br> 5. The e-mail from Roland Moore (P.Ex. 37) and the KTM report (P.Ex. 38) do not reference this part, which has KTM part number 07414C110015 on the KTM drawing (P.Ex. 34). Roland Moore testified that information provided in the e-mail was not Faiveley information and no Faiveley dimensions or tolerances were set forth in the e-mail (Tr. at 795-97). |

| | |
|---|---|
| 3. Adjuster Nut<br><br>(response to P.Ex. 44b) | 1. The special instructions on Wabtec reverse engineered drawing (P.Ex. 42) identify a Wabtec specification for rust protection (AS-07641-01) which is different from any specification on the Faiveley drawing (P.Ex. 39).<br>2. The Wabtec reverse engineered drawing specifies a Wabtec material specification (M-8620-12) which is different from any specification on the Faiveley drawing (P.Ex. 39).<br>3. The KTM generated drawing (P.Ex. 41) shows a standard tolerance range of 0.005" for an outer diameter of 1.858". The 10 measured parts indicated an average outside diameter dimension of 1.8604" (P.Ex. 44). The dimension set forth on the reverse engineered drawing was rounded off to the nearest 1/100 or 1.86" (P.Ex. 42) which is consistent with the KTM and measured dimensions. The standard Wabtec tolerance used for this dimension on the reverse engineered drawing was 0.02" not 0.005" as alleged (See "unspecified tolerances" in P.Ex. 42). The Faiveley Drawing (P.Ex. 39) shows a different dimension and tolerance for the outer dimension of 49.8 +/- 0.1 mm or 1.96 +/- 0.004 inches.<br>3. There is no allegation that the dimensions and tolerances are the same for the reverse engineered drawing as compared to the original Wabtec (P.Ex. 40) and original Faiveley drawings (P.Ex. 39). Seven dimensions on the reverse engineered drawing (P.Ex. 42) are in fact different from the dimensions on the Faiveley drawing (P.Ex. 39).<br>4. The Wabtec reverse engineering drawing (P.Ex. 42) specifies a "STUB ACME" thread (1.165 - .25 – 1.00L) which is different from, and not interchangeable with, the thread ("Tr31x28/4") specified by Faiveley (P.Ex. 39). |
| 4. Leader Nut<br><br>(response to P.Ex. 49b) | 1. Mr. Jamieson testified that Delrin is used by Wabtec in bearing applications for many products, including products other than BFCs (Tr. at 537-38). The reverse engineered drawing (P.Ex. 48) shows a material of "Delrin 100, Black Color". The KTM drawing (P.Ex. 47) also specifies "Delrin" but does not specify a black color.<br>2. The reverse engineered drawing length of 3.72", with a standard Wabtec tolerance of 0.02" (P.Ex. 48 – "unspecified tolerances: .XX +/- .02"), is different from Faiveley's original length of 94.4 mm or 3.716" and Faiveley does not specify a tolerance (P.Ex. 45). There is no allegation that the other dimensions and tolerances are the same for the reverse engineered drawing as compared to the original Wabtec (P.Ex. 46) and original Faiveley drawings (P.Ex. 45). The dimensions on the reverse engineered drawing (P.Ex. 48) are different from the few dimensions on the Faiveley drawing (P.Ex. 45).<br>3. Data sheets supporting measurement of 10 production parts are in evidence as D.Ex. 298. |
| 5. Spring Sleeve<br><br>(response to P.Ex. 54b) | 1. There is no allegation that the dimensions and tolerances are the same for the reverse engineered drawing as compared to the original Wabtec (P.Ex. 51) and original Faiveley drawings (P.Ex. 50). Faiveley admits that the dimensions on the reverse engineered drawing differ from the dimensions on the Faiveley drawing by an average of 0.011" (P.Ex. 59B). Faiveley identifies two "identical" angles but there is only one identical angle (see section B-B of P.Ex. 53 compared to P.Ex. 50) and it is simply 45 degrees. The Wabtec reverse engineered drawing includes a tolerance on the 45 degree angle (P.Ex. 53) whereas the Faiveley drawing does not include a tolerance (P.Ex. 50).<br>2. The instruction to break sharp edges is a standard machining (and Wabtec) instruction and even then, Faiveley |

- 23 -

| | |
|---|---|
| | specifies to break sharp edges with a "max 0.3" (P.Ex. 50) in contrast to the Wabtec instruction to break sharp edges to a "R .02 MAX" (P.Ex. 53).<br><br>3. The reverse engineered drawing shows the dimension and tolerance at the bottom of the teeth of 2.008" + .00/- .020" (P.Ex. 53). The Faiveley drawing shows a dimension at this location of 48 mm with a standard tolerance of 0.3 mm or 1.889" +/- 0.012" (P.Ex. 50) which is different from the Wabtec reverse engineering drawing.<br><br>4. Data sheets supporting measurement of 10 production parts are in evidence as D.Ex. 304.<br><br>5. The original and reverse engineered Wabtec parts have a design change in that they have three (3) inner tabs (P.Ex. 53 – see view C) whereas Faiveley's design has two (2) inner tabs (P.Ex. 50). |
| 8. Guide Sleeve 54143<br><br>(response to P.Ex. 63b) | 1. The reverse engineered drawing specifies "Delrin 100CL" as the material (P.Ex. 62) whereas Faiveley specifies a different material of "Delrin 500AL" as the material with "500CL" as an alternative (P.Ex. 59). Mr. Jamieson testified that Delrin is used by Wabtec in bearing applications for many products, including non-BFC products (Tr. at 537-38).<br><br>2. The reverse engineered drawing uses a standard Wabtec surface finish of 250 micro-inches (P.Ex. 62 – "unspecified tolerances") except on the inside diameter which has a surface finish of 16 micro-inches. The surface finish of the original Wabtec drawing is different, namely 248 micro-inches (P.Ex. 60). The Faiveley drawing shows yet a different surface finish requirement of 6.3 micrometers (250 micro-inches) generally with 2.5 micrometers (100 micro-inches) on the inside diameter (P.Ex. 59).<br><br>3. There is no allegation that the dimensions and tolerances are the same for the reverse engineered drawing as compared to the original Wabtec (P.Ex. 60) and original Faiveley drawings (P.Ex. 59). Faiveley admits that eight dimensions on the reverse engineered drawing are different from the Faiveley drawing by an average variation of 0.022". The outside diameter of the large ring on the bottom of the reverse engineering drawing of 3.550" (P.Ex. 62) is different from the Faiveley dimension of 3.508" (77 mm – 1.95 mm + 8 mm + 8 mm) (P.Ex. 59). A 0.055" increase in this dimension from the Alkab drawing to the reverse engineered drawing by Wabtec thus increased the variance from the Faiveley dimension, rather than decreased it.<br><br>5. Data sheets supporting measurement of 10 production parts are in evidence as D.Ex. 296. |
| 9. Ratchet Pin<br><br>(response to P.Ex. 68b) | 1. The material specification on the reverse engineered drawing is a preexisting Wabtec material specification of M-08620-12 (P.Ex. 67). This is a different material from that in the Faiveley drawing (P.Ex. 64) which is "SS 2511-8".<br><br>2. The surface finish on the reverse engineered drawing shows a surface finish of 16 microns and "grind" (P.Ex. 67) which is different from the Faiveley drawing (P.Ex. 64) which specifies a 20 micron surface finish with no direction to grind on the outside diameters. The inside surface finish on the reverse engineered drawing is 64 microns (P.Ex. 67) which is different from the 100 microns specified on the Faiveley drawing (P.Ex. 64).<br><br>3. The bevel on the inside of the part can be seen upon visual inspection of the part but the reverse engineering drawing (P.Ex. 67) identifies a 120 degree angle for this bevel that neither the Faiveley (P.Ex. 64) nor the original Wabtec |

| | |
|---|---|
| | drawing (P.Ex. 65) show. |
| | 4. The special instruction notes on the Wabtec reverse engineered drawing (P.Ex. 67) are different from any of the special instructions on the Faiveley drawing (P.Ex. 64). |
| | 5. Data sheets supporting measurement of 10 production parts are in evidence as D.Ex. 295. |
| | 6. There is no allegation that any dimensions or tolerances on the reverse engineered drawing (P.Ex. 67) are identical to the original Wabtec (P.Ex. 65) or Faiveley drawings (P.Ex. 64).  Thirteen dimensions on the reverse engineered drawing (P.Ex. 67) are in fact different from the dimensions on the Faiveley drawing (P.Ex. 64).  The Faiveley drawing (P.Ex. 64) only specifies three tolerances which are different from the tolerances on the reverse engineered drawing (P.Ex. 67). |
| 12.  Push Sleeve<br><br>(response to P.Ex. 83b) | 1.  The rust protection treatment on the reverse engineering drawing is a standard Wabtec treatment AS-07641-01 (P.Ex. 80).  The Faiveley drawing does not mention rust protection and the processes it does mention (P.Ex. 77) are different from those specified on the Wabtec reverse engineered drawing (P.Ex. 80). |
| | 2.  The material specifications (M-01117-11) and process specifications (PC-01000-934) on the reverse engineered drawing (P.Ex. 80) are standard Wabtec specifications and are different from any specifications on the Faiveley drawing which uses a different material specification of "SS2172 alt. SKF 280, SS2142, DIN 17MnV6" (P.Ex. 77).  The original Wabtec drawing (P.Ex. 78) has different standard Wabtec material specifications, namely M-8620-12 and M-1020-12, from the reverse engineered drawing which specifies M-01117-11 (P.Ex. 80). |
| | 3.  The groove width on the reverse engineered drawing of 0.110" +/- 0.003"  (P.Ex. 80) is simply the measured average rounded to the nearest 1/100 and is different than the Faiveley specified dimension of 2.65 mm +/- 0.2 mm or 0.104" +/- 0.008 (P.Ex. 77). |
| | 4.  Faiveley does not state which three dimensions on the reverse engineered drawing (P.Ex. 80) are allegedly identical to the dimensions on the Faiveley drawing (P.Ex. 77) but admits that five dimensions on the reverse engineered drawing are different from the Faiveley dimensions by an average variation of 0.002". |
| | 5.  Mr. Moore testified that he did not have access to, and did not use, the SAB or Faiveley drawing or the original Wabtec drawing for the push sleeve when he made the changes in ECRN S080501V (Tr. at 793; 789-90).  He also testified (Tr. at 793-94), and the drawings and ECRN show, that the diameter of the small end was not changed from 2.636" as alleged but kept the same and moved from one view to another (section A-A) (P.Ex. 80).  Mr. Moore testified (Tr. at 794-95) that the 2.756" control diameter could be calculated from the dimensions on the Alkab drawing (P.Ex. 79) or the final reverse engineered drawing (D.Ex. 255). |
| | 6.  Mr. Moore testified (Tr. at 791-93), and the drawings show, that the change from 4.19" to 4.29" could be done by simply adding one-half the 0.2" length of the angled section of the part specified on the Alkab drawing (P.Ex. 79) to the 4.19" length of the large diameter section on the Alkab drawing. |

- 25 -

## CERTIFICATE OF SERVICE

     The undersigned certifies that on the 6th day of August, 2008, a true and correct copy of the foregoing was served upon the following:

A. John P. Mancini, Esq.
Mayer Brown LLP
1675 Broadway
New York, NY  10019
E-mail:  jmancini@mayerbrown.com

*Attorney for Plaintiff Faiveley Transport Malmö AB*

Brian T. Himmel