UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
FAIVELEY TRANSPORT MALMÖ AB,          :
                                       :
      Plaintiff                       :
v.                                     :    08 CIV 3330 (JSR)
                                       :
WABTEC CORPORATION,                    :    Hon. Jed S. Rakoff
                                       :
      Defendant.                      :
------------------------------------------------------------x

**DEFENDANT WABTEC CORPORATION'S POST-HEARING
REPLY MEMORANDUM**

TABLE OF CONTENTS

Page

I. FAIVELEY HAS NOT ADDUCED SUFFICIENT EVIDENCE TO ESTABLISH ITS PRIMA FACIE CASE ...................................................................1

   A. Faiveley Has Not Proven That It Possesses A Protectable Trade Secret.....................1

   B. Faiveley Must Prove That Wabtec Used The Specific Information Contained On The Manufacturing Drawings..........................................................3

   C. The Evidence Shows That Wabtec's Reverse Engineering Process Was "Untainted" By Faiveley's Manufacturing Information......................................4

      1. No Inference Of Misappropriation Is Warranted ...............................................4

      2. No Adverse Inference Against Wabtec Is Warranted ........................................4

      3. Roland Moore Did Not Compromise The Reverse Engineering Process ...............................................................................................6

      4. Mr. Collins Did Not Compromise The Reverse Engineering Process ................8

      5. Alkab's Drawings Were Exactly As Expected....................................................8

      6. Mr. Spadaro Is Independent And Did Not Compromise The Reverse Engineering Process ..........................................................................9

      7. The Reverse Engineering Drawings Were Not Created Or Revised Using Faiveley's Trade Secrets.......................................................10

      8. The "Smoking Gun" Is Much Ado About Nothing..........................................11

II. FAIVELEY HAS NOT ESTABLISHED IRREPARABLE HARM OR OTHER PREREQUISITES FOR INJUNCTIVE RELIEF.........................................................11

   A. Faiveley Has Not Demonstrated That The Balance Of Hardship Tips Decidedly In Its Favor .......................................................................................13

III. WABTEC MAY RESELL PARTS PURCHASED ON THE OPEN MARKET AND HAS NOT BREACHED THE LICENSE AGREEMENT ........................................................................................................ 14

IV. CONCLUSION..............................................................................................................15


# TABLE OF AUTHORITIES

**Page**

## CASES

Andersen Consulting LLP v. American Management Sys., Inc., No. 95 Civ. 5428 U.S. Dist. LEXIS 12417 (S.D.N.Y. Aug. 28, 1995) .......... 11

Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555 (Fed. Cir. 1992) .......... 3

Celeritas Techs. Ltd. v. Rockwell Intl Corp., 150 F.3d 1354 (Fed. Cir. 1998) .......... 4

Computer Assocs. Int'l v. Quest Software, Inc., 333 F. Supp. 2d 68897 (N.D. Ill. 2004) .......... 4

Electro-Miniatures Corp. v. Wendon Co., Inc., 771 F.2d 23 (2d Cir. 1985) .......... 4

Flexible Techs., Inc. v. World Tubing Corp., 910 F. Supp. 109 (E.D.N.Y. 1996) .......... 13

General Elec. Co. v. Sung, 843 F. Supp. 776 (D. Mass. 1994) .......... 4

Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955 (S.D.N.Y. 1996) .......... 11

Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 732 F. Supp. 370 (S.D.N.Y. 1989) .......... 3

Interstate Circuit v. U.S., 306 U.S. 208 (1939) .......... 4

Jay's Custom Stringing, Inc. v. Johnhwan Yu, No. 01 Civ. 1690, 2001 U.S. Dist. LEXIS 9298 (S.D.N.Y. Jul. 6, 2001) .......... 11

Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co., 458 F. Supp. 1197 (S.D.N.Y. 1978) .......... 14

Monovis, Inc. v. Aquino, 905 F. Supp. 1205 (W.D.N.Y. 1994) .......... 4

Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co., 297 F.Supp.2d 463 (N.D.N.Y. 2003), aff'd, 126 Fed. Appx. 507 (2d Cir. 2005) .......... 3

North Altantic Instruments, Inc. v. Haber, 188 F.3d 38 (2d Cir. 1999) .......... 12

Novomoskovsk Joint Stock Co. v. Revson, No. 95 Civ. 539, 1998 WL 651076 (S.D.N.Y. Sept. 23, 1998) .......... 5

Payment Alliance Intern., Inc. v. Ferreira, 530 F. Supp. 2d 477 (S.D.N.Y. 2007) .......... 12

Royster v. Ercole, No. 06 cv 12942, 2008 U.S. Dist. LEXIS 15424 (S.D.N.Y. Feb. 29, 2008) .......... 5

Sit-up Ltd. v. IAC/InterActive Corp., No. 05 CIV 9292, 2008 WL 463884 (S.D.N.Y. Feb. 20, 2008) .......... 1, 4

Ushodaya Enters., Ltd. v. V.R.S. Int'l, Inc., 1998 U.S. Dist. LEXIS 6280 (S.D.N.Y. 1998) .......... 13

Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC, 80 F. Supp. 2d
    25 (N.D.N.Y. 1999) .................................................................................................. 11, 12

## OTHER AUTHORITIES

Restatement of Torts § 757 ............................................................................................... 1

I.   **FAIVELEY HAS NOT ADDUCED SUFFICIENT EVIDENCE TO ESTABLISH ITS PRIMA FACIE CASE**

   A.   <u>Faiveley Has Not Proven That It Possesses A Protectable Trade Secret</u>

In the face of undisputed evidence that at least four competitors are manufacturing or selling BFC parts that have been or could be supplied to NYCT (*see* D.Brief at 3-4), Faiveley has failed to identify any record evidence that the information contained on its manufacturing drawings (1) is not a matter of general knowledge in the industry or (2) affords it a competitive advantage. This failure of proof compels a finding that Faiveley has not made out a prima facie case of misappropriation. *See* Sit-up Ltd. v. IAC/InterActive Corp., No. 05 CIV 9292, 2008 WL 463884, at *12 n.10 (S.D.N.Y. Feb. 20, 2008) ("Accordingly, any information that was generally known in the television retailing industry cannot form the basis of sit-up's trade secret misappropriation claim, regardless of how defendants acquired it."); *see also* (D.Brief at 3-4). Faiveley's failure even to attempt to address this undisputed record evidence highlights its inability to prove that its manufacturing information is a protectable trade secret.

In its brief, Faiveley contends that its manufacturing information is protectable under the six factors identified in Restatement of Torts § 757, Comment b (2007). The first factor, the extent to which the information is known outside of Faiveley's business, requires Faiveley to prove that its manufacturing process is information not generally known in the industry. In this regard, Faiveley offers only three record cites, none of which is relevant. Initially, contrary to Faiveley's assertion, Mr. Larsson offered no testimony that Faiveley's manufacturing information cannot be found in the public domain. (Tr. at 147:9-21). Faiveley's second cite does not address the manufacturing information for individual BFC parts, the subject of the R-142A contract and the focus of this case. Rather, the testimony states only that *the entire*

***BFC unit*** has not been copied with "the quality and the performance of the original product." (Tr. at 54:25-55:5). The third cite, to Wabtec's knowledge in 1993 of the "BFC TBU technology," (P.Brief at 13), has no bearing on whether Faiveley's manufacturing information is a matter of general knowledge in the industry, then or now.

In focusing on irrelevant facts, Faiveley in effect concedes that it is unable to contradict the evidence that at least four suppliers have either reverse engineered Faiveley's purported trade secrets, or have obtained Faiveley's manufacturing drawings. Either way, this powerful evidence that Faiveley has no trade secrets in the BFC parts is wholly uncontradicted by Faiveley, a point that itself is fatal to Faiveley's claims.

As to the second and third factors, the record does not support Faiveley's assertion that it took "extraordinary measures" to guard the secrecy of its manufacturing drawings. (P.Brief at 13-14). To the contrary, the record is clear that Faiveley sent manufacturing drawings to its suppliers without any evidence of confidentiality agreements. (D.Brief at 4-5; Tr. at 167:23-168:4, 176:2-4, 194:6-8, 195:11-14, 435:15-20, 436:17-20, 439:7-9; Ragnarsson Tr. at 60:16-61:3, 61:8-14). Faiveley relies exclusively upon a "general understanding" and the notice on the drawings. (Tr. at 435:15-17, 436:6-16, 437:5-21).[1]

When it turns to the fourth, fifth, and sixth Restatement § 757 factors, Faiveley apparently recognizes that the record is devoid of evidence that its manufacturing information can satisfy those factors, so it discusses only its formerly-patented "BFC TBU technology," but that is not at issue here. (P.Brief at 15). Rather, the question before the Court is whether

---

[1] In addition, Mr Ragnarsson, an engineer who has been at Landskrona for the past 44 years, testified that any person at the Landskrona facility with access to its computer network, virtually the entire work force, could view, print, and walk out the door with any BFC manufacturing drawing. (Ragnarsson Tr. at 64:7-65:24, 67:10-18, 138:18-139:6.)

Faiveley's *manufacturing information* for the specific parts at issue affords it a competitive advantage. Mr. Neller testified that Faiveley's manufacturing information is not necessary to manufacture BFC parts. (Tr. at 445:24-446:3). Accordingly, it affords Faiveley no competitive advantage.

Faiveley's assertion that "it would take years for Wabtec to develop the trade secrets on its own" is made without any support in the record. Further, it is directly belied by the undisputed fact that Faiveley's competitors have done so. (Tr. at 120:19-122:10, 554:12-22, 558:7-559:22, 848:8-849:2). That Hongdu did not produce drawings satisfactory to Wabtec does not show that others have not "properly acquired or duplicated" BFC parts with relative ease, while Faiveley's reliance on Mr. Sullivan's opinion testimony on this issue is futile. (P.Brief at 6). Nor does Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1568-69 (Fed. Cir. 1992), support Faiveley's contention that a failed attempt at reverse engineering followed by immediate results in a second attempt supports an inference of misappropriation.

### B. Faiveley Must Prove That Wabtec Used The Specific Information Contained On The Manufacturing Drawings

Contrary to Faiveley's assertion, it is *not* sufficient for Faiveley to prove only that Wabtec "benefitted" in some vague, ill-defined manner from the use of Faiveley's information. That is not the law, and the cases Faiveley cites do not support its assertion. In Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co., 297 F.Supp.2d 463, 489 (N.D.N.Y. 2003), the court found misappropriation because *the trade secret was used*. Likewise in Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 732 F. Supp. 370 (S.D.N.Y. 1989), the court found misappropriation because defendants "did make use of information" and this "information was maintained as secret by ICM, and was valuable to its business." Id. at 375. Thus, to prove misappropriation, Faiveley must establish that Wabtec improperly used the specific trade secrets

-3-

Faiveley indentified in the reverse engineering process. Just as it is Faiveley's burden to identify its trade secrets with specificity, it remains Faiveley's burden to prove the improper use of those specifically identified trade secrets. Sit-up Ltd., 2008 WL 463884, at *11.

### C. The Evidence Shows That Wabtec's Reverse Engineering Process Was "Untainted" By Faiveley's Manufacturing Information

#### 1. No Inference Of Misappropriation Is Warranted

The opinions cited by Faiveley do not support its contention that an inference of misappropriation is warranted. In fact, none of them involved the application of an inference of misappropriation. In General Elec. Co. v. Sung, 843 F. Supp. 776, 779 (D. Mass. 1994), the defendant *admitted* at trial that the competing product was developed by its engineers "with explicit reference to the GE trade secrets." Similarly, in Electro-Miniatures Corp. v. Wendon Co. Inc., 771 F.2d 23, 26 (2d Cir. 1985), the court found that a jury verdict of misappropriation was supported by substantial evidence. In Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1231-33 (W.D.N.Y. 1994), there was clear evidence of actual misappropriation. Here, the testimony establishes that Wabtec did not develop the reverse engineered BFC parts from Faiveley's drawings. (D.Brief at 6-8; Tr. at 790:23-791:16). In addition, neither Computer Assocs. Int'l v. Quest Software, Inc., 333 F. Supp. 2d 688, 696-97 (N.D. Ill. 2004), nor Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1358 (Fed. Cir. 1998), involved reverse engineering by independent third party vendors isolated from the alleged trade secret information, as was the case here.

#### 2. No Adverse Inference Against Wabtec Is Warranted

Faiveley cites two cases for the proposition that Wabtec's failure to call Messrs. Kreger and Stepp warrants an adverse inference. Both cases are readily distinguishable. In Interstate Circuit v. United States, 306 U.S. 208, 226 (1939), defendant failed to produce any witness with

authority to speak for the company. In <u>Novomoskovsk Joint Stock Co. v. Revson</u>, No. 95 Civ. 5399, 1998 WL 651076, at *6 (S.D.N.Y. Sept. 23, 1998), the defendant refused to produce the business owner being sued.

In this case, the testimony of six witnesses together with the documentary evidence provides ample evidence of the reverse engineering process that was established and has been followed without reference to any alleged Faiveley trade secrets. (Tr. at 549:19-551:19, 552:1-554:11, 594:22-596:4, 596:15-600:15, 790:23-791:16; Collins Tr. at 107:22-112:23, 113:14-115:7; Kabazie Tr. at 52:17-54:8, 55:19-56:15, 66:8-68:18, 158:23-159:5; Spadaro Tr. at 34:15-39:5, 110:23-111:1; 111:12-16; *e.g.*, D. Exs. 212-220, 239-261, 273-278, 283-287, 292-294, 303-307, 317-334, 362-394, 405). This is not a case of Wabtec refusing to provide a witness – indeed, in the words of this Court, the parties "horse-traded" Mr. Kreger's testimony to keep the witnesses to a manageable number for a four-day preliminary injunction hearing and Faiveley cannot now complain that his lack of testimony warrants an adverse inference. (Tr. 573: 4-13). Faiveley was aware of Mr. Stepp's involvement in the reverse engineering process since the beginning of discovery in this case, never requested his deposition and did not include him on its witness list. Moreover, Faiveley has made no showing that his testimony would have been favorable to it or materially different from what was already on the record as is required. *See, e.g.*, <u>Royster v. Ercole</u>, No. 06 cv 12942, 2008 U.S. Dist. LEXIS 15424, *13 (S.D.N.Y. Feb. 29, 2008). Accordingly, no adverse inference against Wabtec is warranted.

Faiveley's main focus has always been on Mr. Moore. Mr. Moore was the subject of three hours of cross-examination over two days by two different counsel for Faiveley.

### 3. Roland Moore Did Not Compromise The Reverse Engineering Process

Faiveley incorrectly alleges that Roland Moore was "intimately" involved in the reverse engineering process. (P.Brief at 7, 19-20). The evidence, however, demonstrates that Mr. Moore had a limited role in the reverse engineering process and did not inject any alleged Faiveley trade secret information at any stage of the reverse engineering process, or after it had been completed. (D.Brief at 10-12). Indeed, Mr. Moore testified that he currently has no role in the reverse engineering process. (Tr. at 737:6-738:18, 744:10-14).

With respect to the KTM drawings, Mr. Moore did not make "substantive" comments on them as Faiveley alleges (P.Brief at 7); rather, he vetted the first set of KTM drawings to see if KTM was generally capable of doing the job they were hired to do. (D.Brief at 10-11; Tr. at 795:23-796:7; P.Ex. 37). After that, Mr. Moore was not further involved in reviewing drawings during the reverse engineering process. (Tr. at 740:5-741:1, 742:6-25, 746:23-25).

Faiveley's assertions that Mr. Moore reviewed the Alkab drawings during the reverse engineering process (P.Brief at 7) and that, "after the drawings came back from outside reverse engineering firms, Moore reviewed them for content and created Wabtec versions of those drawings" (P.Brief at 19), misstates the evidence. Mr. Moore testified that he didn't receive any drawings from Alkab. (Tr. at 738:19-25). Dart Collins unequivocally testified that Mr. Moore was not involved in making Wabtec drawings based on the drawings coming from the reverse engineering firms (Collins Tr. at 114:20-115:7), and Mr. Moore himself testified that he did not make drawings based on information provided by the vendors during the reverse engineering process. (Tr. at 740:23-741:1, 742:6-25). Rather, Mr. Moore reviewed the final drawings after the reverse engineering process had been completed and the new drawings had been "released" to the system. (Tr. at 742:6-743:24, 786:4-16). Even then, Mr. Moore reviewed the drawings for

-6-

product maintenance and, for example, at the request of manufacturing. (Tr. at 743:10-24). At that time, Mr. Moore did not look at, and did not have access to, the Faiveley and original Wabtec drawings. (Tr. at 785:17-787:2; 789:18-170:16).

Faiveley's assertion that Mr. Moore made "substantive revisions" to reverse engineering drawings (P.Brief 19-20) greatly overstates the revisions that were made. Mr. Moore testified that he made revisions to a few drawings, maybe six to eight out of the 50 or 60 drawings for the BFC, at the request of manufacturing. (Tr. at 743:25-744:9). He did not testify that he "added surface finishes and made other material revisions," as Faiveley asserts. (P.Brief at 7). The testimony was that Mr. Moore added one surface finish to one reverse engineering drawing (Tr. at 464:19-21), and a few revisions requested by manufacturing. (Tr. at 743:25-744:9).

Faiveley cites Mr. Moore's "changes" to the push sleeve as examples of copying. (P.Brief at 24). Mr. Moore testified that he did not look at any original Wabtec or Faiveley drawings for the push sleeve when he made those changes. (Tr. at 787:21-788:6, 790:17-22). Mr. Moore's changes to the dimensions, after reverse engineering had been completed, were based on mating parts and the function of the part, things that any engineer would learn by working with the parts over many years without *any* knowledge of Faiveley's alleged trade secrets. (Tr. at 757:16-759:24; D.Brief at 11-12).

Faiveley also insinuates that Mr. Moore's role with respect to the in-house testing requirements – requirements that Faiveley did not allege to be trade secrets at the hearing – somehow tainted the process. (P.Brief at 20). Mr. Moore testified, however, that he has no current involvement in testing reverse engineered parts, but rather the test department did *that work*. (Tr. at 737:19-23). He was simply involved in setting up some of the specifications for

the test department based on environmental criteria and longevity — items that Faiveley has not and could not possibly claim as trade secrets. (Tr. at 737:24-738:4).

### 4. Mr. Collins Did Not Compromise The Reverse Engineering Process

Mr. Collins, the "draftsman" who took the Alkab drawings and the additional engineering information provided to him by Mr. Stepp and created the formal drawings testified that: (1) he is not familiar with the BFC; (2) he is not an engineer; (3) he is a "drawing machine"; (4) he simply receives a request from engineering and does the drawing based on the information provided to him; (5) he sees 1700-2000 drawing per year across all product lines in the division; (6) "[his] detailed knowledge of those drawings is pretty much non-existent"; (7) he did not look at any SAB/Faiveley or Wabtec drawings of a Faiveley part in preparing the formal reverse engineered drawings; and (8) he is "absolutely 100% certain" that he retained no knowledge of any BFC drawings that helped him in preparing the formal reverse engineered drawings. (Collins Tr. at 7: 9-11, 22:21-23, 57:12-59:3, 182:10-16, 193:4-194:2). The "compelling inference" allegedly arising from the testimony of Mr. Collins regarding his exposure to Faiveley manufacturing information on drawings (P.Brief at 21) is completely belied by Mr. Collins' testimony. No inference can or should be drawn that Mr. Collins used any prior Faiveley manufacturing information contained on its drawings while preparing the formal reverse engineered drawings.

### 5. Alkab's Drawings Were Exactly As Expected

It strains credulity for Faiveley to assert that William Kabazie, the president of Alkab, testified that the reverse engineered drawings his company provided at significant cost to Wabtec were "useless." (P.Brief at 22). Mr. Kabazie testified that his expectation was that there would be testing and further refinement of the drawings Alkab provided to Wabtec as part of the reverse

engineering process. (Kabazie Tr. at 66:8-67:12, 90:24-91:5). That is exactly what Wabtec did through Mr. Spadaro of RTC, Jerry Stepp, and Wabtec's quality assurance ("QA") [2] and testing departments. (D.Brief at 8-9). Contrary to Faiveley's assertions (P.Brief at 22), the testimony in no way evidences that the reverse engineering process was a "sham."

### 6. Mr. Spadaro Is Independent And Did Not Compromise The Reverse Engineering Process

Mr. Spadaro of RTC is an independent consultant engaged by Wabtec to review the adequacy of the initial Alkab drawings for manufacturing purposes. It is irrelevant whether Mr. Spadaro had any relationships with Wabtec employees working on the reverse engineering project. In any event, the alleged close relationship with Mr. Kreger (P.Brief at 9, 23), is grossly overstated and Mr. Spadaro testified that he has had limited interactions with Mr. Kreger during the reverse engineering project. (Spadaro Tr. at 58:21-61:24).

Likewise, Mr. Spadaro had no meaningful prior knowledge of BFCs. Mr. Spadaro testified *repeatedly* during his deposition that his prior reliability, maintainability and safety ("RMS") work did not provide him with any meaningful knowledge of BFCs. (Spadaro Tr. at 69:2-75:16, 78:1-8, 80:25-81:3, 83:18-25). His RMS work involved an analysis at the *brake system level*. (Spadaro Tr. at 70:8-73:4). In an RMS analysis, the actual braking unit in the system is irrelevant; it is treated as a "generic" unit. Id. Mr. Spadaro simply assumed three failure modes of the generic braking unit (it fails to apply, it always applies or is leaking air) and then determined the effects of such failures on the larger braking system. (Spadaro Tr. at 71:1-73:8). He never reviewed any BFC units or parts during his RMS work. (Spadaro Tr. at 69:21-

---

[2] Faiveley's assertion that the changes to dimensions and tolerances reflected in its ECRN's for the reverse engineered parts do not match exactly with the QA data sheets (P.Brief at 8) is of no consequence because the dimensions and tolerances do not match those in Faiveley's drawings (D.Brief, Ex. A).

70:7). For his analysis, the braking unit was treated as a "black box", as demonstrated by Spadaro Dep. Ex. 3, a brake system piping diagram used as the basis for Mr. Spadaro's RMS work. (Spadaro Tr. at 71:23-73:4). On this diagram, the braking unit is represented as a "block, which is a pneumatic representation for a brake unit" at diagram nos. 19, 20, 21 22, 23. (Spadaro Tr. at 71:23-73:4). Contrary to Faiveley's assertions in Section III.B.7 of its brief (p. 23), the evidence proves that Mr. Spadaro is independent and not at all "tainted."

### 7. The Reverse Engineering Drawings Do Not Use Faiveley's Trade Secrets

Faiveley asserts that Wabtec's final reverse engineering drawings in "many cases" contain the "exact same dimensions and tolerances" as the original Faiveley drawings (P.Brief at 24), but this vastly overstates the evidence. In his summary charts, Mr. Sullivan identified only *two* dimensions on *one* part - the push sleeve - that are the "exact" same dimensions and incorrectly asserts that one dimension on the leader nut is the same. (P.Ex. 87; D.Brief, Ex. A). Mr. Sullivan otherwise identified no other dimensions that are the same and admits that three of the drawings have different dimensions and tolerances. (P.Ex. 87). As Wabtec's summary response to Mr. Sullivan's chart further sets forth (D.Brief, Ex. A), the final versions of Wabtec's reverse engineering drawings are quite different from the original Faiveley drawings. These differences belie any "inference of copying." (P.Brief at 24).

Moreover, Faiveley misstates the evidence regarding the push sleeve. (P.Brief at 24). Mr. Moore did not change dimensions from the Alkab drawing; he added new dimensions based on manufacturing requests, mating parts, and the dimensions on the reverse engineering drawings themselves, all without reference to the Faiveley drawings. (D.Brief at 11-12). Faiveley's assertion that a number of revisions to the Alkab drawings are "inexplicable" unless Wabtec used Faiveley's "proprietary information" (P.Brief at 8), ignores the evidence. (D.Brief

at 12, Ex. A). The "specific manufacturing information" that Faiveley alleges appears on the original Faiveley drawings but not on the Alkab drawings (P.Brief at 8), consists of visually apparent features of the part (like the "gap" in the guide sleeve), common materials routinely used by Wabtec (like Delrin), common machining or manufacturing processes (like breaking sharp edges), or Wabtec's own material or process specifications, none of which can be considered a Faiveley trade secret. (D.Brief, Ex. A).

### 8. The "Smoking Gun" Is Much Ado About Nothing

Faiveley has made much ado about a supposed "smoking gun" drafting request (P.Ex. 97) that "obsoleted" Faiveley drawings. (P.Brief at 18). This drafting request is irrelevant because any Wabtec drawings created by it have been or will be reverse engineered during the reverse engineering process started in mid-2007. (Tr. at 798:6-799:18; D.Ex. 587).

## II. FAIVELEY HAS NOT ESTABLISHED IRREPARABLE HARM OR OTHER PREREQUISITES FOR INJUNCTIVE RELIEF

Although Faiveley acknowledges that a party seeking a preliminary injunction must demonstrate irreparable harm, Faiveley makes no attempt to actually do so and instead relies entirely on a claimed presumption. (P.Brief at 10-11). However, the presumption of irreparable harm for trade secret misappropriation is rebuttable and cannot satisfy plaintiff's burden where the evidence demonstrates that the only harm at issue is compensable by monetary damages. *See* Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955, 965-66 (S.D.N.Y. 1996).[3]

---

[3] *See also* Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC, 80 F. Supp. 2d 25, 33-34 (N.D.N.Y. 1999); Andersen Consulting LLP v. American Management Sys., Inc., No. 95 Civ. 5428, 1995 U.S. Dist. LEXIS 12417, at *8-9 (S.D.N.Y. Aug. 28, 1995); Jay's Custom Stringing, Inc. v. Jonghwan Yu, No. 01 Civ. 1690, 2001 U.S. Dist. LEXIS 9298, *23-25 (S.D.N.Y. Jul. 6, 2001).

Faiveley acknowledges that its alleged harm is based entirely on the purported loss of business from the overhaul of NYCT's R-142A subway cars.[4] (*see, e.g.,* P.Brief at 9-10). In attempting to justify its delay, Faiveley argues that it "sought to avoid litigation with Wabtec and endeavored to reach a resolution with NYCT." (P.Brief at 11 n.7). If reaching a resolution with NYCT would have been sufficient for Faiveley to avoid this litigation, as Faiveley contends, Faiveley cannot credibly claim that there is any harm, much less *irreparable harm*, beyond its loss of the NYCT contract.

The rationale behind the presumption of irreparable harm is that "a trade secret, once lost, is lost forever." Worldwide, 80 F. Supp. 2d at 33. As previously discussed (D.Brief at 17 n.19), there is simply no evidence that Wabtec has or will disseminate Faiveley's purported trade secrets or that the alleged secrets will be "lost forever." Accordingly, the cases Faiveley relies upon do not support the application of the presumption here.[5]

Additionally, as discussed (D.Brief at 17-18), the presumption of irreparable harm is rebutted by Faiveley's delay of at least five months in seeking a preliminary injunction. For its part, Faiveley offers only a footnote that contends (1) its delay should be measured from the date of the formal award of the NYCT contract (September 5, 2007), and (2) Faiveley's more than five-month delay should be excused because it pursued a protest with NYCT. (P.Brief at 11 n.7).

---

[4] Faiveley makes a passing effort at alleging irreparable harm by arguing that its alleged trade secrets are being "disclosed to unauthorized third parties." (P.Brief at 9). Tellingly, Faiveley cites no record evidence for this allegation. Indeed, there is none.

[5] In Payment Alliance Intern., Inc. v. Ferreira, 530 F. Supp. 2d 477, 480-81 (S.D.N.Y. 2007), plaintiff sought to enjoin a former employee from disclosing trade secret information to his new employer, which would result in loss of the trade secrets. Likewise, in North Altantic Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999), an employer sought to enjoin a former employee. Also, in the latter case, the employee had "acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause 'irreparable injury' . . ."

Faiveley's contention that September 5 is the appropriate date by which its delay is to be measured is belied by the extensive facts of record, including the fact that in May, 2007 its outside counsel wrote to Wabtec threatening to make a claim shortly thereafter. (D.Brief at 17-18.) Additionally, Faiveley's contention that its delay is excused by its pursuit of an NYCT protest is similarly unfounded. Faiveley's decision to raise a protest with the NYCT, rather than seek direct relief against Wabtec, fatally undercuts Faiveley's claim of urgency here. *See* Ushodaya Enters., Ltd. v. V.R.S. Int'l, Inc., 1998 U.S. Dist. LEXIS 6280, *3-4 (S.D.N.Y. 1998) (holding preliminary relief not warranted in part because plaintiff did not explain its delay even though papers submitted refer to lawsuits brought against defendants in India because plaintiff did not provide enough information to show it acted diligently to protect its intellectual property rights). Rather than proceed with any urgency against Wabtec, Faiveley pursued its protest with the NYCT, all the while knowing the stringent qualification requirements of the NYCT and steadfastly refusing to initiate the qualification process. (Layman Tr. at 99:18-100:8, 100:10-14, 100:17-21, 100:23-101:5).

### A. Faiveley Has Not Demonstrated That The Balance Of Hardship Tips Decidedly In Its Favor

Faiveley contends that it is further entitled to injunctive relief because the balance of hardship tips decidedly in its favor. [6] (P.Brief at 11). However, the harm to Wabtec and NYCT will drastically outweigh any harm suffered by Faiveley, and the court can and should consider

---

[6] Faiveley relies on Flexible Techs., Inc. v. World Tubing Corp., 910 F. Supp. 109, 113 (E.D.N.Y. 1996), for this proposition. The balance of hardship in Flexible Techs., Inc., however, tipped decidedly in favor of plaintiff because plaintiff's trade secrets were incorporated in a "hose-making machine" that defendant was preparing to ship out of the country. Id. at 115. The court held that plaintiff's "risk of losing forever its trade secrets" outweighed any "inconvenience" imposed on defendant if the injunction were granted. Id. There is no such risk at issue in the instant matter, which involves parts of a product that has been on the market for 30 years. (*See* D.Brief at 17 n.19).

this harm in its analysis. Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co., 458 F. Supp. 1197, 1201 (S.D.N.Y. 1978). In Joneil, the court found that "whatever injuries [plaintiff] will suffer if the temporary relief is denied appear to be more than counterbalanced by the significant inconvenience and disruption of business operations of defendants *and third parties* that would result if the Court grants the injunction." Id. (emphasis added). The same is true here. As set forth in Wabtec's Post-Hearing Memorandum, Keith Falk, Director of Car Systems Engineering for NYCT, testified that severe consequences would result from an interruption in the supply of tread brake units from Wabtec. (D.Brief at 18-19).

### III. WABTEC MAY RESELL PARTS PURCHASED ON THE OPEN MARKET AND HAS NOT BREACHED THE LICENSE AGREEMENT

Certain parts at issue in this litigation are freely available on the open market. (*See* D.Brief at 3). Wabtec has purchased these parts to supply NYCT pursuant to the R-142A overhaul contract. (Tr. at 558:7-559:22). There is no evidence, and no credible argument by Faiveley, that Wabtec may not buy parts on the open market and resell them to NYCT and other customers.

Faiveley argues that Wabtec breached the License Agreement by failing to return Faiveley's drawings. (P.Brief at 4-5). Faiveley fails to mention, however, that Wabtec's obligation to return documents has not yet been triggered. The License Agreement states that after termination:

> Section 22.1.1 The Licensee shall . . . cease manufacture of the License Products *subject only to the entitlement to finish and sell Products in manufacture before or at the end of the term of the Agreement and to carry out contracts of sale of products entered into by the licensee before such date.*
>
> Section 22.1.2 The Licensee shall return to SW immediately *when having finished manufacture as referred to in 22.1.1 above* all the documents transferred . . .

(P.Ex. 1 at 10) (emphasis added). It is beyond dispute that Wabtec may continue to manufacture and sell the products at issue for "grandfathered" contracts. Id. Wabtec may also retain the documents at issue until those contracts have concluded. Id. Because Wabtec continues to perform under the R-160 contract with NYCT, Wabtec has the right to possess Faiveley's drawings even to this day.

Faiveley also asserts that Wabtec breached by not timely informing Faiveley of modifications to the products at issue. (*See* P.Brief at 4). However, Faiveley's Otmar Berghaus testified that this issue was resolved prior to the termination of the agreement. (Tr. at 132:23-134:2). Moreover, Mr. Ragnarsson testified that Wabtec had given him a copy of Wabtec's drawings with the modifications for NYCT in the late 1990's. (Ragnarsson Dep. Tr. at 110:17-112:4). Accordingly, Faiveley cannot credibly argue that Wabtec breached the agreement by failing to inform Faiveley of modifications.

## IV. CONCLUSION

For all the foregoing reasons, Wabtec Corporation respectfully requests that this Court deny Faiveley Transport Malmö A.B.'s motion for a preliminary injunction.

Date: August 8, 2008

Respectfully submitted,

*/s/ Lawrence E. Flatley*
Lawrence E. Flatley
Courtney C.T. Horrigan
Brian T. Himmel
Maria N. Bernier
Barry J. Coyne
Daniel K. Winters

REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA  15219
412-288-4058
Fax: 412-288-3063
*Attorneys for Wabtec Corporation*

599 Lexington Avenue
New York, New York 10022
(212) 521-5400

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 8th day of August, 2008, a true and correct copy of the foregoing was served upon the following:

A. John P. Mancini, Esq.
Mayer Brown LLP
1675 Broadway
New York, NY 10019
E-mail: jmancini@mayerbrown.com

*Attorney for Plaintiff Faiveley Transport Malmö AB*

_____
Lawrence E. Flatley