UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
                                      :

FAIVELEY TRANSPORT MALMO AB,
                                      :      08-CV-03330 (JSR)

    v.
                                        :

WABTEC CORPORATION.
                                        :

------------------------------------ X

## FAIVELEY TRANSPORT MALMO AB'S RESPONSE TO WABTEC CORPORATION'S POST-HEARING MEMORANDUM

MAYER BROWN LLP
1675 Broadway
New York, New York  10019
(212) 506-2500

*Attorneys for Faiveley Transport Malmo AB*

# TABLE OF CONTENTS

**Page**

**I.    FAIVELEY HAS ESTABLISHED ITS MANUFACTURING DRAWINGS AS TRADE SECRETS** ............................................................................... 1

**II.   WABTEC MISAPPROPRIATED FAIVELEY'S TRADE SECRETS** ...................... 3

    A.   Wabtec's Reverse Engineering Process Was a Sham ............................................ 3

    B.   Roland Moore's Involvement in the Reverse Engineering Process Requires a Finding of Misappropriation .................................................................. 5

**III.  WABTEC HAS FAILED TO REBUT THE PRESUMPTION OF IRREPARABLE HARM TO FAIVELEY** ................................................................... 7

    A.   Faiveley's Qualification for the NYCT Contract Is Impending ........................... 8

    B.   Wabtec Cannot Hide Behind the R-160 Contract .................................................. 8

    C.   Faiveley Did Not Delay in Bringing Its Preliminary Injunction Application ........ 9

**IV.   PUBLIC INTEREST CONCERNS DO NOT MILITATE AGAINST GRANTING THE INJUNCTION** ........................................................................... 10

**V.    WABTEC'S REVERSE ENGINEERING DRAWINGS DEMONSTRATE WABTEC'S MISAPPROPRIATION OF FAIVELEY TRADE SECRETS** ........... 11

    A.   Dimensions and Tolerances .................................................................................. 12

    B.   Material Specifications ......................................................................................... 13

    C.   Special Instructions .............................................................................................. 13

**VI.   FAIVELEY HAS STANDING TO SEEK RELIEF IN THIS COURT** ................. 14

    **CONCLUSION** ................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.H. Emery Co. v. Marcan Prods. Corp.*,
  389 F.2d 11 (2d Cir. 1968)..............................................................................2, 3

*Anacomp, Inc. v. Shell Knob Servs., Inc.*,
  No. 93 Civ. 4003, 1994 WL 9681 (Jan. 10, 1994), *aff'd* 29 F.3d 621 (2d Cir. 1994).........7, 11

*CPG Prods. Corp. v. Mego Corp.*,
  214 U.S.P.Q. (BNA) 206 (S.D. Ohio Jan. 12, 1981) ................................................3

*DB Riley, Inc. v. AB Eng'g Corp.*,
  977 F. Supp. 84 (D. Mass. 1997) .........................................................................3

*Electro-Miniatures Corp. v. Wendon Co.*,
  771 F.2d 23 (2d Cir. 1985)...................................................................................1

*Elite Licensing, Inc. v. Thomas Plastics, Inc.*,
  250 F. Supp. 2d 372 (S.D.N.Y. 2003)..................................................................10

*Encyclopedia Britannica Educ. Corp. v. Crooks*,
  447 F. Supp. 243 (W.D.N.Y. 1978) ......................................................................9

*Eve of Milady v. Impression Bridal, Inc.*,
  957 F. Supp. 484 (S.D.N.Y. 1997) .......................................................................9

*Fabkom v. R.W. Smith & Assocs., Inc.*,
  No. 95 Civ. 4552, 1996 WL 531873 (S.D.N.Y. Sept. 19, 1996)................................7

*Ford v. Consol. Edison Co. of N.Y.*,
  No. 03 Civ. 9587, 2006 WL 538116 (S.D.N.Y. Mar. 3, 2006) .................................6

*Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*,
  342 F.2d 737 (2d Cir. 1965).................................................................................2

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*,
  990 F. Supp. 119 (E.D.N.Y. 1997) .......................................................................9

*Integrated Cash Mgmt.v. Digital Transactions, Inc.*,
  732 F. Supp. 370 (S.D.N.Y. 1989) ......................................................................11

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Schultz*,
  No. 01 Civ. 0402, 2001 WL 1681973 (D.D.C. Feb. 26, 2001)................................10

*Monovis Inc. v. Aquino,*
    905 F. Supp. 1205 (W.D.N.Y. 2004) ...............................................................13, 14

*Norbrook Labs Ltd v. G.C. Hanford Mfg. Co.,*
    297 F. Supp. 2d 463 (N.D.N.Y. 2003) ............................................................11, 13

*Rockwell Graphic Sys., Inc. v. Dev. Indus., Inc.,*
    925 F.2d 174 (7th Cir. 1991) ...................................................................................3

*Sheldon v. Metro Goldwyn Pictures Corp.,*
    81 F.2d 49, 55 (2d Cir. 1936) ................................................................................11

*Telerate Sys., Inc. v. Caro,*
    689 F. Supp. 221 (S.D.N.Y. 1988) ...........................................................................2

*Vt. Microsystems, Inc. v. Autodesk, Inc.,*
    88 F.3d 142 (2d Cir. 1996) ......................................................................................1

## OTHER AUTHORITIES

MILGRIM, TRADE SECRETS (2008)..............................................................................3, 11

RESTATEMENT (FIRST) OF TORTS § 757 (1939) ...............................................................1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
                                       :
FAIVELEY TRANSPORT MALMO AB,           :
                                       :    08-CV-03330 (JSR)
     v.                                   :
                                       :
WABTEC CORPORATION.                    :
                                       :
------------------------------------- X

## FAIVELEY TRANSPORT MALMO AB'S RESPONSE TO
## WABTEC CORPORATION'S POST-HEARING MEMORANDUM

MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Faiveley Transport Malmo AB*

Petitioner Faiveley Transport Malmo AB ("Faiveley") hereby submits this response to Wabtec Corporation's Post-Hearing Memorandum ("Wabtec's Brief" or "W. Br.").[1]

## I.    FAIVELEY HAS ESTABLISHED ITS MANUFACTURING DRAWINGS AS TRADE SECRETS.

Faiveley has established the six elements necessary to demonstrate that it possesses trade secrets. Faiveley's Post-Hearing Memorandum ("Opening Brief" or "Op. Br.") at 12-15. Wabtec does not dispute that Faiveley expended considerable resources in developing its trade secrets, or that it would take considerable effort to duplicate Faiveley's trade secrets. *Id.*; W. Br. at 2-5; *see also Electro-Miniatures Corp. v. Wendon Co.*, 771 F.2d 23 (2d Cir. 1985). Wabtec argues only that the mere existence of BFC-style parts on the market converts Faiveley's trade secrets into "common knowledge" that accordingly affords Faiveley "no competitive advantage," and that Faiveley's substantial efforts at protecting the confidentiality of its manufacturing information are inadequate. W. Br. at 2-5. These arguments fail.

*First*, it is clear that two parties may independently develop similar products, and that each of those parties may possess that information as its own trade secret. *See* Restatement (First) of Torts § 757 cmt. b ("It is not requisite that only the proprietor of the business know it. . . . Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret."); *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 149 (2d Cir. 1996) ("[s]imply because other developers might independently create their own version of a [product] does not deprive [one developer's] version of its trade secret status"). For that reason alone, it is irrelevant that various third parties may market imitation BFC components. Moreover, the evidence demonstrates that some of those

---

[1] Faiveley notes that Wabtec's Brief failed to comply with Paragraph 2(e) of the Individual Rules of Practice of this Court, in that Wabtec's submission is not double-spaced and contains a four-page chart that is single-spaced and contains irregular margins.

parts do indeed have significant differences from the Faiveley-designed product. For example, the BFC produced by a Korean manufacturer "doesn't work." 135:6-11.[2] If a competitor's product is different (and in fact, in at least one case, so different that it is non-functional), then it follows that Faiveley's design is not common knowledge.[3]

*Second*, Faiveley need only demonstrate that its information provides "a slight competitive edge." *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 232 (S.D.N.Y. 1988). The evidence demonstrates that Faiveley's BFC TBU design has numerous advantages over other brake systems. 146:5-12. That a company *may* have reverse engineered the BFC TBU does not bear on whether Faiveley has a competitive advantage, and does not negate the status of Faiveley's trade secrets. *See, e.g., Telerate Sys.*, 689 F. Supp. at 232-33 ("[t]he *possibility* of discovery by 'fair and honest methods' does not preclude the finding of a trade secret").

Wabtec's willingness to pay a license fee further demonstrates the value of Faiveley's trade secrets, and, accordingly, the advantage Faiveley enjoys as possessor of those trade secrets. *See A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 17 (2d Cir. 1968) ("That [defendant] was willing to pay for the [trade secret] attests to his belief in its value."); *Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 744 (2d Cir. 1965) ("If . . . everything . . . is in the public domain, it is not very clear why Toyo is paying . . . for information it could so easily get from a technical library.").

---

[2] Unless otherwise specified, all citations refer to the Hearing Transcript from July 28, July 29, July 31 and August 1, 2008.

[3] Wabtec's misleading statement that "third parties are using the information contained on Faiveley's manufacturing drawings" is unsupported by the evidence. W. Br. at 3-4. There is no evidence that third parties such as Sabre Rail, Yujin, Durox and Flourishing are in possession of the information contained on Faiveley manufacturing drawings. At best, Wabtec's evidence shows that such manufacturers produce parts bearing some resemblance to the Faiveley design.

*Third*, even if manufacturing drawings were provided to suppliers without written confidentiality agreements (and there is no evidence that they were), this would "not in itself necessarily destroy the secrecy which protected them before they were so disclosed." *A.H. Emery Co.*, 389 F.2d at 16. In fact, such disclosure is "necessary to the efficient exploitation of a trade secret" and is deemed to "impos[e] a duty of confidentiality on the part of the person to whom the disclosure is made."[4] *Rockwell Graphic Sys. v. Dev. Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991); *see also CPG Prods. Corp. v. Mego Corp.*, 214 U.S.P.Q. (BNA) 206, 213 (S.D. Ohio Jan. 12, 1981) ("[i]f a supplier is given access to a purchaser's trade secrets . . . such secrets are deemed to be received in confidence by the supplier and the supplier is under a duty not to disclose [them]"); Roger M. Milgrim, Milgrim on Trade Secrets § 7.01[4] (2008) (same).[5]

## II.    WABTEC MISAPPROPRIATED FAIVELEY'S TRADE SECRETS

### A.    Wabtec's Reverse Engineering Process Was a Sham

As previously established, Wabtec's failure to proffer evidence from Jerry Stepp or Al Kreger—the two main engineers in the reverse engineering project—gives rise to an inference of misappropriation. Op. Br. at 16-17. In particular, Wabtec put forth no testimony from Stepp or Kreger as to whether they (i) accessed Faiveley drawings or Wabtec versions of Faiveley

---

[4] The single case Wabtec cites in support of its notion that disclosure to suppliers destroys trade secret protection turns on the fact that the drawings "were distributed haphazardly to both *customers* and parts suppliers for years" *DB Riley, Inc. v. AB Eng'g Corp.*, 977 F. Supp. 84, 91 (D. Mass. 1997) (emphasis added). Here, however, the evidence establishes that Faiveley's manufacturing drawings have never been given to a customer—let alone haphazardly. *See* 151:2-5; 203:11-13; 244:18-22; 285:17-19.

[5] Wabtec cites Larsson's testimony for the proposition that he did not know whether employees with access to manufacturing drawings were bound by confidentiality agreements. W. Br. at 5. Those citations are misleading. Larsson testified that he believed Faiveley employees do not have written confidentiality agreements because they are all part of trade unions, which, under Swedish law, have confidentiality agreements with employers. 164:4-15, 154:19-155:14. Moreover, he testified that access to manufacturing drawings is restricted according to job function and that only a select number of Faiveley employees have access to the trade secret materials. 160:11-16; 161:9-14; 149:19-150:4; 154:9-12.

drawings during the reverse engineering process; (ii) consulted with persons knowledgeable about Faiveley's trade secrets during the revere engineering process, including Roland Moore; or (iii) had prior exposure to Faiveley's trade secrets.[6] Wabtec's failure to produce these witnesses is particularly significant given Wabtec's admission that it was Stepp who "determin[ed] the final dimensions and tolerances to be used on the reverse engineering drawings." W. Br. at 9.

Wabtec also reveals that a substantial amount of the so-called reverse engineering was performed in-house by its "quality assurance department." *Id*. Specifically, Wabtec asserts that "Wabtec's quality assurance department obtained ten samples of the part, measured the noted dimensions, produced a report and provided that report to Mr. Stepp." *Id*. Again, Wabtec offers no evidence regarding which individuals comprise its quality assurance department and what exposure such individuals have had to Faiveley's trade secrets. Wabtec contends that members of the quality assurance department "would have no way to tie the parts to a SAB/Faiveley drawing or a Wabtec drawing of a Faiveley part." *Id*. at 8. However, the chronological sequence set forth by Wabtec establishes that Faiveley drawings and Wabtec versions of Faiveley drawings were not removed from the Wabtec system until *after* the reverse engineering drawing had been finalized (*see id*. at 9), meaning that the original drawings remained available to quality assurance personnel throughout their involvement in the process.

Even more fundamentally, that dimensions and tolerances were determined in-house at Wabtec *based on ten part samples* demonstrates that Wabtec's use of Alkab was a mere

---

[6] When asked about guidance he received from Jerry Stepp on how to reverse engineer a particular part, William Kabazie, the president of Alkab, testified, "[h]e's giving me guidance, because I guess he has familiarity with the part, apparently." Kabazie Dep. 170:2-4. Similarly, when asked why Al Kreger was able to catch a particular tolerancing mistake by Alkab, Kabazie testified, "I think they're more familiar with the part than we are." *Id*. at 172:3-4. Such testimony further supports an inference that Stepp and Kreger were tainted with Faiveley know-how or otherwise made use of Faiveley know-how while providing guidance to Alkab.

smokescreen, rather than a legitimate reverse engineering effort. Kabazie testified that Wabtec gave Alkab only one copy of each part, which reduced the accuracy of the Alkab drawings. *See* Kabazie Dep. 174:16-18 ("having one part versus a multitude of parts, it's difficult to hit on every number"); *id*. at 123:7-11. Had Wabtec seriously intended Alkab to create usable drawings, Wabtec would have supplied Alkab with at the very least more than one copy of each part to maximize accuracy. Because, however, Wabtec supplied Alkab with only one copy, and then did the measurements in-house using ten copies, the inference is that Wabtec's use of Alkab was merely for the sake of appearances.

Finally, the remarkable admission by Wabtec witness James Hoffner that parts containing Faiveley know-how were shipped out "one or two times"[7] post-termination of the License Agreement because a customer was "in trouble" is significant in two respects. 677:14 - 679:2. *First*, it establishes that Faiveley has a *certainty* of success on the merits, not a mere likelihood. *Second*, Hoffner's admission demonstrates that Jamieson's alleged "instructions" not to use Faiveley know-how—on which Wabtec exclusively relies to prove that its reverse engineering program was "clean"—were at times ignored.

**B.    Roland Moore's Involvement in the Reverse Engineering Process Requires a Finding of Misappropriation**

Although Wabtec characterizes Moore's involvement in the reverse engineering process as "limited" (W. Br. at 10), it cites no authority for the proposition that "limited" participation by a thoroughly-tainted individual is permissible in a "clean" reverse engineering effort. In fact, as previously established, the law is otherwise: a tainted party may not participate in a reverse

---

[7] Hoffner's subsequent testimony established that there were in fact two such instances, one of which involved NYCT. *See* 678:25 – 679:2. Although Wabtec attempts to downplay these instances by characterizing them as "isolated" and asserting that "there is no evidence . . . that such sales are continuing" (W. Br. at 14 n.15), Wabtec has failed to put forth evidence in support of either assertion.

engineering process. *See* Op. Br. at 20. Moreover, the burden is squarely on Wabtec to establish independent development. *See id.* at 17. The only evidence proffered by Wabtec to show that Moore segregated his knowledge of the Faiveley trade secrets during the reverse engineering process is self-serving testimony by Moore himself that he generally does not remember specific tolerances "unless there is a particular problem on something." 788:5-6. Of course, self-serving testimony by an interested witness is of limited evidentiary value. *See, e.g.*, *Ford v. Consol. Edison Co. of N.Y.*, No. 03 Civ. 9587, 2006 WL 538116, at *13 n.6 (S.D.N.Y. Mar. 3, 2006). But even if Moore's testimony is taken at face value, it acknowledges that Moore does in fact remember specific tolerances in certain circumstances. Further, there was no testimony to rebut the conclusion that Moore also remembered other trade secrets at issue, including Faiveley's material specifications and treatments, surface finishes, lubrication specifications and special instructions for manufacturing, testing and assembly. Wabtec has clearly failed to meet its burden of establishing independent development.

Wabtec's analysis of the documentary evidence implicating Moore in the reverse engineering process is even less convincing. For example, Wabtec attempts to dismiss Petitioner Exhibit 37 by claiming it merely shows that Moore was "vetting KTM's capabilities for reverse engineering." W. Br. at 10. What the document actually establishes is that, as of October 2007, Moore was providing KTM with very specific information concerning tolerances ("Tolerance for bushing holes of +/-.024 is way off"), dimensions ("Air cylinder ID is very critical-no dimension given"), surface finishes ("125 surface finish not acceptable for cylinder ID"), and the like. *See* Pet'r Ex. 37. Wabtec's assertion that "any engineer" (W. Br. at 10) could have supplied this information without using Faiveley's trade secrets is belied by the fact that KTM itself—presumably a competent engineering firm—was not able to get the information correct. While

Wabtec concedes that Moore reviewed the reverse engineering drawings provided by KTM and Hongdu (*see* W. Br. at 10), the documentary evidence conclusively establishes that Moore also provided substantive guidance to Alkab. *See* Kabazie Ex. 9.

Finally, Wabtec contends that much of Moore's participation in the reverse engineering project should be discounted because it happened "after the reverse engineering process was complete." W. Br. at 11. But Wabtec cannot escape liability by playing word games and imposing an arbitrary definition of when the reverse engineering process is "complete." Whether Moore made changes to reverse engineering drawings immediately or after the passage of some time, the effect—legally and factually—is exactly the same. Under any reasonable definition, the reverse engineering process is not "complete" until the drawings have reached final form and are being used to manufacture parts that are fit for purpose. By his own admission, Moore made changes to reverse engineering drawings on six to eight occasions (743: 22-744:4) before they were in final form, and did so based upon the knowledge he acquired during the License period (759:19-760:2). A more clear-cut case of misappropriation is difficult to imagine.

## III.    WABTEC HAS FAILED TO REBUT THE PRESUMPTION OF IRREPARABLE HARM TO FAIVELEY

As previously established, irreparable harm is presumed in cases of trade secret misappropriation. *See* Op. Br. at 10-11. Wabtec has plainly failed to rebut that presumption.[8]

The "overwhelming evidence" Wabtec proffers to rebut this presumption is: (i) Faiveley is not qualified to compete for the NYCT contract; (ii) Wabtec is permitted to use Faiveley's

---

[8] Furthermore, in a trade secret case, loss of market share constitutes irreparable harm. *Anacomp, Inc. v. Shell Knob Servs., Inc.*, No. 93 Civ. 4003, 1994 WL 9861, at *5-6 (S.D.N.Y. Jan. 10, 1994), *aff'd* 26 F.3d 621 (2d Cir. 1994); *Fabkom v. R.W. Smith & Assocs., Inc.*, No. 95 Civ. 4552, 1996 WL 531873 (S.D.N.Y. Sept. 19, 1996) (same). Because Faiveley owns the trade secrets necessary to make the Licensed Products, Faiveley controlled the market until Wabtec's misappropriation commenced. Indeed, any market position Wabtec has is merely a function of its now-terminated License Agreement with Faiveley.

trade secrets to supply the R-160 contract with NYCT; and (iii) Faiveley delayed in bringing its preliminary injunction motion.  None of these allegations—nor all three combined—comes even close to rebutting the presumption of irreparable harm to Faiveley.

## A.    Faiveley's Qualification for the NYCT Contract Is Impending

Wabtec places significant weight on the argument that Faiveley is not presently qualified to supply NYCT.  W. Br. at 15.  Wabtec's argument ignores crucial facts.[9]  *First*, contrary to Wabtec's suggestion, Faiveley has in fact taken steps in the NYCT qualification process.  Upon learning of the NYCT's sole source procurement announcement, Faiveley immediately commenced its registration as a supplier.[10]  396:24-397:23.  *Second*, Keith Falk, NYCT's Director of Car Systems Engineering, acknowledged that as long as the Faiveley BFC is the same BFC being provided by Wabtec, there was no reason NYCT could not purchase the product from Faiveley.  813:24-814:13; 829:1-3.  Falk testified that it will take a mere two to four months to run the requisite testing.  814:20-23; 822:14-16.  Indeed, Falk stated, "[NYCT is] more than willing to run these tests with [Faiveley] to qualify their product."  814:11-13.

## B.    Wabtec Cannot Hide Behind the R-160 Contract

Wabtec claims that there is "no question that Wabtec has the right to use the subject information to manufacture and sell pursuant to [the R-160] contract the parts reflected in the drawings introduced by Faiveley at trial."  W. Br. at 16.  As an initial matter, Wabtec has not

---

[9] Testimony by NYCT personnel demonstrates conclusively that prior to Faiveley's objection to the award of the R-142 contract to Wabtec, NYCT was not even aware that the BFC parts being provided by Wabtec were in fact Faiveley parts because Wabtec never so informed them.  816:2-5; 826:23-827:1; Layman Dep. 25:1-31:3.

[10] Although the undersigned counsel represented during the hearing, pursuant to a note passed to counsel, that the Loan Agreement had been signed (*see* 821:24-822:4), it has now come to our attention that the Loan Agreement supplied was only a draft, but that it is now being executed.

established that it is entitled to supply products to NYCT pursuant to the R-160 contract.[11]  But even if Wabtec were permitted to sell to NYCT for the R-160, it is not permitted to sell parts for the R-142A or any other contract with NYCT.  *See* Pet'r Ex. 1, § 22.1.  Wabtec could have offered evidence that it has sequestered drawings, employees or know-how used to supply components pursuant to the R-160 contract as opposed to any other contract.  Wabtec chose not to do so.

**C.    Faiveley Did Not Delay in Bringing Its Preliminary Injunction Application**

Since Faiveley filed this action a mere six weeks after NYCT denied its protest on September 5, 2007 – which, if granted, could have obviated the need for this proceeding – Faiveley cannot be said to have unreasonably delayed.  In any event, it is well established that "[t]he requirement that a plaintiff must seek injunctive relief in a timely manner is flexible, and courts look to the facts of each case to determine the consequences of a plaintiff's delay."  *See Eve of Milady v. Impression Bridal, Inc.*, 957 F. Supp. 484, 490 (S.D.N.Y. 1997).  Here, any delay is easily excused given Faiveley's extensive efforts to resolve the matter with both Wabtec and NYCT directly.  Pet'r Exs. 24, 25.  Faiveley repeatedly contacted Wabtec's counsel to no avail.  *Id.*  Furthermore, Faiveley attended meetings with NYCT, requested information regarding the specifications for the R-142A contract, submitted a preliminary bid and filed a protest to NYCT's award of the contract to Wabtec, prior to filing its application.  *Id. See Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 124 (E.D.N.Y. 1997) (failing to find delay where plaintiff waited to file for injunction until it had officially lost contract with leading client to defendant); *Encyclopedia Britannica Educ. Corp. v. Crooks*, 447

---

[11] Indeed, Wabtec never came forward with evidence to establish that the R-160 contract may be supplied post-termination of the 1993 License Agreement.  Furthermore, Faiveley has never acknowledged that Wabtec does, in fact, have the right to sell Faiveley's products under the R-160 contract post-termination, and does not waive its rights with regard to that contract.

F. Supp. 243, 252 (W.D.N.Y. 1978) (plaintiffs' delay "caused . . . in part by their attempts to reach an out-of-court compromise . . . should be commended rather than condemned."); *see also Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372, 390 (S.D.N.Y. 2003) (finding that six month delay did not warrant denial of relief sought).

## IV. PUBLIC INTEREST CONCERNS DO NOT MILITATE AGAINST GRANTING THE INJUNCTION.

As previously established, impact on the public interest or third parties should play only a limited role in suits between private parties. *See* Op. Br. at 11. If anything, public interest considerations favor granting the injunction in order to stop the misappropriation. *See, e.g., Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Schultz*, No. 01 Civ. 0402, 2001 WL 1681973, at *4 (D.D.C. Feb. 26, 2001) (injunction promotes public interest where "it protects the confidentiality of company trade secrets and consumer information").

Moreover, there has been no indication that granting the injunction would negatively impact the public interest. Wabtec relies on testimony from Falk that: "[i]f we are cut off from that supply [of BFC TBU parts], it could severely implicate our ability to continue trains in service." 811:2-4. The key word in that statement is "if." An injunction would not cut off the supply to NYCT; it would merely change the source of supply, a relatively quick and easy substitution. Falk in fact testified that replacing Wabtec with Faiveley as the supplier "should be fairly simple since if [the product] is identical, it should be a drop-in replacement for the Wabtec components. We would put them on a train, instrument the train, run the tests. The test itself, typically, can take about two months."[12] 815:6-9.

---

[12] There is no reason to believe that the Faiveley BFC TBU products would not be functionally identical to Wabtec's. According to Falk, the BFC TBU components that NYCT is now obtaining from Wabtec are no different from those it received five years ago, while Wabtec was still acting as Faiveley's licensee. 828:8-13.

**V.    WABTEC'S REVERSE ENGINEERING DRAWINGS DEMONSTRATE WABTEC'S MISAPPROPRIATION OF FAIVELEY TRADE SECRETS**

Wabtec asserts that "there are vastly more differences [between Faiveley drawings and Wabtec reverse engineering drawings] . . . than the few similarities that . . . Faiveley seized upon." W. Br. at 13. But even if this were true, the existence of certain differences between the final products "is hardly probative of independent development." *Norbrook Labs Ltd v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 489 (N.D.N.Y. 2003). Misappropriation may occur even where "no direct copying occurred." *Integrated Cash Mgt. Servs. v. Digital Transactions*, 732 F. Supp. 370, 377 (S.D.N.Y. 1989), *aff'd* 920 F.2d 171 (2d Cir. 1990). Thus, rather than establishing copying, all Faiveley need show is that Wabtec "benefitted" from its prior exposure to Faiveley's trade secrets. *Id.*; *see also Anacomp*, 1994 WL 9681, at *11 (preliminary injunction issued because "starting point for this 'reverse engineering' was" plaintiff's trade secrets). Indeed, it is well settled that "a plaintiff may prevail on a trade secret claim by establishing that defendant used plaintiff's trade secret as a helpful starting point for defendant's own development efforts." 4 Milgrim on Trade Secrets § 15.01[1][d][vii].[13]

Here, the evidence shows that, at a minimum, Wabtec "benefitted" from its prior exposure to Faiveley's trade secrets and that such trade secrets were a "starting point" for Wabtec's own development efforts. Accordingly, Faiveley has established misappropriation. Moreover, as demonstrated below, Exhibit A to Wabtec's Brief is misleading and omits crucial information.

---

[13] Indeed, even in the context of copyright infringement, where proof of copying *is* required, as Judge Learned Hand famously stated, "[n]o plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro Goldwyn Pictures Corp.*, 81 F.2d 49, 55 (2d Cir. 1936).

11

### A.    Dimensions and Tolerances

Wabtec's attempt to show that its reverse engineering drawings do not duplicate Faiveley's drawings is unconvincing.  For example, in response to Petitioner Exhibit 49b, Wabtec notes that the reverse engineering drawing lists a length of 3.72 in, which "is different from Faiveley's original length of 94.4 mm or 3.716 [in]."  W. Br. at Ex. A, 4.2.  Quite obviously, 3.716 rounds to 3.72—yet Wabtec falsely suggests that these measurements are "different."  Wabtec's assertion that these two numbers differ does not merit the Court's consideration.  Even more remarkably, data sheets provided by Wabtec indicate that Wabtec ignored its own internal calculations.  Per Respondent Exhibit 298, the average dimension was 3.7262 (*see* Resp't Ex. 298 at WAB0096360), and was rounded on the final inspection report to specify a dimension of 3.73 (*see* Resp't Ex. 298 at WAB0096358).  However, the dimension used on the final reverse engineering drawing is 3.72—the exact same dimension on the original Faiveley drawing.  Pet'r Ex. 45.

Furthermore, Wabtec cannot account for the many changes made to the dimensions and tolerances of its drawings per Moore's instruction.  Wabtec did not offer any evidence to contradict Faiveley's contention that Wabtec used Faiveley's trade secrets with respect to the Ring-Jointing depicted in Petitioner Exhibits 89, 90, and 93.  *See* 784:9-788:6.  For example, Wabtec never asked Moore how he arrived at the exact same tolerance for the Ring-Jointing. Rather, Wabtec only asked Moore if he ever viewed Faiveley drawings or Wabtec versions of Faiveley drawings while he performed his review of the reverse engineering project.  784:9-788:6.  Wabtec's failure to show how Moore revised a reverse engineering drawing to exactly match the tolerance range of the original Wabtec version of a Faiveley drawing leaves intact the presumption that Moore used his knowledge of Faiveley trade secrets to alter these dimensions.

### B.    Material Specifications

Wabtec's assertion that some of its material specifications differ from Faiveley's specifications does not detract from the fact that many of those material specifications are *exactly the same*. *See* Collins Dep. 59:13-60:6; *compare* Pet'r Ex. 89 *with* Pet'r Ex. 93. For example, Petitioner Exhibit 31b notes that both the final Wabtec reverse engineering drawing and the original Faiveley drawing specified Delrin 500CL as the material for the part. Wabtec responds by asserting that "Delrin 550CL [sic] is a standard bearing material that Wabtec has used for many products, including products other than the BFCs." W. Br. at Ex. A, 1.2 (internal citation omitted). But Wabtec fails to explain why Delrin 500CL was used instead of Teflon—the material specified by Alkab in its final drawing supplied to Wabtec— thereby giving rise to an inference of use of Faiveley's trade secrets. *See* Pet'r Ex. 29. Wabtec's decision to overrule Alkab's choice of Teflon, and instead use Delrin 500CL, was based on its knowledge of the function and operational environment of the guide sleeve, specifically because Wabtec knew that there would be "two surfaces of metal mov[ing] slowly against each other." 538:8-9. This serves as a clear example of Wabtec relying upon knowledge of Faiveley's trade secrets to save it "from having to conduct its own trial and error work." *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1232 (W.D.N.Y. 1994); *Norbrook*, 297 F. Supp. 2d at 478 .

### C.    Special Instructions

Wabtec's description of the differences between the special instructions on the final Wabtec reverse engineering drawings and Faiveley original drawings is inaccurate.[14] For example, Exhibit A of Wabtec's Brief discusses the special instructions relating to the Adjuster

---

[14] Although Wabtec references Petitioner Exhibit 34 for this proposition that certain special instructions are "standard industry practice" (*See* W. Br. at Ex. A, 2.1.), this Exhibit does not, in and of itself, demonstrate the existence of such standards.

Nut. W. Br. at Ex. A, 3.1. While the Wabtec and Faiveley specifications differ somewhat, they both explicitly call for rust protection. *Compare* Pet'r Ex. 39 *with* Pet'r Ex. 42. The drawing prepared by the reverse engineering firm, however, contains no information whatsoever regarding rust protection. *See* Pet'r Ex. 41. Wabtec contends that its specification is different from the Faiveley specification; however, this is a distinction without a difference. That the information on the Wabtec drawing is not identical to the information found upon the original Faiveley drawing is irrelevant. The crucial fact is that Wabtec used Faiveley's trade secrets as a "springboard" for reaching the conclusion that the Adjuster Nut requires rust protection. Such conduct constitutes trade secret misappropriation, even absent direct copying. *See Monovis*, 905 F. Supp. at 1232.

## VI.    <u>FAIVELEY HAS STANDING TO SEEK RELIEF IN THIS COURT</u>

The July 14, 2008 decision of the ICC Panel adjudicating the underlying arbitration refutes Wabtec's argument that Faiveley lacks standing because one of the other Faiveley entities is the proper party. *See* Pet'r Ex. 6, ¶ 126 and p. 26. In that decision, the ICC Panel found that the original party to the License Agreement, SAB WABCO Holdings B.V., assigned its rights and obligations under that contract to Faiveley in a written agreement dated June 11, 1996. *Id.* ¶¶ 121-126.[15] Furthermore, the entities that Wabtec suggests might be the proper parties, Faiveley Transport Nordic AB and Faiveley Transport USA, are a wholly-owned subsidiary and an affiliate of Faiveley, respectively. *Id.* ¶ 83. Even if Wabtec could contradict the aforementioned irrefutable evidence relied upon by the ICC to determine that Faiveley has

---

[15] The ICC Panel also found persuasive the fact that Wabtec has previously argued in this case that Faiveley *is* a party to the License Agreement. For example, in its Memorandum of Law in Support of Wabtec Corporation's Motion to Dismiss, Wabtec wrote that "Faiveley clearly and explicitly agreed that it would not have 'recourse to the courts'" in Section 27 of the License Agreement. *See* Pet'r Ex. 6, ¶ 154. Wabtec's current argument is inconsistent with its former position. *Id.* ¶ 153.

standing to seek the relief requested herein, equity would mandate that the Court amend the

caption to permit joinder.  373:23-374:2.

## **CONCLUSION**

For the reasons set forth above and in Faiveley's Opening Brief, the Court should enter

an order enjoining Wabtec, pending a final determination in the ICC arbitration, from, among

other things, manufacturing, supplying, selling or offering for sale, any BFC TBUs, BFC TBU

parts, or BFC TBU kits or components, as set forth more fully in Exhibit A hereto.

Date:    August 8, 2008

By: _A. John P. Mancini_ _____

A. John P. Mancini
Gregory A. Frantz
Vanessa M. Biondo
Christine M. Hernandez

MAYER BROWN LLP
1675 Broadway
New York, NY  10019
(212) 506-2295
(fax) (212) 849-5895

*Attorneys for Petitioner Faiveley Transport
Malmo AB*

15

# Exhibit A

A. John P. Mancini
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Attorneys for Faiveley Transport Malmo AB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                             :
FAIVELEY TRANSPORT MALMO AB,                                 :     08-CV-03330 (JSR)
                                                             :
         v.                                                  :     **[PROPOSED] ORDER GRANTING**
                                                             :     **PRELIMINARY INJUNCTIVE**
WABTEC CORPORATION.                                          :     **RELIEF IN AID OF FOREIGN**
                                                             :     **ARBITRATION**
                                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JED RAKOFF, District Judge:

        IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that, pending a final

determination of the International Court of Arbitration of the International Chamber of

Commerce (the "Arbitral Tribunal") in a dispute between Malmo Transport Malmo AB

and Wabtec Corporation,  commenced on October 18, 2007, Respondent Wabtec

Corporation shall be:

        (a)    enjoined from manufacturing, supplying, selling or offering for
               sale any BFC TBUs, BFC TBU parts, or BFC TBU kits or
               components to any third parties, including, but not limited to, the
               New York City Transit Authority or similarly-situated transit
               authorities located anywhere in the United States, until the Arbitral
               Tribunal renders a final determination and all appeals therefrom
               have been exhausted or otherwise concluded (collectively, the
               "Final Arbitral Decision"); and

        (b)    enjoined from bidding for contracts to supply BFC TBUs, BFC
               TBU parts, or BFC TBU kits or components until a Final Arbitral
               Determination of the Arbitral Tribunal; and

(c)    enjoined from providing to any third party any documents, drawings, plans, designs, casts, molds, or any other information, materials or know-how (collectively, "Faiveley's Trade Secrets") that was provided to Wabtec by Faiveley under the 1993 License Agreement; including any documents, information or materials premised upon, composed of, derived from, or otherwise related to Faiveley's Trade Secrets; and

(d)    ordered to deliver to Faiveley any and all of Faiveley's Trade Secrets; including any documents, information or materials premised upon, composed of, derived from, or otherwise related to Faiveley's Trade Secrets, which remain in Wabtec's possession or which have been produced to third parties by Wabtec; and

(e)    ordered to provide to Faiveley an accounting of Faiveley's Trade Secrets; including any documents, information or materials premised upon, composed of, derived from, or otherwise related to Faiveley's Trade Secrets, which remain in Wabtec's possession or which have been produced to third parties by Wabtec.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the requirement that Faiveley post a bond to secure this preliminary injunction is hereby waived.

SO ORDERED.

Dated: New York, New York
_____, 2008


_____
United States District Judge

2