```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- x
                                         :
FAIVELEY TRANSPORT MALMO AB,             :
                                         :
                Petitioner,              :       08 Civ. 3330 (JSR)
                                         :
                -v-                      :       DECISION AND ORDER
                                         :
WABTEC CORPORATION,                      :
                                         :
                Respondent.              :
                                         :
---------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Faiveley Transport Malmo AB ("Faiveley"), a Swedish company that manufactures and supplies railway systems and services, petitions the Court to preliminarily enjoin respondent Wabtec Corporation ("Wabtec"), an American company in a similar line of business, from undertaking certain commercial activities with respect to a product called a Brake Friction Cylinder Tread Brake Unit, or "BFC TBU," pending arbitration of the parties' dispute in Sweden. On July 28, 29, 31, and August 1, the Court conducted an evidentiary hearing on Faiveley's request for injunctive relief, and thereafter received extensive written submissions from both sides. Based on that evidence and those submissions, the Court makes the following findings of fact and conclusions of law, and, as a consequence, grants Faiveley's request in part and denies it in part.[1]

---

[1] Subsequent to the hearing, the Court also received certain depositions submissions, with objections noted thereon. The Court has now ruled on the objections and, except where an objection was sustained, considered the proffered deposition testimony in its rulings here. The Court will separately arrange for the parties to retain the ruled-upon deposition transcripts.

The BFC TBU was invented in the 1970s by Faiveley's predecessor-in-interest, SAB Wabco Holdings B.V. ("SAB Wabco"). The product was highly innovative, incorporating such novel techniques as a "wedge principle" and an "integrated slack adjuster." Transcript, Preliminary Injunction Hearing, 7/28/08 - 8/1/08 ("Tr."), 139:23-140:21, 140:23-141:5, 146:5-12. It is now in wide use in passenger railway transit systems, including – of particular importance to this case – the New York City subway system. The underlying patents have, however, expired. Tr. 229:5-9.

In 1993, SAB Wabco entered into a License Agreement with a company simply called Wabco, which was Wabtec's predecessor-in-interest.[2] Petitioner's Exhibit ("Pet. Ex.") 1.[3] Under the License Agreement, Wabco (later Wabtec) was authorized to use SAB Wabco's know-how and technologies to produce and market certain products, including the BFC TBU. Id. As provided in the Agreement, SAB Wabco supplied information to Wabtec regarding the manufacture of BFC TBUs, including manufacturing drawings of the kind centrally at issue in

---

's factual findings reflect, inter alia, its evaluation of the credibility of the various witnesses.

[2] The similarity of all these names stems from their historical relationships, directly or indirectly, with the famous Westinghouse Air Brake Company, through which George Westinghouse, the inventor of the air brake, conducted his commercial activities. Tr. 38:4-9.

[3] All exhibit references are to exhibits admitted at the evidentiary hearing. The respective exhibits are being maintained in the custody of the party that introduced them.

this hearing. Tr. 110:14-111:15; 152:3-6.

In 2004, Faiveley acquired SAB Wabco, including SAB Wabco's intellectual property related to the BFC TBU and SAB Wabco's rights and duties under the License Agreement. Tr. 52:10-11, 53:16-21. In December 2004, Faiveley sent Wabtec notice that the License Agreement would not be renewed, and so would expire on December 31, 2005. Pet. Ex. 2. Over a period of about a year, the parties, who were contemplating a merger, discussed the possibility of extending the term of the License Agreement. Pet. Ex. 4; Respondent's Exhibits ("Resp. Exs.") 14, 21-22. However, the partes never reached a meeting of the minds on any extension, and the License Agreement duly expired on December 31, 2005.[4] Upon termination of the Agreement, Wabtec was required to "cease manufacture of the License Projects subject only to the entitlement to finish and sell Products in manufacture before or at the end of the term of the Agreement and to carry out contracts of sale of products entered into by the licensee before such date" (the "grandfathered contracts"). Pet. Ex. 1 at § 22.1.1.

Faiveley alleges that following the termination of the License Agreement, Wabtec wrongfully continued to use Faiveley's trade secrets to manufacture and supply BFC TBU products. In

---

[4] The parties disputed the termination date of the License Agreement, and the Court received evidence relevant to that question during the course of the hearing. That evidence demonstrated that Faiveley's offer to extend the Agreement for six months was met only by Wabtec's counteroffer of extending it for eighteen months, and neither offer was ever accepted. Accordingly, the Agreement terminated on December 31, 2005.

particular, Wabtec, following termination of the License Agreement, sought and was awarded a "sole-source" contract to provide BFC TBU kits to New York City Transit on that entity's overhaul project of the R-142A subway cars (the "R-142A contract"). Faiveley alleges that Wabtec can only perform the R-142A contract by relying on trade secrets it has misappropriated from Faiveley. On October 18, 2007, Faiveley initiated arbitration in Sweden on these and other claims, and simultaneously filed the instant action seeking injunctive relief in aid of arbitration. See Order to Show Cause.[5] Faiveley now seeks a preliminary injunction enjoining Wabtec from manufacturing, supplying, selling, or offering for sale any BFC TBU parts to New York City Transit, or any other third party, until the Swedish Arbitral Tribunal proceedings have terminated.

In this Circuit, "[a] party seeking a preliminary injunction must establish that (1) absent injunctive relief, it will suffer irreparable harm, and (2) either (a) that it is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving

---

[5] This matter was initially referred to this Court, sitting in Part I, on October 18, 2007. Wabtec moved to dismiss Faiveley's motion for injunctive relief on the ground that the Court lacked jurisdiction to consider it. By Memorandum Order dated November 16, 2007, the Court denied Wabtec's motion to dismiss. Wabtec appealed this decision; but by Order dated May 2, 2008, the Court of Appeals for the Second Circuit dismissed the appeal. Meanwhile, the parties had submitted a joint request to the Court, asking it to accept permanent assignment of the case and adjudicate Faiveley's motion on the merits. By Order dated March 26, 2008, the Court accepted assignment of the case.

party." North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43 (2d Cir. 1999). Because the irreparable harm inquiry here turns on whether or not Wabtec has misappropriated any of Faiveley's trade secrets, the Court first evaluates whether Faiveley has established a likelihood of success on the merits with respect to that claim.[6] The parties are agreed that the merits are governed by the law of New York. See Faiveley Transport Malmo AB's Post-Hearing Memorandum in Further Support of its Application for a Preliminary Injunction at 10; Defendant Wabtec Corporation's Post-Hearing Memorandum at 2.[7]

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." North Atl. Instruments, 188 F.3d at 43-44. "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." Id. at 44 (quotation marks omitted; alteration in original). "In determining

---

[6] At the evidentiary hearing, Wabtec raised a threshold challenge to Faiveley's standing to bring this claim. However, the Arbitral Tribunal in Sweden previously reached this question, and concluded that Faiveley was the proper party. Pet'r Ex. 6. The Court agrees, for the reasons stated in the Arbitral Tribunal's Order, that Faiveley has standing here.

[7] Faiveley has also asserted a claim for breach of the License Agreement. However, the asserted breach is the misappropriation of the trade secrets, so that the claims are essentially overlapping. Accordingly, the Court does not separately reach the breach of contract claim.

whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Id. (internal quotation marks omitted).

At the evidentiary hearing, it became clear that the only trade secrets that Faiveley could plausibly maintain met these requirements were those set forth in its manufacturing drawings and not otherwise disclosed. Faiveley claimed that its manufacturing drawings contain several kinds of trade secrets, including dimensions and tolerances, surface finishes, material selection and treatments, lubrication specifications, and special instructions for manufacture, testing, and assembly. Tr. 232:13-19.[8] The Court concludes that this information does constitute trade secrets under New York law, for the following reasons.

First, the information is not widely "known outside the

---

[8] Although Faiveley claims that Wabtec has misappropriated hundreds of Faiveley's trade secrets, the Court, in order to limit the evidentiary hearing to a manageable scope and focus the issues, limited Faiveley's presentation at the hearing to twelve representative manufacturing drawings relating to twelve specific parts of the BFC TBU. See Tr. 6/19/08. The Court's conclusions in this Decision and Order are, however, applicable to all Faiveley's manufacturing drawings for all part of the BFC TBU.

6

business." It is true that, as Wabtec established at the hearing, a few companies do currently sell certain BFC TBU component parts in direct competition with Faiveley: Sabre Rail, Yujin, Durox, and Flourishing. Tr. 554-557; 848-855. However, no company has succeeded in producing a complete BFC TBU unit. Tr. 54:25-55:5; 281:13-15. Moreover, there is no evidence to suggest that these companies, unlike Wabtec (see infra), produced the parts by drawing on Faiveley's confidential knowledge or information. Tr. 445:11 - 446:3. The fact that some others know of a trade secret "independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret," does not deprive it of its trade secret status. Restatement (First) of Torts § 757; cf. Vermont Microsystems v. Autodesk, Inc., 88 F.3d 142, 149 (2d Cir. 1996) (applying California law and finding that "[s]imply because other developers might independently create their own version of a [product] does not deprive [the developer's] version of its trade secret status").[9]

Second, Faiveley took ample measures to protect the confidentiality of the information. Faiveley protected the electronic copies of its manufacturing drawings by password, and kept

---

[9] Sit-Up Ltd. v. IAC/InterActiveCorp., 2008 WL 463884, *12 (S.D.N.Y. 2008), which Wabtec cites in their post-hearing submission, is not to the contrary, as that case concerned a putative trade secret that was "commonly used by other" participants in the industry; that is not the case here. Similarly, Frink Am., Inc. v. Champion Rd. Mach. Ltd., 48 F. Supp. 2d 198, 207 (N.D.N.Y 1999), concerned information that was "easily acquired" by competitors once the product was on the market.

7

the hard copies in locked cabinets; only a limited number of employees were granted access. Tr. 149:19-150:15; 160-161. Faiveley never provided manufacturing drawings to customers. Tr. 285:17-19. It is immaterial that Faiveley's employees may not have had written confidentiality agreements with Faiveley, as there was testimony that those employees were members of Swedish trade unions which, by law, have confidentiality agreements with employers. Tr. 164:4-15; 154:19-155:14. It is also immaterial that in some instances, the guarantee of confidentiality between Faiveley and its suppliers was based on mutual understanding rather than memorialized. Tr. 82:19-25, 76:25-77:2; 79:19-80:2. In addition, all of Faiveley's manufacturing drawings contained confidentiality notices. Tr. 149:12-18.

Third, Faiveley (or, more precisely, SAB Wabco) devoted substantial resources to developing the BFC TBU, a matter Wabtec does not seriously dispute. Similarly, Wabtec does not seriously contest Faiveley's claim that it would take considerable resources to duplicate Faiveley's technologies; nor, plausibly, could Wabtec make such an argument, considering the difficulties and expense that Wabtec itself encountered in trying to reverse engineer the BFC TBU parts.

Finally, the information is very valuable to Faiveley, providing far more that the "slight competitive edge" required by New York law. Telerate Systems, Inc. v. Caro, 689 F. Supp. 221, 232 (S.D.N.Y. 1988). The fact that a few companies have produced and are selling certain parts of the BFC TBU does not negate Faiveley's

8

competitive advantage because, among other reasons, as already stated, no company has produced a complete, functioning unit.

Having found that Faiveley possessed trade secrets in the form of the aforementioned information contained in the manufacturing drawings, the Court turns to the question of whether Wabtec "used th[ose] trade secret[s] in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." N. Atl. Instruments, 188 F.3d at 44.

As an initial matter, Wabtec argues that Faiveley cannot claim Wabtec has "used" Faiveley's trade secrets with respect to information pertaining to parts that are not currently being sold by Wabtec to any customers or that are only being sold and supplied by Wabtec to carry out a "grandfathered" contract. Tr. 565:24-567:2. The Court agrees, and thus the injunctive relief granted below will only pertain to trade secrets that do not fall in these two categories.

Of the twelve representative parts presented at the evidentiary hearing, the six parts that do not fall within the aforementioned two categories are guide sleeve 53508, guide sleeve 54143, the packing cup, the leader nut, the spring sleeve, and the ratchet pin. Tr. 565:17-20; Resp. Ex. 586. As to those six parts (all of which are being sold to New York City Transit pursuant to the R-142A contract), Wabtec claims that it did not use Faiveley's trade secrets at all, but rather produced the manufacturing drawings related to those parts through a bona fide reverse engineering process. Faiveley, by contrast, claims that Wabtec's reverse

9

engineering was, at worst, a "sham," and, at best, unacceptably tainted by Faiveley know-how.

"It is a well-recognized principle that, where a defendant in a trade secret case claims independent development, the burden shifts to the defendant to show that this was in fact the case." Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 732 F. Supp. 370, 377-378 (S.D.N.Y. 1989).

Wabtec first attempted to reverse engineer BFC TBU components in 2005, using a reverse engineering company called Hongdu. Tr. 635:19-21; 567:15-568:11. That effort was unsuccessful; Hongdu produced no usable drawings. Tr. 671:14-24. In June or July 2007, Paul Jamieson, the chief engineer for Wabtec's passenger transit division, initiated Wabtec's second effort to reverse engineer the parts, using primarily the reverse engineering firms Alkab Contract Manufacturing, Inc. ("Alkab"), KTM Solutions ("KTM"), and Rail Transit Consultants ("RTC"). 560-62. Also involved in the process were not only Al Kreger and Jerry Stepp, two Wabtec engineers who worked outside Wabtec's Foundation Brake Group and therefore had had no prior exposure to Faiveley drawings, but also Roland Moore, who was the Lead Engineer for the Foundation Brake Group and had had frequent contact with Faiveley drawings during the course of the License Agreement. Tr. 609-610; 732-33. Kreger and Stepp determined which parts were commercially available and thus not necessary to reverse engineer. Tr. 560-61; 568-69; 575. Then Moore selected which of the remaining products were of highest priority and should be sent for reverse engineering, a task to which he was assigned

10

because "he [was] knowledgeable about the product." Tr. 617:2-10. During this process, Jamieson instructed Moore, Kreger and Stepp not to consult Faiveley drawings, but the drawings remained on Wabtec's computer system.

After Alkab or KTM produced a drawing, that drawing was sent to RTC for manufacturability review and comments. 578-80. RTC was run by Dallas Spadaro, a former Wabtec employee who had been exposed to BFC TBU drawings, although he stated during his deposition that he had not gained a meaningful understanding of the product. Spadero Dep. 68-75. Stepp reviewed the reverse engineered drawings and RTC's comments and referred certain measurements to the quality assurance department at Wabtec for further testing; the quality assurance personnel created a report of their results. Tr. 582-83; e.g., Pet. Ex. 82. Roland Moore determined the testing criteria for at least some of these tests. Tr. 737:24-738:9. Moore also issued several Engineering Change & Release Notices ("ECRNs") directing engineering draftspersons to make certain changes to the manufacturing drawings. E.g, Pet. Ex. 83. The draftsperson would make the requested change on the drawing. Once the final reverse engineered drawing was complete, it replaced the previous version of that drawing on Wabtec's computer system. The previously existing version, which was typically a "Wabtec version of [a] Faiveley drawing," was then made obsolete (or, in the jargon of the engineers, "obsoleted") and could no longer be accessed by Wabtec employees without special permission. Tr. 705; 775:10-11; 789-90.

At a minimum, this process was fatally tainted by the

11

involvement of Roland Moore. The Court is skeptical as to the reliability of Moore's self-serving testimony that his role in the reverse engineering process was minimal, that he did not at any point during the reverse engineering process refer to Faiveley drawings or Wabtec versions of Faiveley drawings, and that he did not send those drawings to the reverse engineering firms. 785-87; 790-91. But even if one were to accept these assertions, it is clear that Moore previously had had substantial access to Faiveley's know-how, that he was very familiar with Faiveley's drawings, and that he had worked closely over many years with the BFC TBU parts. This was not learning that he could likely erase from his mind, and yet he was still called upon to provide significant substantive input into the reverse engineering process.

For example, Petitioner's exhibit 37 is an email from Moore to Kreger, Jamieson, and Spadaro, among others. In it, Moore states that he reviewed numerous drawings from KTM and is "not very pleased" because the drawings contain numerous omissions and errors in "how the items fit together," "how they should be toleranced to make sure they can be assembled and function," and in the lack of "proper surface finishes and diameters" for certain cylinders. Moore then provides "comments on several drawings" "based on how parts go together, how they function, and customer requirements." These comments state, for example, that the "[t]olerance for bushing holes of +/- .24 is way off," that the "[a]ir cylinder ID is very critical [but that] no dimension is given," that "125 surface finish [is] not acceptable for cylinder ID," and that a part would "not fit [a]

12

mating part."

Another such example is Petitioner's exhibit 83, an Engineering Change & Release Notice related to the push sleeve, in which Moore directs a change to a dimension and tolerance based on Moore's understanding of "the function of the part that was not taken into account at the reverse engineering stage."  Pet. Ex. 83.

In evaluating these and other such exhibits, it is well to recall that much of Faiveley's case turns on the alleged reappearance of Faiveley's dimensions, tolerances, and other special instructions in final putatively reverse engineered drawings, when they were not in the drawings received from Alkab or KTM.  Indeed, Faiveley has identified a number of such convergences, as outlined by summary witness Robert Sullivan.  The Court does not agree with Faiveley that these convergences are conclusive proof that Wabtec copied from Faiveley drawings or from drawings derived from Faiveley drawings. For example, it appears that at least some of the changes could in fact be derived from the face of the Alkab drawings.  Tr. 791-95. For others it is at least possible that Moore was relying on general engineering knowledge.

Even crediting these possibilities, however, and even absent any finding of bad faith on Moore's part, the Court concludes that there were simply too many "coincidental" changes that the Court believes Moore would not have been able to suggest had he not been deeply familiar with Faiveley's products and know-how, familiarity that he gained during the course of the License Agreement.  Moore himself testified that certain changes he made were based on his

13

understanding of the "function of the part," and that he gained his understanding of the part's function by "work[ing] with these parts for many years" during the License Agreement. Tr. 759:14-760:2, 767:17-20. Consciously or not, Moore was, the Court finds, making important use of Faiveley's trade secrets in the course of the reverse engineering process.

In addition to Moore's involvement, there are other aspects of the reverse engineering process that suggest that it was tainted. For example, it is clear that the drawings as produced by Alkab were not sufficient to produce usable parts. Kabazie Dep. 91. It was only after the drawings were reviewed by RTC (run by a former Wabtec employee with at least some exposure to Faiveley's manufacturing drawings) and by Wabtec itself that the remainder of the necessary information was added. Moreover, Wabtec's first attempt to reverse engineer parts through Hongdu, which did not involve RTC or in-house Wabtec revisions, failed. These factors combine to create a persuasive inference that Faiveley know-how tainted the second reverse engineering project.

As noted, the burden is on Wabtec to establish that its reverse engineering process was fully independent from any past access to Faiveley trade secrets. As the foregoing examples illustrate, it is probable that Wabtec will be unable to meet that burden in any final adjudication on the merits. See Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1232 (W.D.N.Y. 1994) (finding that defendant used plaintiff's method, with which he was familiar, "as a springboard to launch his own approach"). It follows that Faiveley

has established a likelihood of success on the merits.

The Court, therefore, turns to the question of whether Faiveley has established that, absent the injunction it seeks, it would suffer irreparable harm.[10] Faiveley places considerable weight on the presumption, frequently applied in this Circuit, that the damage caused by trade secret misappropriation ordinarily "cannot be measured in money damages." FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984) (per curiam); Payment Alliance Int'l, Inc. v. Ferreira, 530 F. Supp. 2d 477, 480 (S.D.N.Y. 2007) (applying presumption based on FMC Corp.); Ivy Mar Co. v. C.R. Seasons, Ltd., 907 F. Supp. 547, 567 (E.D.N.Y. 1995) (same). That presumption is based on the theory that "[a] trade secret once lost is, of course, lost forever." FMC Corp., 730 F.2d at 63. While that

---

The Court rejects Wabtec's argument that Faiveley's delay in seeking this injunction belies its claim of irreparable harm. See Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) (stating that "[a]though a particular period of delay may not . . . bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction"). Wabtec points to various events in the Spring of 2007 indicating that Faiveley had, at the least, become "suspicious" that Wabtec was misappropriating its trade secrets, but alleges that Faiveley unjustifiably delayed an additional five months before filing this suit in October 2007. But even if there were some bright-line rule about what length of delay presumptively indicates a lack of irreparable harm, which there is not, see Eve of Milady v. Impression Bridal, 957 F. Supp. 484, 490 (S.D.N.Y. 1997), no such presumption is warranted here. It was only on September 5, 2007, that NYCT denied Faiveley's protest of its award of the R-142A contract to Wabtec; up until that time, it was not unreasonable of Faiveley to believe it might obtain the R-142A contract by means short of a lawsuit. See Inflight Newspapers v. Magazines In-Flight, L.L.C., 990 F. Supp. 119, 124 (E.D.N.Y. 1997) (finding it reasonable for plaintiff to wait until it actually lost a particular contract before seeking the "drastic relief" of a preliminary injunction).

15

may be true in the typical trade secret case, however, it is not true in all of them. See Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955, 966 (S.D.N.Y. 1996). Consequently, where there is no danger that a trade secret will be "lost forever," the presumption is not warranted.

Here, the primary loss that Faiveley is claiming – the loss of the R-142A contract to Wabtec – is monetary in nature. Faiveley contends that if Wabtec were enjoined from supplying the BFC TBU parts allegedly based on misappropriated trade secrets, New York City Transit would instead award the contract to Faiveley and obtain those parts from Faiveley – albeit after a delay of a few months. Faiveley itself, however, has delayed in taking the steps necessary to become a registered supplier to the City, and has now retracted a representation made to the Court that it had in fact completed those steps. Faiveley Transport Malmo AB's Response to Wabtec Corporation's Post-Hearing Memorandum ("Faiveley's Post-Hearing Response") at 8 n.10.[11] In any event, if Wabtec were not enjoined from performing under the contract, and Faiveley therefore did not obtain it, Faiveley would have suffered only the monetary loss associated with the value of the contract. Such a loss is obviously compensable in monetary damages.

Morever, there is no evidence that allowing Wabtec to carry

---

[11] The Court's observation of the conduct of Faiveley's representatives at the evidentiary hearing leads it to believe that this misrepresentation was the fault of Faiveley's own personnel, and not its counsel; but it was nonetheless a serious misrepresentation and should have been corrected in more than just a passing footnote.

16

through on the R-142A contract will cause any of Faiveley's trade secrets to be "lost forever."  Wabtec is not disseminating Faiveley's manufacturing drawings or other know-how to any third parties; indeed, Wabtec appears to be treating them with the same confidentiality that they give to their own proprietary information, that they gave to Faiveley's proprietary information during the course of the License Agreement, and that they presumably are continuing to give to Faiveley's proprietary information in the context of the so-called grandfathered contracts.  Because there is no reason to conclude that Faiveley's trade secrets will be "lost forever" absent injunctive relief, the Court does not believe has made a sufficient showing of irreparable harm to support an injunction of the R-142A contract.  See Geritrex Corp., 910 F. Supp. at 966 (S.D.N.Y. 1996)(finding no irreparable harm in trade secret case because plaintiff did not allege any danger of defendants' disseminating its trade secrets to third parties).

There remains at least the theoretical possibility that New York City Transit could, in the course of the R-142A contract, acquire information from Wabtec consisting of trade secrets misappropriated from Faiveley.  Based on testimony at the hearing, however, the Court's understanding is that neither Faiveley nor Wabtec, in the ordinary course of business, pass on manufacturing drawings (which Faiveley claimed in this case were the documents memorializing its trade secrets) to customers like New York City Transit.  See, e.g., Tr. 285:17-19.  Moreover, Wabtec has been supplying New York City Transit with BFC TBU parts for many years

17

under a grandfathered contract, and the Court heard no evidence suggesting that New York City Transit was acquiring Faiveley's trade secrets through Wabtec's performance under that contract. Nonetheless, as a precautionary measure, <u>Wabtec is hereby enjoined from providing New York City Transit with manufacturing drawings during the course of the R-142A contract</u>. If Wabtec believes, now or at some later point, that it has need to do so, Wabtec and New York City Transit may come before the Court to seek a modification of the injunction.[12]

     Apart from the R-142A contract, Faiveley's request for injunctive relief touches on two other classes of contracts. The first is the so-called grandfathered contracts. Faiveley, in its post-hearing submissions, states that "Wabtec has not established that it is entitled to supply products to [New York City Transit] pursuant to [a grandfathered] contract," that "Wabtec never came forward with evidence to establish that [grandfathered] contract may be supplied post-termination of the 1993 License Agreement," and that "Faiveley has never acknowledged that Wabtec does, in fact, have the right to sell Faiveley's products under the [grandfathered] contract post-termination." Faiveley's Post-Hearing Response at 8-9 & n.11. Moreover, Faiveley's Proposed Order Granting Preliminary Injunctive Relief appears to enjoin performance under all BFC TBU-related

---

[12] At that point, the Court would consider joining New York City Transit to this lawsuit and enjoining it from further distributing any trade secrets coming into its possession. However, the Court will deal with any such issues if and when they arise.

contracts, including the grandfathered contracts. The Court, however, neither heard nor saw any evidence during the hearing to suggest that Wabtec is not entitled to continue performing under contracts entered prior to the termination of the License Agreement, and the text of the License Agreement is inconsistent with that position. Pet. Ex. 1 § 22.1.1. Accordingly, the Court will enter no injunction with respect to any contracts Wabtec entered prior to the termination of the License Agreement.

The final class of contracts falling within the scope of Faiveley's proposed order consists of contracts that Wabtec has not yet entered. As explained above, Faiveley may suffer "irreparable harm" only if its trade secrets are released to third parties and the public and are thereby "lost forever." Were Wabtec to continue to enter additional contracts to provide BFC TBUs based on Faiveley's likely-misappropriated trade secrets, the risk of further dissemination would become unacceptably high. Consequently, <u>Wabtec is hereby enjoined from entering into, or bidding for, any new contracts to manufacture, supply, or sell any BFC TBUs, or BFC TBU parts, kits or components until the Arbitral Tribunal renders a final determination on the parties' dispute, and all appeals therefrom have been exhausted or concluded.</u>

For similar reasons, <u>Wabtec is likewise enjoined from providing to any third party in some other context those manufacturing drawings or other materials that contain Faiveley's</u>

19

<u>trade secrets as described above.</u>[13]

In sum, the injunctive relief underscored above is hereby granted, and the motion for injunctive relief is in all other respects denied. Since this disposes of all present issues in this case, the Clerk of the Court is directed to place this case on the Suspense Calendar, pending further developments.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       August 22, 2008

---

[13] Faiveley's proposed Order Granting Preliminary Injunctive Relief also directs Wabtec to deliver to Faiveley all documents, information and materials related to Faiveley's trade secrets. However, Faiveley's Statement of Issues in the parties' Joint Prehearing Statement said nothing of this issue. Even assuming <u>arguendo</u> that this issue is preserved, the Court declines to enter any injunction with respect to the return of documents or materials. The Licensing Agreement plainly says that Wabtec "shall return to [Faiveley] immediately <u>when having finished manufacture as referred to in 22.1.1 above</u>," which discusses the grandfathered contracts, "all the documents transferred [as part of the License Agreement], and shall not retain copies thereof." Pet. Ex. 1 § 22.1.2. As the Court does not enjoin Wabtec's continued performance under any such grandfathered contract, and, in any event, the Court's injunction prohibits Wabtec from disseminating any materials in its possession or entering contracts based on those materials, the Court declines to enter any injunction with respect to the return of documents or materials. The Court likewise declines to enter any injunction with respect to an "accounting" of such documents and materials, as Faiveley has also requested by way of its Proposed Order Granting Injunctive Relief.